FILED - GR
April 19, 2023 1:10 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:JMW SCANNED BY: JW /4-19

KATHERINE L. LAWRENCE )
)
    Plaintiff, )    Hon: Hala Y. Jarbou
)
v. )
)
BRIAN J. PRIEST, )    Case No. 1:23-cv-356
UNITED STATES OF AMERICA )
)
    Defendants. )
_____ )

## VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, INJUNCTIVE, AND EQUITABLE RELIEF

    The Plaintiff, Katherine L. Lawrence[1] hereby brings this complaint against the Defendants, Brian James Priest and the United States of America ("the Government"), and for her Complaint states as follows:

### I.    INTRODUCTION

    This case raises constitutional claims under the First, Second, Fourth, Fifth, and Fourteenth Amendments. To narrow or more concisely state the issues and claims for the Court: The Plaintiff attempted to purchase a handgun in 2020, but she was declined because she became suicidal in September of 2016 and was involuntarily committed to a hospital in Auburn Hills, Michigan because of the perjury set forth in **Exhibit BB** by Defendant Priest. The reason she became suicidal is because she has been the victim of so many committed, discussed, and intended felonies since graduating from law school in May of 2005 that she has now lost count of them all. She simply wants what she has wanted since graduating from high school in 1998: to

---

[1] For the reasons explained herein, the Plaintiff respectfully submits this filing under her mother's maiden last name.

be able to speak freely, including with her own mother, the same legal career that she invested thousands of dollars into, to live her life with the person she chooses, and to be left alone. The Plaintiff became suicidal after: (1) she was sexually assaulted shortly after graduating from law school in May of 2005, summa cum laude, with a published law review article addressing the Partial Birth Abortion Ban Act, the deliberate politicization of the federal judiciary, and threats that were being made against federal judges that was immediately cited in a Supreme Court amicus brief filed by the Cato Institute in *Gonzalez v. Carhart* in 2006;[2] (2) was electronically stalked and terrorized in the manner described in **Exhibit C** while she was clerking for now-Michigan Court of Appeals Judge, the Honorable Christopher P. Yates, inside his chambers due to a prior romantic relationship with the Defendant, Brian James Priest using an all-encompassing form of technological power that she could not explain at the time; (3) her federal jurisdiction professor, Sixth Circuit Judge David W. McKeague insisted on what resulted in a Secret Service investigation that was discontinued after Edward Snowden came forward without providing the Plaintiff with any answers or information; (4) she was physically, professionally, and sexually threatened in a courthouse in Kentucky and August of 2013, and then openly harassed for two years with being held in contempt of "the Government" for repeating the same principles of federal jurisdiction that Judge McKeague taught her in appellate briefs; and (5) she was threatened with rape between between October of 2014-2015 in the manner described in **Exhibit B** for speaking about threats to her own physical safety and that of judges having to do

---

[2]Katherine L. MacPherson, *Devising an Appropriate Standard of Review: An Analysis of Congress's Findings of "Fact" Within the Partial Birth Abortion Ban Act of 2003*, 2005 MICH. ST. L. REV. 713 (cited at: www.cato.org/sites/cato.org/files/pubs/pdf/ alberto_gonzales_v_leroy_carhart_amicus_brief_05-380.pdf?q=supreme-court-of-the-united-states)

with the surreptitious theft and sale of the private homes addresses and contact information for federal judges.

Notwithstanding everything set forth in **Exhibit B**, Congress deliberately sat on legislation to protect the private home addresses of federal judges until last year for leverage purposes, after Judge Esther Salas's son, Daniel, was murdered due to gun violence in 2020.

For that reason, this is a unique case insofar as it involves the prior statements, rights, and interests of the Plaintiff and the federal district court, Sixth Circuit, Ninth Circuit, and Michigan judges identified herein, their current and former law clerks, and their family members. On September 22, 2022 in *Snyder-Hill, et al. v. Ohio State University* (Sixth Cir. Case No. 21-3981), the Sixth Circuit Court of Appeals held that the discovery rule applies in the Sixth Circuit, stating: "The discovery rule recognizes that, without certain information, a plaintiff has no viable claim."[3] This has been the problem throughout the history of this case, and it is the reason this Complaint is lengthy. In an interview on CNN this summer discussing the rise in violence and threats against federal judges, Judge Esther Salas stated: "facts are facts." She further acknowledged the current state of democracy and noted that authoritarianism starts with capturing and toppling the judiciary. In a recent Twitter post, a user further commented that because of the pace at which litigation moves, and because the justice system is grossly underfunded, the federal court system and the Supreme Court have missed some incredibly

---

[3] Stating: "That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. This lack of knowable information leaves the plaintiff 'at the mercy of' the defendant and unable to file suit. To say to one who has been wronged, 'You had a remedy, but before the wrong was ascertainable to you, the law stripped you of your remedy,' makes a mockery of the law. The discovery rule ensures that plaintiffs in this position still have a remedy." *Id*. (Internal citation omitted).

important separation of powers issues. Most importantly, Chief Justice Roberts recently echoed the exact sentiments that the Plaintiff has recently expressed very loudly and publicly from her Facebook account regarding threats against federal judges.

The Plaintiff was barred in Michigan, Oregon, and Washington, worked on *In Re: 9/11 Litigation* on behalf of Boeing from 2007-2009, accepted a career clerkship offer and was vetted for a top secret security clearance for purposes of taking over responsibility for what she was told was "an espionage case," and relocated from Seattle to Oahu in reliance on the express language of the application including the Privacy Act reassurances set forth at the bottom of every page of the application. The Plaintiff's federal jurisdiction professor, Sixth Circuit Judge David W. McKeague, whose confirmation and elevation to the Sixth Circuit was being deliberately held up for political reasons until June of 2005, swore the Plaintiff into the Sixth Circuit via a private for physical safety-related reasons swearing-in ceremony in April of 2006, but he was not informed of the reasons. *See* **Exhibit B**. He was also one of three people who convinced the Plaintiff to apply for federal clerkships beginning in the Fall of 2008, while she was working on the 9/11 Litigation, along with the Plaintiff's contracts professor at MSU, Dan Barnhizer, who she reported her sexual assault to, and one of Justice Kennedy's female law clerks in Seattle, Lisa Manheim. The one and **only** reason the Plaintiff gave up a six figure salary and applied for federal clerkships after four years in private practice was so she could have the same constitutional law-focused appellate practice specialty and career path that Justice Roberts was famous for and the Plaintiff fell in love with after the second semester of her first year of law school.

The Plaintiff established her first Facebook account in August of 2006, shortly before she discovered the above-cited Supreme Court amicus brief citation and at the insistence of her maternal cousin, Justin Lawrence, whose father, unbeknownst to the Plaintiff at the time, is best friends with the father of a Navy SEAL, Craig Kobza. She further did so with the privacy and information settings deliberately set as tightly as possible for what were exceedingly good physical safety-related reasons using the same personal Yahoo email account that she was required to have for purposes of federal financial aid since 1998, and is listed on the cover of her top secret security clearance application. *See* **Exhibit A**. The Plaintiff met Defendant Priest because of her relationship with Judge McKeague; specifically, after she unexpectedly reconnected with her first love from high school, David Wing, who found her on Facebook in January of 2010, switched from a Perkins Coie I.T. Department provisioned Blackberry to the first AT&T Apple iPhone the same month, flew from the Honolulu International Airport ("HNL") to the Ford International Airport ("GRR") to interview with Judge McKeague in March of 2010, and Defendant Priest sent the Plaintiff a Facebook friend request. The Plaintiff accepted the friend request for three reasons: (1) she is the same childhood emotional abuse victim that has been flying as an unaccompanied minor and relying on air traffic controllers for her physical safety since 1986, and Facebook informed her that he was "mutual high school friends" with the Plaintiff's high school classmate, Joe Thue, who is an air traffic controller in Chicago, IL; (2) the Plaintiff was aware of the fact that the FAA had federally preempted the entirety of air traffic safety and regulation and that Mr. Thue was required to have a security clearance to be an air traffic controller; and (3) she expected the Government to investigate and prosecute if Defendant

Priest became a threat to her later since it isn't "optional" to investigate on behalf of a judge or one of their daughters.

The Plaintiff met Defendant Priest after he posted a brilliantly written Facebook note about the killing of Osama Bin Laden on May 2, 2011. As he was leaving her in August-September of 2011, he asked her if she had "ever had to hurt someone intentionally before," told her that he "never intended to disappear from her life forever," and said he would be back in "four years."As a consequence, the Plaintiff applied to the National Security Agency's ("NSA") appellate division in Washington D.C. in September of 2011, because she had already been vetted for the top secret security clearance required by the job posting in 2009, and she already believed that Defendant Priest worked for the same agency or did something else a lot more classified. In March of 2012, Defendant Priest began working for the Plaintiff's cell phone service provider, AT&T. According to a reporter with whom the Plaintiff recently spoke about this case, his LinkedIn page now says that he began working for AT&T in May of 2011, the same month that Osama Bin Laden was executed. Beginning in September of 2011, the Plaintiff became an electronic stalking victim, which encompassed every electronic device, account, her cell phone, and her computer in Judge Yates' chambers. In May of 2012, the Plaintiff lost her job clerking for Judge Yates over his objections for that reason. In February of 2013, Judge McKeague insisted on what resulted in a Secret Service investigation that was deliberately discontinued in June of 2013, immediately after Edward Snowden came forward, without providing her with any answers or an explanation after the Plaintiff gave Judge McKeague the following hypothetical: "Hypothetically, let's say you knew a girl, we'll say it's me, who is in love with someone that she is positive is either CIA or NSA, but she's being electronically talked

and doesn't know what to do. How would she go about finding that information out?" *See*

**Exhibit B** at p. 1. Instead, he insisted that what she was experiencing was "criminal," that she go

talk to AUSA Tim Verhey in Grand Rapids, and that she tell AUSA Verhey that he sent her. *Id.*;

**Exhibit C** at p. 3. One month before the investigation was discontinued, in May of 2013, the

Plaintiff attended her maternal grandparents' joint memorial and learned for the **first** time that

her maternal uncle is best friends with the father of a Navy SEAL. Like Judge McKeague, Mr.

Kobza was extremely concerned and informed the Plaintiff that "only the NSA" has the

technological power to deceive a cell phone tower in the manner evidenced on the cell phone bill

and screenshots from March-April of 2012 attached hereto as **Exhibit G** because it coordinates

the communications for his son. He further instructed her on how to set up her laptop like a mini-

Navy SEAL, gave her all kinds of inside information discussed in more detail herein, and told

her to contact the Secret Service immediately while the investigation was still pending.

        Next, beginning in August of 2013, the Plaintiff was physically, professionally, and

sexually threatened in a federal courthouse in Kentucky, and then openly threatened and harassed

with criminal contempt of "the Government" for over two years by an AUSA in Kentucky and a

Kentucky district court judge for: (1) repeating the same principles of federal jurisdiction that

Judge McKeague taught her in appellate briefs; (2) complying with her ethical obligations; (3)

arguing adherence to Supreme Court and published Sixth Circuit precedent and an entire

congressional statute that was enacted to avoid the financial liability associated with this case;

and (4) speaking about threats to her physical safety in appellate briefs filed with the Sixth

Circuit. The facts of this case are exactly as absurd and ethically prohibited as that. One of those

cases, *United States v. Grooms*, specifically raised the NSA's surveillance practices in the context

of the warrantless search of a cell phone and made the first third-party Fourth Amendment

standing argument in accordance with Justice Sotomayor's concurring opinion in *United States v.*

*Jones*, 565 U.S. 400 (2012) (installing a GPS tracking device on a vehicle constitutes a search

within the meaning of the Fourth Amendment).

In October of 2013, and because of the unprecedented nature of those threats and various

events or conversations that took place between May and October of 2013, the Plaintiff went to

the AT&T store on Henry St. in Muskegon and asked Defendant Priest to set up a burn number

for her. In January of 2014, the Plaintiff learned about the existence of *Clapper v. Amnesty*

*International*, 568 U.S. 398 (2013), that the Solicitor General had accidentally violated the duty

of candor when arguing that the Plaintiffs lacked standing to challenge the FISA Amendments

Act of 2008, and that Senator Feinstein accidentally admitted to the press that the NSA, which

reports to the Department of Defense,[4] began collecting and sharing illegally obtained

information with federal law enforcement agencies in 2004 — one year before the Plaintiff

graduated from law school, while she was working on a law review article that opens with a

famous quote by George Orwell, and one year before Justice Roberts became Chief Justice.

In February of 2014, and for that reason, the Plaintiff sent the FOIA request attached

hereto as **Exhibit C** to the same National Security Agency whose appellate division she applied

to in September of 2011, the same month the stalking began. The FOIA request explained the

electronic stalking and terrorization of herself due to a prior romantic relationship with

Defendant Priest and requested **expedited** consideration for that reason, which the NSA had

---

[4] As in, defending the same constitutional rights on a battlefield that the Plaintiff used to defend
in a courtroom.

twenty days to respond to. In April of 2014, a Rule 28(j) supplemental appellate brief that the Plaintiff filed in the above-referenced Tennessee Sixth Circuit CJA-appointed case involving the warrantless search of a cell phone, *United States v. Grooms*, was disclosed to the district court judge in Kentucky, who issued a sealing order for a speech and it was offered into "evidence" to be used against the Plaintiff in conjunction with the above-referenced contempt of "the Government" motion. In May of 2014, the Plaintiff drove from Grand Rapids, Michigan to Washington D.C. and hand-delivered an emergency application to the Supreme Court with the burn number listed on the cover that was set up for her by Defendant Priest. Justice Ginsburg set it for conference and it resulted in S. Ct. Case No. 13-A-1101. Between May and August of 2014, the Plaintiff drafted and filed a Certiorari Petition, S. Ct. Case No. 14-205, with a list of questions presented that were not supposed to be constitutionally or ethically possible while not sleeping for 2-4 days at a time, along with a Supplemental Brief explaining how certain cases and issues were being deliberately and technologically timed, the effect of which had closed her out of the Supreme Court.

In August of 2014, she was informed that her Sixth Circuit CJA-PACER account had been hacked and her login credentials were used to remove her CJA designation one year earlier, so she could not get paid on her affected Sixth Circuit CJA-appointed cases. In October of 2014, after receiving the denial of the Certiorari Petition, the Plaintiff became so worried about the physical safety of the Justices and herself that she retroactively remembered and decided to look up the facts of the same "espionage case" for the first time, which she never actually ended up working on while she was clerking for Judge Gillmor and the Ninth Circuit opinion for which only became publicly available in July of 2014. She was astonished by the associated lethality,

reflected harm, and intent as to herself. The same month, and for that reason, the Plaintiff hand-delivered a draft filing to Defendant Priest at the AT&T store on Henry St. in Muskegon explaining who and what she believed he was and reminding him of his promise to come back to her in four years. In response to that hand-delivery, he changed his publicly visible Facebook photos to an album of wedding pictures, which was how he had previously communicated with the Plaintiff as is detailed in the letter to Judge Yates attached hereto as **Exhibit F**. The Plaintiff spent an entire year revising that filing while: (1) being threatened in the above-referenced Kentucky case and not sleeping for up to a week at a time; (2) running out of money and time; and (3) being threatened on Facebook. In October of 2015, Defendant Priest then tried to make the Plaintiff kill herself when he got engaged to someone else, and in September of 2016 when he perjured himself in the PPO attached hereto as **Exhibit BB**. A week after Defendant Priest tried to make the Plaintiff kill herself in October of 2015, and twenty months after the Plaintiff sent the FOIA request attached as **Exhibit C**, the NSA finally responded and informed her that **all** of the documents and evidence that she was seeking about **herself** and her own electronic stalking were "classified," notwithstanding the fact that no man is supposed to be "above the law," her top secret security clearance application and approval was on file and still valid, but by that point, she was barely coherent and could no longer write.

In terms of the Plaintiff's state of mind, as a direct result of her separation from Defendant Priest in September of 2011, being alone without anyone to physically protect her, and the electronic stalking, the Plaintiff stopped sleeping for, at first, 1 to 3 days at a time, meaning that she would stay awake for three days, crash, and then do it all over again. In fact, every appellate brief that she filed after September of 2011 was drafted under those conditions, and

every extension that she sought in her Sixth Circuit CJA-appointed cases was due to various

computer-related issues that she was having. As a result of the additional contempt-related

threats, that gap widened to 2 to 4 days at a time. Between October of 2014 and October of 2015,

the Plaintiff stopped sleeping for up to a week at a time while: (1) she was being threatened with

the same contempt power that decided *United States v. Nixon* for being the same, but female,

appellate lawyer as Justice Roberts and Judge Yates' former wife, D.C. Court of Appeal Judge

Corinne Beckwith; (2) she would stop breathing every time she started to fall asleep and wake up

gasping for breath; (3) she was running out of money and time; and (4) she suffered through a

predictable and deliberately caused nervous breakdown as was stated above. This was

compounded dramatically by the fact that in April-June of 2015, the Plaintiff along with the rest

of the public learned for the first time that there was a hidden component of the same AT&T

Apple iPhone operating system that the Plaintiff switched to in January of 2010, while she was

clerking for Judge Gillmor, that let any application downloaded surreptitiously steal and sell a

user's entire cell phone, Facebook, and email contacts list without their knowledge, awareness,

consent, or permission. In the Plaintiff's case, that list contained either the private home

addresses, email addresses, contact information, or cell phone numbers for (in the following

chronological order): (1) Judge McKeague (2004-2005); (2) one of Justice Kennedy's female law

clerks in Seattle, Lisa Manheim (2007-2009); (2) Judge Gillmor (2009-2010); (3) Judge David

Ezra (previously in Hawaii, now in Texas) (2009-2010); (4) all of the law clerks on Oahu; (5)

Judge Yates (2010-2012), and Judge Beckwith, who clerked for Justice Stevens (1993-1994),

which represented the value of the Plaintiff's entire life, legal education, and career. So, while the

Plaintiff didn't have enough contacts to qualify when she applied to be a financial advisor at

Edward Jones before the events on September 11, 2001, those same contacts were later stolen from her own cell phone and sold, which made her cry so hard when she read about that for the first time that her nose started bleeding profusely and she couldn't make it stop.

The same day the Plaintiff learned that information, federal marshals showed up at the home of the person she was living with in Cedar Springs, Michigan. According to Judge McKeague's career law clerk, Paul, who the Plaintiff spoke with over a year later in July of 2016, Judge McKeague was the person who sent them, and they were supposed to do what the Plaintiff asked and get her what she needed.

They didn't listen to a single thing she said.

One of the federal marshals, who was so old then that he retired the following year and knew nothing about technology, specifically asked her "what she needed," her answer to which was: "BRIAN," and she couldn't have said it any louder or more crystal clearly. Instead of just bringing the Plaintiff to Defendant Priest and to Judge McKeague so they could all talk in a safe environment and the Plaintiff could verify what communications they had received in-person, the federal marshals treated her like some stupid, hysterical woman and let her continue to suffer in silence. Despite her later discovery that they run the Witness Protection Program, they didn't see a problem with the above-described theft and sale of the home addresses of federal judges, law clerks, and **all** of the Plaintiff's private information. *See* **Exhibit B**.

Between October 6-8, 2015, the Plaintiff had the same combination of people from March-August of 2010: Judge McKeague, AUSA Tim Verhey, Defendant Priest, and Judge Yates personally served with a copy of the resulting 100+ page filing that took her an entire year to revise while she was suffering through a nervous breakdown, which was titled: In Re "Blank

12

Check," In Re Members of the Judiciary, Anonymous Supreme Court Bar Member, Anonymous Government Agency Employee, explained the exact, sexual assault-related manner in which the Plaintiff was being threatened, and further requested a federally issued PPO for **both** herself and Defendant Priest. She then met with the same marshals, one of which, Steve Heatherington, who the Plaintiff initially encountered in April-June of 2015, had the copy for Judge McKeague in his hands, said he "didn't get it," and sternly informed her that "federal judges don't like to be served." Then, they funneled her right back to the same parental relationship that she climbed out of her bedroom window to escape from in 1997. After she filed a complaint electronically over the patriarchal, sexist manner in which they ignored everything she said, actually asked her "what her relationship with her father was like," but then didn't listen when the Plaintiff specifically told them **not** to contact her father and further emailed them an explanation of the reasons why,[5] they manipulated the Plaintiff's father and advised him on how to get a Britney Spears-style conservatorship in September of 2016. He had her involuntarily committed when she became suicidal over that fact and the perjury set forth in the above-referenced PPO, both of which, the conservatorship and the PPO, also toll all applicable statutes of limitations.

So, the same, but female, appellate lawyer temporarily lost her legal rights and her ability to pursue a remedy on her own behalf at that time.

The Plaintiff spent September of 2016 through May of 2019 alone, miserable, and wishing that she were dead trying to get over the idea that Defendant Priest wanted her dead, and that her legal career was somehow over because she complied with her ethical obligations. It takes **years** to recover from that kind of psychological trauma, and until 2022, the Plaintiff had a

---

[5] *See* **Exhibit B.**

13

PTSD-type response anytime she tried to write anything. Healing isn't possible without answers, a full explanation, and actual justice. In May of 2019, the Plaintiff started her current sales job. Because she has the same sweet, charming, funny personality, and extremely dry, sarcastic sense of humor that resulted in the above-described friendships, personal and professional relationships, and an extremely monetarily valuable flight record, cell phone, Facebook, and email contacts list, she has quadrupled every sales record for the company that she works for and is loved by every one of her co-workers and customers.

She literally collects people's contact information for a living.

In October of 2019, the conservatorship that the Plaintiff never needed to begin with was terminated and Judge Feyen called her "a success story." In September of 2020, the Plaintiff met someone who she dated for a brief period of time, is now her best friend, knows the full story set forth herein, is a gun owner, took her shooting, and encouraged her to buy a gun for protection after everything she's been through. When she attempted to do so later, she was shocked to learn that she couldn't because her father had her involuntarily committed in 2016. Since Judge Feyen terminated the conservatorship and deemed her a "success story," she was operating under the assumption that that adjudication would carry over. Upon further research, the Plaintiff learned of the Sixth Circuit's decision in *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678 (6th Cir. 2016) (holding that a person who was involuntarily committed for becoming suicidal over a divorce is not permanently barred from possessing a firearms and may seek restoration of his or her right in federal court).

In July of 2021, the Plaintiff finally ran into Judge McKeague again, who she was exceptionally angry on behalf of between 2004-2005 while revising her law review article, and

14

she had not seen or spoken to since April of 2014. Their conversation and the two specific

questions he asked her: (1) whether she had "fixed her relationship with her parents;" and (2) if

she "was happier now" immediately indicated that, somehow and just as otherwise inexplicably,

he had no idea what she suffered through after April of 2015 despite her emails to him describing

the same. *See* **Exhibit B**. Defendant Priest is exactly as important to the Government as the

Plaintiff previously stated that her communications with the same federal jurisdiction professor

were blocked, and Defendant Priest was allowed to commit perjury in a PPO filed in state court

with impunity.

Even though, once again, no man is supposed to be "above the law."

On May 2, 2022, the eleven year anniversary of Osama Bin Laden's execution, the

Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. \_\_\_

(2022), overturning *Roe v. Wade* was leaked. On May 21, 2022, the eleven year anniversary of

the Plaintiff's first date with Defendant Priest, someone hacked into Verizon's system, changed

her cell phone SIM information, and registered it to a different device so she couldn't make or

receive any phone calls or text messages. Upon going into the store, the customer service person

told her that this was technologically "impossible" and sent her the associated screenshots as

evidence. For what should be obvious reasons, the Plaintiff is getting really tired of hearing that.

She is also just as tired of dealing with this, which has cost her millions of dollars in cell phones,

computers, lost time, lost wages, and she has had so many email addresses and passwords at this

point that she has lost count of them all. In June of 2022, the Plaintiff drove to Lansing, went to

the Michigan Attorney General's Office, and spoke with a female attorney in the Civil Rights

Division by phone, who was incredibly kind, empathetic, and listened to the full story. Like

Judge McKeague, she agreed that most of what the Plaintiff had described is criminal, and she suggested that the Plaintiff start with local law enforcement. Local law enforcement, including a Grand Haven police officer who also has a J.D., was a Muskegon County Prosecutor for a brief period of time, and actually had Judge McKeague for federal jurisdiction, doesn't know what to do with this case.

The Plaintiff's law review article-Supreme Court amicus brief citation, OSCAR clerkship application packet, top secret security clearance application, the specific cases on which she worked, and current political reality turned her into reflected harm. The federal marshals run the Witness Protection Program and are responsible for protecting federal judges. The Plaintiff was home and literally **witnessed** the murder of thousands of American citizens on September 11, 2001. She wrote a law review article with a section titled: In **Defense** of the Judiciary because she was exceptionally angry about the death threats and deliberate politicization of the federal judiciary that has continued and become exponentially worse since that time. She is currently reading a book written by a federal marshal called *Extreme Privacy: What it Takes to Disappear*, because she wants to leave the country. One of the reasons the Plaintiff wrote the article was because other federal judges had requested guidance. Since the Plaintiff was extremely familiar with the friend of the court as a child, an amicus brief is otherwise known as a "friend of the court" brief, and the Plaintiff's law review article was cited at the Supreme Court level, she respectfully submits that she is a friend of every judge and law clerk in the country who would treat her with dignity and respect regardless of her gender. Furthermore, the Plaintiff's work on the 9/11 Litigation; one of the two writing samples that she submitted for purposes of her OSCAR clerkship application packet in the Fall of 2008, specifically addressed the reasonably

16

foreseeable criminal misuse of a product in the context of gun and ammunition manufacturers. Shortly after Defendant Priest left the Plaintiff in September of 2011, the husband of one of her high school acquaintances, Garry Johnson, threw the Plaintiff into a brick wall while she was trying to physically protect her high school friend, Shannon Johnson, from his abuse. In exchange for pleading guilty to domestic violence in September-October of 2011, the assault and battery charge as to the Plaintiff was dismissed. On March 24, 2023, Mr. Johnson managed to have the conviction expunged, the consequence of which is that he will be able to legally purchase a gun. During the course of preparing to speak as a victim in that case, a local prosecutor told the Plaintiff that she should go to the FBI regarding the stalking.

The same FBI that sponsored her own top secret security clearance.

Had the Plaintiff still been dating Defendant Priest in late September of 2011, he would have pummeled Mr. Johnson for assaulting her; however, because the Plaintiff became suicidal over the level of perjury set forth in the PPO that Mr. Priest filed in September of 2016 and her father had her involuntarily committed, Defendant Priest is also the reason the same repeated female crime **victim** can no longer purchase a gun to protect herself. Mr. Johnson screamed obscenities at the Plaintiff, picked her up, threw her into a brick wall, doesn't believe in facts, and should **not** be able to own a gun. The Plaintiff, on the other hand, is now learning the same, extremely violent form of self-defense that Daniel Lewin, who was the first victim that died on September 11, 2001, was intimately familiar with as a member of Israeli Defense Forces for the same hatred, violence, antisemitism, and misogyny-related reasons that now pervade American society. For that reason, the Plaintiff re-activated her Facebook account in August of 2022, made her Facebook posts public, and began openly advocating on behalf of most of the judicial branch,

female federal judges and law clerks, Merrick Garland, Jack Smith, Liz Cheney, "Team DOJ-National Security," and federal law enforcement officers and agency employees: (1) whose lives are increasingly at risk due to the fomentation of hatred and violence for money and advertising dollars; (2) who certain "pro-life" politicians said should be "shot on sight" while campaigning during the mid-terms; and (3) whose female family members can now die from a life threatening pregnancy-related complication in states like Texas where Judge Ezra and his granddaughters live, because of the same refusal to acknowledge objective medical facts that the Plaintiff wrote about in the context of abortion in the same law review article, and Judge Salas spoke about on CNN last summer.

Finally, the Plaintiff respectfully contends that: (1) the facts are exactly as egregious as stated and there is no defense in this case; (2) she is the same sexual assault victim from May of 2005 who was threatened with rape in a courtroom in Kentucky, and then further threatened with rape for making damages calculations on behalf of herself and the judiciary between March-October of 2015 and attempting to inform them about a technology-related threat as it related to the theft and sale of their private home addresses and contact information from the Plaintiff's cell phone; (3) she has exhausted all administrative remedies in the manner described herein, and she was affirmatively harmed for doing so because of the associated financial liability; (4) spying on federal and state judges, Justices, and their current and former law clerks including the Plaintiff, who go on to become federal judges, is a separation of powers violation; (5) end-running their decisions while weaponizing certain Supreme Court decisions and statutes, including the same the Religious Freedom Restoration Act ("RFRA") discussed in the Plaintiff's law review article, is unconstitutional and constitutes gender discrimination post-*Dobbs;* and (6) deliberately

engaging in acts that jeopardize their physical safety violates the decreased compensation clause

of Article III. Further, since it was quite literally **all** for nothing, the Plaintiff relied on the

contractual nature of binding precedent, the express language of her top secret security clearance

application, and Justice Ginsburg's entire legacy, and Justice Scalia's originalism, who was a

staunch Fourth Amendment originalist, has now been used to destroy the legacy of his best friend

while his opinions were ignored and surveillance technology can be used to track women to

reproductive healthcare providers, the Plaintiff respectfully requests: (1) a full accounting and

assessment of damages; (2) that her gun rights be restored; (3) that the Court order the

Government to produce **all** in its possession about the Plaintiff and Defendant Priest, including

those identified in **Exhibit C**; and (4) all other declaratory, injunctive and equitable relief based

on a full review of the facts, documents, and evidence included with this filing.


## II.    <u>JURISDICTION AND VENUE</u>

1.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. 1331, 1332, 1340,

1357, 1361, and 1367, and the Declaratory Judgment Act, 28 U.S.C. 2201-02. This is an action

arising under the Constitution and the laws of the United States, including: Article III, the First,

Second, Fourth, Fifth and Fourteenth Amendments, the Privacy Act, FISA, the Religious

Freedom Restoration Act, the Federal Tort Claims Act, 42 U.S.C. 1983, and all other federal

statutes identified in or related to the Plaintiff's career clerkship offer letter and top secret

security clearance application attached hereto as **Exhibit A**. This Court also has jurisdiction

under Title VII of the Civil Rights Act of 1964 and the Elliott-Larsen Civil Rights Act, as well as

supplemental and pendent jurisdiction over all related claims as they arose out of the same

common nucleus of operative fact and sequence of events.

2.      Venue is proper in this district under 28 U.S.C. 1391(b)(2) and (e)(1), as the

events, omissions, and acts giving rise to the claims identified herein occurred in this judicial

district.

### III.    PARTIES

3.      The Defendant, the United States of America ("the Government"), is subject to

suit for constitutional violations, breach of contract, and personal injury caused by the negligent,

wrongful, or criminal acts and omissions of its employees, officers, contractors, and agents while

acting within the course and scope of their office or employment.

4.      The Defendant, Brian J. Priest, is a resident of the state of Michigan and this

judicial district. Upon information and belief, Defendant Priest is or was a dual employee of both

the Government or one of its agencies and AT&T Communications, Inc.

5.      The Plaintiff, Katherine L. MacPherson, is a licensed attorney who is admitted to

practice in Michigan (January of 2006, current), the U.S. District Court for the Eastern and

Western Districts of Michigan (January of 2006), the Sixth Circuit Court of Appeals (April of

2006), the Ninth Circuit Court of Appeals (July of 2007), and the United States Supreme Court

(July of 2012). She is a resident of the state of Michigan and this judicial district.

### IV.    OTHER RELEVANT OR POTENTIALLY INTERESTED PARTIES

Other potentially relevant and interested parties in chronological order of acquisition,

contact, or referral include: 1. Sixth Circuit Judge David W. MacKeague (2004-2005, 2008,

2010, 2013, 2014); (2) Professor Lisa (maiden name Marshall) Manheim and AUSA Nick

Manheim (2007-2009); (3) Ninth Circuit Judge Richard C. Tallman (2009); (3) U.S. District

Court Judge Helen W. Gillmor (2009-2010); (4) Judge Gillmor's former assistant, Kelly Lovett

(2009-2010); (5) U.S. District Court Judge David A. Ezra (2009-2010); (6) AUSA and Professor

Ryan Dickey (Cybercrimes Division, Washington D.C.); (7) AUSA Tim Verhey; (8) Sixth Circuit

Judge Richard A. Griffin (2010); (9) Michigan Court of Appeals Judge Christopher P. Yates

(2010-2012); (10) D.C. Court of Appeals Judge Corinne Beckwith (2011); (11) Sixth Circuit

Judge Karen Nelson Moore (2011-2012); (12) Sixth Circuit Judge Eric L. Clay (2012-2013);

(13) Sixth Circuit Judge Helene N. White (2012-2013); (14) Sixth Circuit Judge Julia Smith

Gibbons (2013-2014); (15) Sixth Circuit Judge Jane Branstetter Stranch (2013-2014); (16) now-

Chief Sixth Circuit Judge Jeffrey S. Sutton (2013-2014); (17) Professor Erwin Chemerinsky

(2014); (18) U.S. District Court Judge Esther Salas (2020); (19) Senator Debbie Stabenow; (20)

Senator Gary Peters; (21) Governor Gretchen Whitmer.


## V.  RELEVANT LEGAL AND HISTORICAL BACKGROUND

6.      The Supreme Court decided *Roe v. Wade* in 1973. One year later, the Court

decided *United States v. Nixon*, 418 U.S. 683 (1974), and famously applied the principle that "no

man is above the law" to a sitting President. In that case, the Court first examined the issue of its

own jurisdiction and appellate review and held that the district court's order requiring President

Nixon to turn over the Watergate tapes was appealable as a "final" order and was therefore

properly in the court of appeals. In so holding, the Court stated that "although such an order is

normally not 'final' within the meaning of 28 U.S.C. 1291 and subject to appeal, an exception

exists in a "limited class of cases where denial of immediate review would render impossible any review whatsoever of an individual's claims." According to the Court, such an exception is proper "in the unique circumstances of this case where it would be inappropriate to subject the President to the procedure of securing review by resisting the order and inappropriate to require that the District Court proceed by a traditional contempt citation in order to provide appellate review." *United States v. Nixon*, 418 U.S. at 690-692. The Court then famously ordered President Nixon to turn over the Watergate tapes, which would have been enforceable via its contempt power.

7.      President Nixon was subsequently pardoned by President Gerald R. Ford, who nominated the same Justice John Paul Stevens that Judge Yates' former wife, D.C. Court of Appeals Judge Corinne Beckwith, clerked for between 1993-1994, and swore Chief Justice Roberts in (September of 2005), and has both a presidential museum and an international airport named after him in Grand Rapids. A Chief Justice does not **fly** on Air Force One; however, because no man is **above** the law, the only criminal trial that a Chief Justice presides **over** is the impeachment of a President.

8.      Literal, physical contempt of a woman is rape and murder. Literal, physical contempt of the Supreme Court in today's political environment, and in accordance with the facts of the above-referenced "espionage case," *United States v. Gowadia*, would be a nuclear bomb dropped on it from a B-2 Stealth Bomber by the same country that was responsible for the events on September 11, 2001.

9.      In response to the Watergate scandal, Congress enacted the Foreign Intelligence Surveillance Act ("FISA") in 1978, which makes "electronic surveillance under color of law" a

felony unless the procedures outlined in FISA or the Wiretap Act are adhered to.[6] The term

"electronic surveillance" is defined as: (1) "the acquisition by an electronic, mechanical, or other

surveillance device of the contents of any wire or radio communication sent by or intended to be

received by a particular, known United States person who is in the United States, if the contents

are acquired by intentionally targeting that United States person, under circumstances in which

the person has a reasonable expectation of privacy and a warrant would be required;" and (2)

"the installation or use of an electronic, mechanical, or other surveillance device in the United

States for monitoring to acquire information, other than from a wire or radio communication,

under circumstances where the person has a reasonable expectation of privacy and a warrant

would be required." 50 U.S.C. 1801(f)(1)-(4). The statute further states: "there is federal

jurisdiction over an offense under this section if the person committing the offense was an officer

or employee of the United States at the time the offense was committed." In terms of civil

liability, 50 U.S.C. 1810 states that "an aggrieved person…who has been subjected to electronic

surveillance or about whom information obtained by electronic surveillance of such person has

been disclosed or used in violation of section 1809 of this title shall have a cause of action

against **any** person who committed such violation and shall be entitled to recover — (a) actual

damages, but not less than liquidated damages of $1,000 or $100 per day for each day of

---

[6] *See* 50 U.S.C. 1809 (stating: "A person is guilty of an offense if he intentionally — (1) engages in electronic surveillance under color or law except as authorized by this chapter, chapter 119, 121, or 206 of title 18, or any express statutory authorization that is an additional exclusive means for conducting electronic surveillance under section 1812 of this title; (2) discloses or uses information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized by this chapter, chapter 119, 121, or 206 of title 18, or any express statutory authorization that is an additional exclusive means for conducting electronic surveillance under section 1812 of this title.").

violation, whichever is greater; (b) punitive damages; and (c) reasonable attorney fees and other investigation and litigation costs reasonably incurred. *Id.* (emphasis added).

10.     The Privacy Act further provides individuals with a means of accessing government records about themselves. The Department of Justice's Overview of the Privacy Act: 2020 Edition states: "Agencies should process individuals' access requests for their own records maintained in a system of records under both the Privacy Act and the FOIA, regardless of the statute(s) cited, and further explains that "a requester is entitled to the combined total of what both statutes provide."[7] More importantly, 5 U.S.C. 552a(t)(1) states that FOIA exemptions, including "national security" and classified information, cannot defeat Privacy Act access. Thus, if "John Q. Citizen writes to Agency: Please send to me all records that you have on me," both the Privacy Act and FOIA apply.[8] The Plaintiff already did that once, and she was informed that all documents and evidence about herself and her own electronic stalking were classified even though "no man is above the law," and her top secret security clearance application and approval were on file and still valid.

11.     In 1986, the same year the Plaintiff began flying from the Ford International Airport ("GRR") as an unaccompanied minor, Justice Scalia was confirmed to the Supreme Court, and Justice Rehnquist was confirmed as Chief Justice, Congress passed the Money Laundering Control Act of 1986. Title 18 U.S.C. 1956 states: "whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful

---

[7] *See* Overview of the Privacy Act: 2020 Edition, Individual's Right of Access, A. The Privacy Act and FOIA (https://www.justice.gov/option/overview-privacy-act-1974-2020-edition/access#PA&FOIA) (last retrieved January 3, 2023).

[8] *Id.*

activity, conducts or attempts to conduct such a financial transaction, which in fact involves the proceeds of specified unlawful activity…" is guilty of a felony. Title 18 U.S.C. 1957 prohibits a person from engaging in a "monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity." The terms "financial transaction,"[9] "proceeds," "specified unlawful activity," "monetary transaction,"[10] "criminally derived property,"[11] and the fact that such a transaction affected "interstate commerce," are essential elements of such an offense. A "specified unlawful activity," 18 U.S.C. 1956(c)(7) encompasses a vast array of offenses, including "(a) any act or activity constituting an offense listed in section 1961(1) of this title." Section 1961(1) defines "racketeering activity." Racketeering is defined as "any act or threat involving murder, kidnapping…bribery, extortion," which is exactly what the Plaintiff was threatened with in October of 2011, and August of 2013-October of 2015); or "any act which is indictable under any of the following provisions of title 18, United States Code…section" 1503 (relating to obstruction of justice), section 1511 (relating to obstruction of State or local law enforcement). Title 18 U.S.C. 875(c) addresses interstate

---

[9] *See* 18 U.S.C. 1956(c)(4) (stating: "The term "financial transaction" means: (A) a transaction which in any way or degree affects interstate or foreign commerce; (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments; or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft; or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree.").

[10] *See* 18 U.S.C. 1957(f)(1) (stating: "The term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument…by, through, or to a financial institution…, but such term does not include any transaction necessary to preserve a person's right to representation as guaranteed by the Sixth Amendment to the Constitution.").

[11] *See* 18 U.S.C. 1957(f)(3) (stating: "The term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense.").

communications and states: "Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person…shall be fined under this title or imprisoned not more than five years, or both." Title 18 U.S.C. 2261A(1)(B)(2), which criminalizes stalking, further states that whoever "causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of subparagraph (A); or with the intent to…place under surveillance with intent to kill, injure, harass, or intimidate another person, uses…any interactive computer service or electronic communication service or electronic communication system of interstate commerce…" is guilty of a felony.

12.     In 1993, Congress passed the Religious Freedom "Restoration" Act ("RFRA") as a means of end-running the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), which held that when deciding whether neutral, generally applicable laws had the effect of imposing a burden on the free exercise of religion, the required showing was not a compelling state interest, but rather, a rational basis for the law.[12] Instead, the RFRA mandates

---

[12]Katherine L. MacPherson, *Devising an Appropriate Standard of Review: An Analysis of Congress's Findings of "Fact" Within the Partial Birth Abortion Ban Act of 2003*, MICH. ST. L. REV. 2, 714 (2005) at fn. 219 (stating: Congress disagreed and attempted to re-instate use of the compelling interest and narrowly tailored requirements via the Religious Freedom Restoration Act. *City of Boerne*, 521 U.S. at 512-16. Here, the Court felt that the "facts" as found by Congress in the RFRA were a direct attempt to undercut its *Smith* decision. On this issue, the Court made a point to note that deferring to Congress's factual assertions upon review would be tantamount to granting Congress the power to "decree the substance" of the Fourteenth Amendment. This was the case because the legislation was not a protective measure designed to enforce constitutional liberties under the Enforcement Clause, but was instead an attempt to alter the constitutional boundaries of the Free Exercise Clause as previously defined by the Court in *Smith*. Thus, allowing Congress to alter these boundaries would have directly undermined the Court's primary function, which is to interpret and define the scope of Constitutional rights.).

that strict scrutiny be used in any case burdening the free exercise of religion. As the Court also observed in that case, it acts as a super-statute and is incorporated into all federal laws.

13.     The same year, in 1993, Congress passed the Brady Handgun Violence Prevention Act, which mandated the creation of a national database of prohibited purchasers called the National Instant Criminal Background Check Systems (NICS). The Act requires federally licensed firearms dealers to check NICS before selling a weapon. In *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678 (6th Cir. 2016), the Sixth Circuit held that a person who "has been committed to a mental institution" is not permanently barred from possessing firearms. In that case, a Michigan resident, Clifford Tyler, was barred from purchasing a handgun because he became suicidal over a divorce years earlier and was involuntarily committed. When the Gun Control Act was passed in 1968, Congress included a "relief from disabilities provision," allowing the director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to remove a person from the category of precluded purchasers based upon a finding that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of relief would not be contrary to the public interest. However, Congress defunded the program in 1992 barring ATF from granting relief under any circumstances. In other states, Tyler could have sought relief at the state level. In response to the killings at Virginia Tech in 2007, Congress passed the NICS Improvement Amendments Act, which incentivized states to submit names of involuntarily committed persons by providing funding to help establish and maintain reporting systems, but to qualify for funding, states were required to establish their own relief from disabilities programs to restore gun rights to persons excluded due to having been involuntarily committed. Some states, including Michigan, have resisted establishing them. Thus, there was no

way for Mr. Tyler to restore his gun rights and acquire a firearm legally without a federal judge making such a determination.

The same is true of the Plaintiff in this case.

14.    In *United States v. Aleo*, 681 F.3d 290 (6th Cir. 2012), now-Chief Sixth Circuit Judge Jeffrey S. Sutton wrote a lengthy concurring opinion explaining the history of the contempt statute and the concept of inherent authority in the context of using it to sanction a criminal defense attorney for a frivolous filing outside the confines of the contempt statute. Briefly summarized, the Judiciary Act of 1789 conferred on all courts of the United States the power "to punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause or hearing before the same," 1 Stat. 83 (1789); however, in 1826, Missouri District Court Judge James Peck grossly abused this power by holding a lawyer in contempt, imprisoning and disbarring him "for criticizing his opinion on appeal." *Id.* Judge Peck was impeached due to public outcry and nearly convicted in a 21-22 vote. As Judge Sutton observed: "the next time an attorney criticized one of Judge Peck's rulings on appeal, does anyone think the judge could have disregarded Congress's limitations on the contempt power by invoking his inherent sanctioning authority? Of course not: a judge may not use inherent power to end-run a cabined power."

15.    Because of the constitutional harm that can result if a lawyer cannot speak freely or at all in the Plaintiff's case, Congress enacted the contempt statute and placed limitations on

what constituted contempt.[13] The statue expressly states that a court has the power to punish by

fine or imprisonment...contempt of its authority, and **none** other..." 18 U.S.C. 401 (emphasis

added). In *United States v. Shipp*, 202 U.S. 563 (1906), the Supreme Court explained that it is the

one and only court whose jurisdiction and 'inherent authority' is not and can never be limited by

the contempt statute, stating:

> The power and dignity of this Court are paramount. This Court is preeminent as
> speaking the last word for the judicial power, and looks to the Constitution, not
> only for its origin in general, but for its express creation, while inferior Federal
> courts look to Congress for their actual being, functions, and jurisdiction. It may
> be doubted whether Congress could limit the authority of this Court over
> contempts and whether the restrictions of 18 U.S.C. 401 apply to this Court
> although professing to apply to all courts of the United States. An act of Congress
> controls the courts of its own creation, but not this Court, if thereby its organic
> authority and jurisdiction under the Constitution are curtailed. The general and
> inherent authority of this Court, of whatever nature, does not need any statutory
> grant of power and is not subject to statutory restrictions.

16. Section 3 of the Fourteenth Amendment prohibits a person from holding office if

they've "engaged in insurrection or rebellion" against the United States, or "given aid or comfort

to the enemies thereof," which mirrors the definition of Treason set forth in Section 3 of Article

III. Section 4 of the Fourteenth Amendment states: "The validity of the public debt of the United

States (the debt ceiling), authorized by law...shall not be questioned. But neither the United

States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or

rebellion against the United States..." Section 1 of Article III further states that the compensation

---

[13] 18 U.S.C. 401 states: A court of the United States shall have power to punish by fine or
imprisonment, or both, at its discretion, such contempt of its authority, and none other, as — (1)
Misbehavior of any person in its presence or so near thereto as to obstruct the administration of
justice; (2) Misbehavior of any of its officers in their official transactions; (3) Disobedience or
resistance to its lawful writ, process, order, rule, decree, or command.

of federal judges during "periods of good behavior" "shall not be diminished during their continuance in office."

17.     Rule 4(a)(6) of the Rules for Judicial Conduct and Disability Proceedings states: "Failure to Report or Disclose. Cognizable misconduct includes failing to call to the attention of the relevant…chief circuit judge any reliable information reasonably likely to constitute judicial misconduct or disability." Rules 25 and 26 of the Rules for Judicial Conduct and Judicial Disability Proceedings state that in exceptional circumstances, the Judicial Council for the Sixth Circuit may ask the Chief Justice of the United States to review a matter and transfer the proceeding to the judicial council of another circuit.[14] It was the Plaintiff's contention in 2015, and it still is, that it was the responsibility of "her" group of judges to report the events described in this Complaint because they have the power to protect themselves. At the time, however, the Plaintiff was not aware that her communications with her judges had been cut off.

18.     On November 5, 2013, the Sixth Circuit issued a published decision in *United States v. Llanez-Garcia*, 735 F.3d 483 (Sixth Cir. 2013). Judge Gibbons, who wrote the lead opinion in *Tyler* and now sits on the Sixth Circuit Judicial Council, was on the panel in that case, which specifically dealt with a district court's inherent authority to sanction in the context of a female federal public defender. Her opinion opens with the following statement: "An attorney's

---

[14] The Commentary to Rule 26 states that such a transfer is appropriate "where the issues are highly visible and a local disposition may weaken public confidence in the process, where internal tensions arising in the council as a result of the complaint render disposition by a less involved council appropriate, or where a complaint calls into question policies or governance of the home court of appeals."

reputation is her most valuable possession. It forms the basis for her peers' view of her and plays

an important role, often a determinative one, in how she advances her legal career."

The same was true of the Plaintiff between September of 2011 and October of 2016, it

still is, and she wants it back.

## VI.   **FACTUAL BACKGROUND**

The Government cannot dispute the following facts and events because: (1) it already

verified them in the Plaintiff's top secret security clearance application attached hereto as

**Exhibit A** and her personal interview, along with her honesty, integrity, trustworthiness, and

commitment to the Constitution; and (2) they are fully contained within the Plaintiff's appellate

record before the Sixth Circuit and the Supreme Court, and in the documents and exhibits

attached hereto. That is, they are objectively verifiable.

19.     The Plaintiff and Defendant Priest were born in 1980 and 1981, respectively, two

years after Congress enacted FISA, the same year and term (1980-1981) that now-Chief Justice

Roberts started his legal career clerking for then-Associate Justice Rehnquist.

20.     The Plaintiff's mother's maiden last name, Lawrence, is so old that she is a

Daughter of the American Revolution. The Plaintiff began flying as an unaccompanied minor

from the Gerald R. Ford International Airport in Grand Rapids, Michigan ("GRR") in 1986-1987

after her mother, Janice Lawrence, who is now a retired nurse, moved out of the State of

Michigan that year. Thus, the Plaintiff has been relying on air traffic controllers for her physical

safety since 1986. The same year, Congress enacted the Money Laundering Control Act of 1986,

Justice Scalia was confirmed to the Supreme Court, and Justice Rehnquist was confirmed as

Chief Justice. The Plaintiff's mother was exclusively responsible for paying for the Plaintiff's plane tickets as a child.

21.    The Plaintiff's maternal uncle, Jim Lawrence, is best friends with the father of a Navy SEAL, Craig Kobza. The Michael E. Kobza Hall of Justice in Muskegon, Michigan where the Plaintiff won a sexual harassment lawsuit at the age of 20 is named after the same family. Judge Michael E. Kobza was Craig Kobza's uncle. Craig Kobza knew the Plaintiff's maternal grandparents for longer than the Plaintiff has been alive and is so close to the Lawrence family that the Plaintiff's maternal cousins, Justin and Jillian Lawrence, refer to him as "Uncle Craig." However, the Plaintiff did not learn about that long-standing familial relationship until she met Mr. Kobza for the first time at her grandparents' memorial in May of 2013.

22.    The Plaintiff has a near-photographic memory, which she has had since the age of three, is documented in a book that her biological parents kept about her, and it is why she graduated from law school in the top 7% of her class. The Plaintiff's paternal grandfather, Marion MacPherson, joined the Navy sometime before or after the attack on Pearl Harbor, became a teacher and then eventually the Superintendent of Orchard View High School in Muskegon, and along with the Plaintiff's parents, taught the Plaintiff and her stepsister, Shellie James, that getting an advanced education was the key to a better life. His repeated refrain was that the Plaintiff "should take her education as far as her intellect would allow."

23.    The Plaintiff climbed out of her bedroom window and ran away from home to escape from an emotionally abusive situation involving her stepmother in 1997, the same year the Supreme Court decided *City of Boerne v. Flores*, 521 U.S. 507 (1997) and struck down the Religious Freedom Restoration Act ("RFRA") as applied to the states. As is stated in Section 21

of the Plaintiff's top secret security clearance application titled: Mental and Emotional Health,

the Plaintiff developed an eating disorder in 1992, which was specifically a result of: (a) her

inability to speak to her mother by phone as a child without her dad or stepmother listening to

her calls; (b) the fact that she had no privacy; (c) her inability to control anything beyond what

she ate; and (d) the fact that nothing she ever did was good enough to make her stepmother

happy. The associated emotional abuse is why she ran away from home.  (*See* **Exhibit A** at p. 54

of application).

      24.    The Plaintiff graduated from Oakridge High School in Muskegon, Michigan in

1998, the same year the first victim who died on September 11, 2001, Daniel Lewin, co-founded

a cloud computing and content mirroring company called Akamai Technologies, Inc.,

("Akamai"), which is a Hawaiian word for "intelligent." Daniel Lewin was a former member of

Israeli Defense Forces (IDF), spoke a foreign language, had an advanced math degree, and

pioneered new technology called consistent hashing. The Plaintiff was required to establish an

email account in 1998 for purposes of receiving Federal Financial Aid and filing out the FAFSA,

katherinelou0311@yahoo.com, which is the email address listed on the cover of her top secret

security clearance application. The password for that email account, along with all of her other

online accounts through 2011, was "Hawaii00." She further graduated from Oakridge High

School with Joe Thue, who was then-known as a pothead, is an air traffic controller in Chicago,

IL, and is required to have a top secret security clearance to be an air traffic controller, but to

quote him when the Plaintiff specifically asked after Edward Snowden came forward, "only for

purposes of knowing the location of Air Force One," which is also the historically assumed

location of the nuclear football.

25.     Defendant Priest graduated from Oakridge High School in 1999, the same year

the Supreme Court decided *Neder v. United States*, 527 U.S. 1 (1999), which presented the

question of whether a jury instruction that omits an essential element of an offense is a Sixth

Amendment structural error and therefore automatically reversible on appeal. In *Neder*, the

Supreme Court explained that "a limited class of fundamental constitutional errors is so

intrinsically harmful as to require automatic reversal without regard to their effect on a trial's

outcome," and that its separation of powers role in all criminal cases is deciding and declaring

structural errors. While an appellate court typically reviews errors alleged in a criminal case

using the "harmless error" standard of review, structural errors are in their own category of "very,

very bad" and include: (a) a complete denial of counsel under the Sixth Amendment; (b) denial

of the right to counsel of one's choice under the Sixth Amendment; (c) denial of the right to

represent oneself; (d) denial of the right to a public trial under the First and Sixth Amendments;

(e) failure to correctly instruct the jury on reasonable doubt; (f) racial discrimination in the

selection of a grand jury under the Fourteenth Amendment; and (g) denial of the right to an

impartial tribunal under the Fifth and Fourteenth Amendments, which is also incorporated into

the recusal requirements of the same judicial Code of Conduct identified in the Plaintiff's career

clerkship offer letter that she was required to adhere to during her clerkship.

26.     In his dissenting opinion in *Neder v. United States*, Justice Scalia likened the

impeachment clause of Article III ("The Trial of all Crimes, except in Cases of Impeachment,

shall be by Jury...") and the Sixth Amendment jury trial right ("In all criminal prosecutions, the

accused shall enjoy the right to a speedy and public trial, by an impartial jury") to the "spinal

column of American democracy." *Id.* at 31. He further explained that one of the indictments

against King George III set forth in the Declaration of Independence was that he "subjected us to a jurisdiction foreign to our Constitution and unacknowledged by our laws," and he predicted what could happen in twenty years when the confirmation process is politicized and federal judges are appointed by oppressive administrations.[15] *Id.* at 30. Like the Plaintiff's law review article, and like Judge McKeague predicted at his investiture, this was not intended as a "how to" on dismantling American democracy, reproductive rights, and capturing and toppling the judiciary.

27.      The Plaintiff did not know Defendant Priest in high school, nor did he contribute in any way, shape, or form to the Plaintiff's airfare, educational expenses, bar admissions expenses, living expenses, or provide her with financial support at any point. Further, the specific purpose of the Plaintiff's advanced education and legal career was so that: (a) she had the financial means of providing for herself until she met "Prince Charming," who she wanted to

---

[15] *Id.* Further stating: Even if we allowed (as we do not) other structural errors in criminal trials to be pronounced "harmless" by judges—a point I shall address in due course—it is obvious that we could not allow judges to validate this one. The constitutionally required step that was omitted here is distinctive, in that the basis for it is precisely that. Absent voluntary waiver of the jury right, the Constitution does not trust judges to make determinations of criminal guilt. Perhaps the Court is so enamored of judges in general, and federal judges in particular, that it forgets that they (we) are officers of the Government, and hence proper objects of that healthy suspicion of the power of government which possessed the Framers and is embodied in the Constitution. Who knows? Twenty years of appointments of federal judges by oppressive administrations might produce judges willing to enforce oppressive criminal laws, and to interpret criminal laws oppressively—at least in view of the citizens in some vicinages where criminal prosecutions must be brought. And so the people reserved the function of determining criminal guilt to themselves, sitting as jurors. It is not within the power of us Justices to cancel that reservation—neither by permitting trial judges to determine the guilt of a defendant who has not waived the jury right, nor (when a trial judge has done so anyway) by reviewing the facts ourselves and pronouncing the defendant without-a-doubt guilty. The Court's decision today is the only instance I know of (or could conceive of) in which the remedy for a constitutional violation by a trial judge (making the determination of criminal guilt reserved to the jury) is a repetition of the same constitutional violation by the appellate court.

meet, marry, and live happily ever after with since the age of six when she began flying from

GRR; and (b) she would **not** end up like her high school friend, Shannon Johnson. So she would

**not** get trapped in a physically or emotionally abusive situation that she couldn't get herself out

of, she would not be financially dependent on a man, could have a better life, wouldn't have to

settle, could own her own home, and be safe.

     28.    Between 1998 and 2002, the Plaintiff: (a) pursued a B.A. in Finance at Grand

Valley State University ("GVSU"), because although she had the necessary grades and wanted to

attend Harvard or an Ivy League school, she couldn't afford to hire the same lawyer that she is

today to become legally emancipated from her parents, and according to her high school

guidance counselor, it was the only college that would let her petition their financial aid board

for independent status for purposes of federal financial aid and the FAFSA; (b) she won a sexual

harassment lawsuit in the Michael E. Kobza courthouse in Muskegon, Michigan, but her attorney

didn't tell her that she had to pay taxes on the resulting damages award until it was too late so

she entered into an installment agreement with the IRS (**Exhibit A** at p. 60 of application); and

(c) just as importantly, she applied to be a financial advisor at Edward Jones, but because she

didn't have at least 50 contacts; that is, an already existing book of business, she didn't qualify.

     29.    On the morning of September 11, 2001, the Plaintiff was day-trading the S&P 500

e-mini futures contract when she witnessed an equally literal and symbolic "spinal column of

American democracy" shatter, to quote Justice Scalia's dissenting opinion in *Neder*. When the

market opened limit down two weeks later, the Plaintiff lost a very large chunk of what was then-

called Bank One's money, which she had borrowed on a $25,000 signature loan. (*See* **Exhibit A**

at p. 33). In response to those events, the Plaintiff applied to the Secret Service and the CIA

because Alias was her favorite show at the time and she wanted to be a spy, but she was rejected by both agencies because she **didn't** have either a military background, an advanced math or technology degree, or speak a foreign language, all of which Daniel Lewin had. She further talked to an Air Force recruiter in Grand Rapids, Michigan about her interest in working in the intelligence community, who was honest when the Plaintiff specifically asked and told her that because of her physical appearance and small size, she would likely be a target for harassment if she did join, and her options if she were sexually assaulted or harassed would be very limited. Thus, given her prior experiences, the Plaintiff specifically chose to attend law school instead. Her law school admissions essay to MSU was about her desire to "fight back" against the parties who were responsible for the events on September 11, 2001.

30.     The Plaintiff finished her first year at MSU with a 3.89 GPA, and she fell in love with constitutional law (Article III especially) and the same appellate practice specialty that Justice Roberts was famous for. At the end of her first year, MSU offered her a full tuition scholarship to prevent her from transferring to Harvard, Yale, or Georgetown, and she objectively graded onto law review.

31.     Because of her childhood, the Plaintiff is both an extreme empath and has a Myers-Briggs ENFJ "protagonist" personality profile (extroverted, intuitive, feeling, judging) Pursuing justice is a fundamental part of her identity as a human being. During the summer between her first and second year of law school, the summer of 2003, the Plaintiff read Atlas Shrugged by Ayn Rand, who was from fascist Russia, the same country that Edward Snowden fled to and sought politician asylum in in 2013. Atlas Shrugged describes the fall of American democracy when objective facts are ignored, violence is embraced, language and words become

meaningless or propagandized, intelligence is vilified, and people are taught that their hatred and ignorance are virtues. After reading Atlas Shrugged, the Plaintiff wrote her law review article during her second year at MSU (August of 2003-May of 2004), which was written in the specific context of the Partial Birth Abortion Ban Act of 2003.

32.     The Plaintiff's federal jurisdiction professor during the Fall semester of her third year of law school (2004) was now-Sixth Circuit Judge David W. McKeague. Judge McKeague was first nominated to the Sixth Circuit Court of Appeals on November 8, 2001, two months after the events on September 11, 2001. Despite the fact that he was rated unanimously well-qualified by the American Bar Association, his nomination along with that of now-Sixth Circuit Judge Richard A. Griffin was being deliberately held up for political reasons. The Plaintiff was instructed by the law review's supervising faculty to choose a controversial or interesting subject and try to build a consensus within the Supreme Court, and she wrote the article for the following reasons: (a) she was a mouthy 24 year old law student who still believed in the guarantees of the First, Fourth, Fifth and Sixth Amendments along with the binding nature of every Supreme Court and published circuit court decision interpreting the same; (b) after witnessing the murder of thousands of American citizens on September 11, 2001, she thought that threatening federal judges, including Judge McKeague, for doing their jobs objectively was the height of disgusting; (c) she was angry about the increased use of Orwellian language in passing various pieces of legislation, including the "PATRIOT" Act, an encroachment on judicial review and an attempt to legislatively "end-run" Supreme Court precedent in *Stenberg v. Carhart*, via a manufactured "record " of non-facts that contradicted basic science, which Congress demanded blanket deference to and the Court had resoundingly rejected in *City of*

*Boerne v. Flores* discussed herein; (d) the danger to women associated with the refusal of politicians to acknowledge facts, science, and medical reality, or show any kindness, compassion, empathy, or respect for women's lives and health; and (e) the same threats and deliberate politicization of the federal judiciary that Judge McKeague and Judge Griffin were experiencing at the time, which Judge McKeague at his investiture and Justice Ginsburg, Justice O'Connor, and Justice Roberts subsequently spoke out about publicly.

Simply stated, the Plaintiff couldn't believe that after the murder of thousands of American citizens on September 11th, certain politicians were calling for the murder of "activist" federal judges and Justices.[16] Even more specifically, certain politicians, political pundits, and television personalities at that time deemed it appropriate to publicly suggest that impeachment up to and including killing federal judges to prevent "judicial activism" and "an arrogant, out-of-control, unaccountable judiciary that thumbed their noses at Congress and the President"[17] was appropriate. In emails and Facebook posts between April-October of 2015, the Plaintiff "strongly encouraged" them to choose a different collective finger. *See* **Exhibit B** at p. 12-13.

33.    As is clear from the opening quote and the title, Devising an Appropriate Standard of Review: An Analysis of Congress's Findings of **"Fact"** Within the Partial Birth Abortion Ban Act of 2003, and as the Plaintiff later described it to her group of friends, the judges for whom she either clerked or was personally acquainted, her former professors at MSU, and to her own dad, it was the functional equivalent of giving a then-Republican controlled Congress "a giant

---

[16] *See* Former Top Judge Says U.S. Risks Edging Near to Dictatorship, March 20, 2006, available at www.theguardian.com/world/2006/mar/13/USA.topstories3.

[17] *Id*. Further stating: "[D]eath threats against judges were on the rise and adding that the situation was not helped by" Senator John Cornyn's "suggestion that there might be a connection between violence against judges and the decisions they make."

double-middle finger" and "telling them to go ___k themselves" on behalf of every then-existing and subsequent federal judge and Justice, who don't deserve to be subjected to violence or the same type of dog-whistled threats and "activist judge" label that resulted in the murder of Judge Esther Salas' son and necessitated the temporary closure of Magistrate Judge Reinhart's synagogue after he approved the search warrant for former President Trump's Mar-a-Lago residence.

It should also never be offensive to find out that the Plaintiff cares about human life, including her own.

34.     The article opened with a famous quote by George Orwell, author of the book 1984: "Political language is designed to make lies sound truthful, murder respectable, and give the appearance of solidarity to pure wind," and it cited *Marbury v. Madison* in the second footnote. In addition to containing a section titled: In Defense of the Judiciary, and to over-emphasize this fact, the article contained a section titled: In **Defense** of the Judiciary, which specifically addressed the above-referenced politicization of the judiciary. It was selected as one of four for publication at the end of the Plaintiff's second year of law school by constitutional law scholars and supervising professors, including the Plaintiff's contracts professor, Dan Barnhizer, who worked at the same then-named Hogan & Hartson law firm in 1997 that Justice Roberts made famous and the Plaintiff wanted to work for. This meant that the Plaintiff was automatically excluded from running for Editor in Chief ("EIC") of her law review, and she instead spent her third year revising the article and getting it ready for publication.

35.     The Plaintiff met Judge McKeague during the Fall semester of her third year of law school, while she was revising the article. He was confirmed to the Sixth Circuit on June 9,

2005 in the now-infamous Gang of Fourteen deal, which the Plaintiff knew nothing about at the time. At his investiture, Judge McKeague graciously professed admiration for the system of nominee confirmations despite what he went though to get there, but said that he considered the then-existing (and now-exponentially worse) viciousness of the Senate confirmation process detrimental to the long-term health of the judicial system, which Justice Scalia also predicted in *Neder v. United States*. Judge McKeague's theory then was that because of the personal attacks and scrutiny under which judicial nominees are placed, fewer qualified candidates would be willing to accept a nomination.[18] The consequence, according to Judge McKeague, would be that appellate judges with actual trial court experience would become increasingly rare at that level, and he noted that the pool of candidates would come from "sitting judges who have already survived the process, politicians, and law professors who are difficult to attack because they have not published many articles."

He clearly was not aware of the Plaintiff's law review article.

When asked if he hated politics, Judge McKeague responded by saying that it wasn't politics that he had a problem with, but politicians.[19] The Plaintiff also could not agree more with that statement, which has grown exponentially over the last eleven years. Judge McKeague is also, and always will be, the person who reminds the Plaintiff of who she was before she learned that monsters are real and look just like people.

---

[18] *See* Judge McKeague and the Cost of Confirmation, https://www.mackinac.org/7219 (last retrieved December 23, 2022).

[19] *Id.*

A.    **Post-Graduation Sexual Assault, Private Law Firms, and Income Information**

36.    The Plaintiff started her legal career at Dickinson Wright in Grand Rapids, Michigan in May-June of 2005 where her starting salary was $100,000-102,000 per year, but she was sexually assaulted shortly after graduating from law school in May of 2005. In July of 2005, the same month the Plaintiff took the Michigan Bar Exam, Justice O'Connor retired, and in September of 2005, Chief Justice Rehnquist unexpectedly died. Now-Chief Justice Roberts, who, again, started his legal career clerking for then-Associate Justice Rehnquist the same year and term that the Plaintiff and Defendant Priest were born (1980-1981), was nominated for both vacancies and ultimately confirmed as Chief Justice.

37.    The Plaintiff reported her assault to her contracts professor at MSU, Professor Dan Barnhizer, in October of 2005 after she received her Bar Exam results and learned that she had failed by three points for that reason and the associated psychological trauma. Had she been able to afford to transfer to Harvard at the end of her first year, it would have been Justice Kagan's shoulder that she cried on. The only thing the Plaintiff really wanted to do as a lawyer was constitutional law-related appellate work, but her first "case" was drafting her own appeal and passing the Michigan Bar Exam on appeal in January of 2006, which she handled entirely by herself.

38.    In April of 2006, the Plaintiff contacted Judge McKeague and requested what was supposed to be a private for physical safety-related reasons swearing-in ceremony that no one from her family was invited to or permitted to attend and was jointly presided over by Judge Batani for the purpose of swearing her into the Sixth Circuit and the Eastern District of

Michigan. Judge McKeague wondered aloud where the Plaintiff's parents were and why no one else was there, but the Plaintiff didn't tell him because she didn't want him to feel sorry for her. The reason no one was invited was because while the Plaintiff's mother in Washington was extremely empathetic and compassionate, her father essentially told her to quit crying because: "What are you going to do, let this ruin your entire career?,"[20] he was and still is married to the Plaintiff's stepmother who told her father that she wasn't sure if she believed the Plaintiff, they contributed nothing to the Plaintiff's education, the Plaintiff viewed her stepmother as a threat to her safety and to that of her mother, and they couldn't all be in a room together. The Plaintiff has always had to be the adult in the situation.

39.     Shortly before that, and upon the recommendation of a partner in the Detroit office of Dickinson Wright, the Plaintiff contacted Ken Loomis at the Sixth Circuit Clerk's Office and volunteered to start taking Sixth Circuit CJA-appointed cases, because again, appellate work involving constitutional questions was her only interest. However, for obvious reasons, she had a standing rule that she would not take any cases involving sexual assault or any type of violent felony. Her first client threatened her in a letter, so Mr. Loomis instead appointed her to brief a certified question involving the Federal Sentencing Guidelines.

40.     On June 26, 2006, the Supreme Court decided *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2007), and held that the deprivation of the right to counsel of one's choice; specifically, by wrongfully excluding or conflicting that lawyer out of a case, is a Sixth Amendment structural error and therefore automatically reversible on appeal. On August 10,

---

[20] Because of the same photographic memory described above, the Plaintiff has near-perfect recall when it comes to dates and conversations.

2006, the Cato Institute filed an amicus brief with the Supreme Court in *Gonzalez v. Carhart,*

which not only cited the Plaintiff's law review article; it essentially plagiarized the entire content

and all of her ideas as it related to structural power, the power grab on the part of Congress,

legislatively manufactured "facts," and attempt to end-run Supreme Court precedent. Upon

making that discovery, the Plaintiff called Professor Barnhizer at MSU, and he verified the

citation.

      41.     The same month, the Plaintiff set up a Facebook account at the insistence of her

maternal cousin, Justin Lawrence, who is five years younger than the Plaintiff and whose father,

Jim Lawrence, is best friends with the father of a Navy SEAL as was stated above. The Plaintiff

was the first person from her law school graduating class to have a Facebook account, and she

set up the account for the sole purpose of keeping in touch with Justin's group of friends, one of

whom, Carl Gritter, she was dating at the time. She further and **deliberately** did so: (a) with the

privacy and information settings set as tightly as possible for what were, once again, exceedingly

good, physical safety-related reasons; (b) using the same personal Yahoo email address that she

was required to have for purposes of federal financial aid beginning in 1998 that is listed on the

cover of her top secret security clearance application. *See* **Exhibit A** at p. 7.

      42.     After a miserable start to her legal career in the Grand Rapids office of Dickinson

Wright because of a male partner who called Judge McKeague an expletive after the Plaintiff

told him that he was her federal jurisdiction professor; and actually, one of her favorite

professors, and then screamed at her regularly after that because she was the only female

associate in the office, *see* **Exhibit B** at p. 1, the Plaintiff decided that she wanted to relocate to

Portland, Oregon for the purpose of being closer to her mother and brothers who live in

Vancouver, Washington. The Plaintiff paid close to $1,000 to take the Oregon Bar Exam in

February of 2007, but she was unexpectedly contacted in March of 2007 and recruited to work

on *In Re: 9/11 Litigation* on behalf of Boeing for the same world famous Seattle-based law firm,

Perkins Coie, that recruited and hired: (a) one of Justice Kennedy's female law clerks and her

husband at the same time, Lisa (Marshall) Manheim and Nick Manheim, the former of which

clerked on the Second Circuit (then-Supervised by Justice Ginsburg) before clerking for Justice

Kennedy (then-Supervising Justice for the Ninth Circuit) and now teaches constitutional law at

the University of Washington in Seattle; and (b) an ex CIA analyst turned lawyer, Hugh

Handeyside, who left Perkins Coie to clerk for a district court judge the same year as the Plaintiff

and then worked for the ACLU on its national security and surveillance project.

43.    On April 18, 2007, the Supreme Court issued its decision in *Gonzalez v. Carhart*,

which, unlike *City of Boerne v. Flores*, 521 U.S. 507 (1997), permitted Congress to end-run the

Court's prior decision in *Stenberg v. Carhart* based on a legislatively manufactured set of "facts"

that contradicted objective medical reality. The majority opinion was written by Justice Kennedy

who authored the opinion in *City of Boerne v. Flores*, which the Plaintiff cited and relied upon

heavily in her law review article. The Plaintiff was so upset by that decision on behalf of Justice

Ginsburg and every woman described in the footnotes of her law review article that she couldn't

bring herself to read the opinion until sometime in 2021. Thus, she was not aware that Justice

Kennedy authored the majority opinion.

44.    A few weeks later, between May 1-8, 2007, the Plaintiff relocated from Grand

Rapids to Seattle with: (a) the same personal Yahoo email address (established in 1998); (b) a

gmail address established in 2004 while she was working on her law review article, which her

father sent her an invitation to set up so he could send her money from an anonymous PayPal account once in a while without her stepmother finding out about it; (c) an already-established Facebook account (established in 2006); and (d) a non-smart T-Mobile RAZR left over from her time in law school, which had the contact information for her mother's entire family, Professor Barnhizer, Judge McKeague, her best friend from law school, and her dad and stepsister stored in it. Shortly after arriving in Seattle, the Plaintiff met and became personal friends with Lisa and Nick Manheim and Mr. Handeyside, who later sent her Facebook friend requests that she accepted.

45.     All associates were issued Perkins Coie "state of the art" I.T. Department hardened and provisioned laptops and a separate key fob that generated a new numerical sequence every minute for purposes of logging into the firm's document management system and email system remotely, and they were "strongly encouraged" (read: required) to switch to Perkins Coie I.T. Department provisioned Blackberries. Thus, all Fifth Amendment privileges were taken very, very seriously. Document review for purposes of the Plaintiff's work on the 9/11 Litigation, for a civilian air craft, had even more stringent security measures. The design documents were stored on separate servers located on a different floor of the building. Accessing that floor required a separate key card, and accessing the computers for purposes of document review required a separate set of login credentials.

46.     On June 21, 2008, the Supreme Court decided *United States v. Santos*, 553 U.S. 507 (2008), in which the Court interpreted the "proceeds" essential offense element of the money laundering statute, 18 U.S.C. 1956, which Congress had not defined. In that case, the Court held that "proceeds" meant "profits," not the broader definition of "gross receipts" advocated for by

the Government. That summer, the Plaintiff called Professor Barnhizer and Judge McKeague,

and she spoke with Ms. Manheim in-person, and in that exact order, about her continued desire

to pursue constitutional law and the same appellate practice specialty that she fell in love with at

the end of her first year of law school and Justice Roberts was famous for. All three convinced

her to apply for federal clerkships. Professor Barnhizer specifically told the Plaintiff that: (a)

because she went to MSU, which is a tier two law school, she needed to "launder up" her J.D. by

either landing a federal clerkship or getting an L.L.M. from an Ivy League school if she wanted

to pursue that particular career path; (b) even getting an interview with a federal judge was an

incredible honor and highly unlikely; and (c) she had to be prepared to accept an offer if one was

made no matter the location or state, because according to him, federal judges don't like being

told that an applicant is waiting on an offer from a higher court unless it's the Supreme Court.

47.  Judge McKeague also convinced the Plaintiff to apply for federal clerkships after

she explained the above-stated career goals, but he told her that: (a) she had to apply

electronically via the OSCAR Clerkship Application System and couldn't just email him her

resume and application materials; and (b) he couldn't provide a letter of recommendation for her

as a former professor since he is a federal judge, but he didn't elaborate on the reasons. Ms.

Manheim, who received her J.D. from Yale, was the managing editor (EIC) of the Yale Law

Journal, and was part of Perkins Coie's appellate and political law practice groups, also

encouraged the Plaintiff to apply for clerkships. Marc Elias was the managing partner of the

political law practice group at Perkins Coie when the Plaintiff and Ms. Manheim worked there.

Mr. Elias represented the Democratic National Committee and Hillary Clinton during her 2016

election campaign. He is now the founding partner of Elias Law Group whose mission is

preserving democracy and voting rights, and he won over 60 cases against former President

Trump during the post-election period. At the time of their conversation in 2008, Ms. Manheim

informed the Plaintiff that she was transitioning to the University of Washington to start teaching

constitutional law as an adjunct professor, and that she received a $250,000 signing bonus from

Perkins Coie for her Supreme Court clerkship upon joining the firm.

48.     The Plaintiff's OSCAR clerkship application packet included: (a) a copy of her

transcripts and resume with the Supreme Court amicus brief citation listed on it; (b) a research

memo from her work on *In Re: 9/11 Litigation* collecting and analyzing what were primarily gun

and ammunition manufacturer cases that addressed the reasonably foreseeable criminal misuse of

a product; (c) a motion and supporting brief from a bench trial involving a military aircraft, the

Boeing C-17, which the Plaintiff won on and saved the same Government and Department of

Defense millions of dollars; and (d) letters of recommendation from two partners at Perkins

Coie, Todd Rosencrans and Rich Coyle, and from Professor Barnhizer who likened it to a

"hagiography."

49.     In October of 2008, the Plaintiff flew from Seattle ("SEA") to GRR to attend her

ten-year high school reunion where she learned that Joe Thue, who was known as a pothead in

high school, was now a civilian air traffic controller in Chicago, IL. They briefly discussed the

Plaintiff's work on *In Re: 9/11 Litigation* and the absurdity of Boeing being sued for "failing to

be psychic." He sent her a Facebook friend request after she returned to Seattle, which she

accepted.

50.     On March 19, 2009, Justice Kagan became the first female Solicitor General of

the United States. Five days later, on March 24, 2009, and before Justice Kagan assumed her

48

new role, the Supreme Court heard oral argument in *Citizens United v. F.E.C.*, 558 U.S. 310

(2010). The case was initially argued by Ted Olson on behalf of Citizens United whose wife,

Barbara Olson, was killed on the plane that crashed into the Pentagon on September 11, 2001.[21]

As is clear from the article cited in footnote 24 explaining the history of that case, it has **always**

been about abortion.[22]

51.     The Plaintiff's clerkship application packet resulted in multiple interviews,

including those with: (a) Magistrate Judge Barry Garber in Miami in the Fall of 2008, who the

Plaintiff flew to Miami to interview with in-person, but she turned down his offer because she

didn't feel safe in the city; (b) a district court judge in Alaska by phone in January of 2009; and

(c) two in-person interviews during the same week in March-April of 2009 with then-Chief

Hawaii District Court Judge Helen W. Gillmor in Honolulu, Hawaii, who was hiring off-term for

a career position starting the same year in September of 2009, and Ninth Circuit Judge Richard

C. Tallman in Seattle, who was hiring for a term position beginning in September of 2010. The

Plaintiff interviewed in-person with Judge Gillmor first because she happened to be vacationing

in Hawaii at the time with one of her high school friends, Angie Whipple, when Judge Gillmor's

assistant, Kelly Lovett, called to set up the interview. The Plaintiff lived with Angie's Whipple's

parents during her senior year of high school after she ran away from home.

52.     While Judge Tallman was calling to check the Plaintiff's references, Judge

Gillmor offered, and the Plaintiff accepted, a prospectively intended career offer with a

---

[21] *See* Jeffrey Toobin, Money Unlimited, The New Yorker, May 14, 2012,  https://
www.newyorker.com/magazine/2012/05/21/money-unlimited (last retrieved March 27, 2023)
(explaining the history of the Citizens United decision).

[22] Explaining that the attorney who initially represented Citizens United, James Bopp, served as
general counsel to the Indiana Chapter of the National Right to Life Committee.

guaranteed two-year minimum term. Upon accepting Judge Gillmor's offer, the Plaintiff was

informed of the existence and that she would be taking over responsibility for what she was

simply told was "an espionage case" for the first time, *United States v. Gowadia*. This further

required her to be personally interviewed and fully vetted between May and August of 2009,

while Justice Sotomayor was confirmed to the Supreme Court and Justice Kagan was

transitioning from her position as the Dean of Harvard to the first female Solicitor General, for a

top secret security clearance.

     53.     The Plaintiff was provided with no information about the case. She was

personally interviewed in her office in Seattle a few floors above Ms. Manheim, **not** in her own

home, her father was personally interviewed in his office in Muskegon, Michigan, all of her

references were interviewed and checked, and she was told that she should be approved "with no

problems." Sometime in 2015, the Plaintiff learned that no one ever contacted her own mother,

which was because the Government is fully aware of who the Lawrence and the Kobza families

are. The Plaintiff, on the other hand, was not. *See* **Exhibit B** at p. 1-3. During her interview, the

Plaintiff mentioned the fact that she applied to the Secret Service and the CIA post-9/11, and the

above-stated constitutional law and appellate career goals.

     54.     When the Plaintiff accepted Judge Gillmor's offer in April of 2009, she was

making approximately $163,000 per year with a billable hours-based bonus of $20,000-$30,000

after her second year. Had she stayed at Perkins Coie in Seattle, which was within driving

distance of her mother and brothers, that amount would have grown exponentially by now. Had

she turned down Judge Gillmor's offer and accepted Judge Tallman's impending offer instead,

the Plaintiff could have continued to collect a six figure salary at Perkins Coie for another year

and remained in the State of Washington near her mother and brothers. Instead, she took close to a $100,000 pay cut, sold most of her belongings, rolled thousands of dollars of negative equity from leasing an Audi A3 into a used car loan, emptied out her 401(k) and actually paid tax **penalties** on it, all so she could afford to take the position with Judge Gillmor.

55.     On June 29, 2009, the Supreme Court restored *Citizens United* to the calendar for re-argument, and the second argument was set for September 9, 2009. During the first argument, the Solicitor General had indicated that Congress could potentially ban a book in response to a question from Justice Alito. *Id.* at fn. 24. That question about banning a book, which is exactly what is happening currently in various states, sent Justice Kennedy down the path that he went in *Citizens United*, who ultimately authored the majority opinion in that case.

56.     Approximately one month before the Plaintiff's planned relocation, Judge Gillmor's assistant, Kelly Lovett, who is a former Marine and is still one of the Plaintiff's closest friends, called the Plaintiff to inform her that Judge Gillmor had become "ill." As a consequence, she had to step down as Chief Judge, fly to California with her husband for medical treatment, and transfer *Gowadia* to the new Chief Judge, the Honorable Susan Oki Mollway. So, after having fully vetted the Plaintiff, Ms. Lovett informed her that her top secret security clearance was being cancelled.  According to Ms. Lovett, that is because top secret security clearances are an asset and are "really, really, really, expensive" for the Government. At the time, the Plaintiff stated that she had "won the clerkship lottery." Given current political reality, the continued use of the same "activist judge" epithet that infuriated the Plaintiff so much in law school, the attempts by various politicians to ban books, the story set forth in the Plaintiff's forthcoming

book, and the egregiousness of the facts in this case, she respectfully submits that this one should

be **extremely** expensive for the Government.

**B.      Clerkship for the Honorable Helen W. Gillmor**

57.      The Plaintiff relocated from Seattle to Oahu in August of 2009 in reliance on the

express language of her security clearance application and her offer letter, including but not

limited to: (a) the mental health questions,[23] financial crimes and obligations,[24] and the

statutorily prohibited, technologically committed felonies encompassed within the questions set

forth therein;[25] (b) the First, Fourth, Fifth and Sixth Amendments and the binding nature of every

Supreme Court opinion and published circuit court case interpreting the same; (c) the Privacy

Act Information and reassurances set forth at the bottom of **every** page of the application; (d) the

judicial Code of Conduct identified in her offer letter; and (e) that clerking for Judge Gillmor

would further her career-related goals either as Judge Gillmor's career law clerk and eventually a

---

[23] Section 21 of the Plaintiff's top secret security clearance application is titled: Mental and Emotional Health, and it asks if the Plaintiff has "consulted with a health care professional regarding an emotional or mental health condition or were you hospitalized for such condition?" *See* Exhibit A at p. 54 of application.

[24] Section 26 entitled: Financial Record asks numerous questions related to potential financial conflicts of interest. In that section, the Plaintiff explained that she had a tax lien filed against her by the State of Michigan as a result of the sexual harassment lawsuit, which was because her "attorney failed to inform [her] that [she] had to pay taxes on the judgment, so [she] ended up owing the IRS and the State of Michigan in the 2002 tax year." *See* Exhibit A at p. 60 of application.

[25] Section 27 entitled: Use of Information Technology Systems states: "(a) In the last 7 years, have you illegally or without proper authorization entered into any information technology system?; (b) In the last 7 years, have you illegally or without authorization modified, destroyed, manipulated, or denied others access to information residing on an information technology system; (c) In the last 7 years, have you introduced, removed, or used hardware, software, or media in connection with any information technology system without authorization, when specifically prohibited by rules, procedures, guidelines, or regulations?"

federal judge, or as an appellate specialist with the ability to teach constitutional law. In vetting

the Plaintiff for her security clearance, the Government further verified that the Plaintiff suffered

from no mental health conditions. As the application discloses, the Plaintiff suffered from an

eating disorder since the age of twelve, which, as was stated above, was caused by her childhood

environment, her relationship with her parents, and her inability to control anything beyond what

she ate. *See* **Exhibit A** at p. 54 of application.

58.     The Plaintiff had no idea what a Chief District Court Judge, a Chief Justice, a

Supervising Justice, or a Solicitor General is or does yet, why the Chief Judge had to preside

over *Gowadia*, or why it had to be tried on President Obama's childhood and high school home,

but she relied on the basic premise that no one lies to federal judges, Justices, or their law clerks

about issues that might affect their physical safety. Upon arriving on Oahu in August of 2009, the

Plaintiff learned that Judge Gillmor flew to California with her husband for chemotherapy

because she was actually diagnosed with cancer and could have died. The Plaintiff never ended

up working on *Gowadia* other than pulling a copy of the money laundering statute for the

outgoing law clerk, Yusuf Rangwala, so he could run it over to Judge Mollway. She had no

knowledge of the Supreme Court's 2008 decision in *Santos* because she never ended up working

on the case, and he never told her why he needed a copy. The Plaintiff took over Mr. Rangwala's

computer, which had the opinions and documents from *Gowadia* stored on it, but she never

looked in his folder and had no idea what the case was about.

59.     The Plaintiff's starting salary while she was clerking for Judge Gillmor was

$88,269. *See* **Exhibit A** at p. 1. She paid approximately $1750 per month to rent a studio-sized

Ohana unit on someone else's property because that was all that she could afford. Upon arriving

on Oahu, the Plaintiff received no type of security briefing beyond being informed by Ms. Lovett that Judge Gillmor's number one rule was: "Whatever happens in chambers stays in chambers," nor was she provided with any information about what federal agencies are responsible for investigating various crimes.

60.     On September 9, 2009, the Supreme Court heard oral argument in *Citizens United* for the second time. At the age of forty-eight, it was Justice Kagan's first argument before any appellate court.[26] The Plaintiff, on the other hand, didn't give her first argument before **any** court until she did so before the Sixth Circuit Court of Appeals in November of 2012 at the age of thirty-two, **after** she had been electronically stalked to within 100 yards of a Post Office in Cedar Springs, Michigan and no one had her home address, because of the same decision and what it enabled.

61.     The Plaintiff was vetted for a security clearance for purposes of an espionage and what she later learned was a **treason** case, and her official start date was **September 11**, 2009. Daniel Lewin named his company after the Hawaiian word for "intelligent." Oahu is simultaneously: (a) a strategically located military base in the middle of the Pacific Ocean with numerous intelligence gathering bases and buildings, including those that Edward Snowden worked in; (b) the home of the Navy SEALs; (c) President Obama's childhood and high school home; and (d) part of the ring of fire. The federal courthouse house is located on the water and built like a cement bunker. Accessing Judge Gillmor's chambers required a photo I.D. to get through courthouse security, a separate magnetic keycard to get into the back hallway where her

---

[26]*See* Jeffrey Toobin, Money Unlimited, The New Yorker, May 14, 2012, https://www.newyorker.com/magazine/2012/05/21/money-unlimited (last retrieved March 27, 2023) (explaining the history of the Citizens United decision).

chambers was located, a physical key to unlock the door, a separate key to unlock her office, and the microphones in the courtroom were always on and are wired to speakers in-chambers so as to be able to listen for any potential threats. Despite this level of security, the Plaintiff and every other law clerk were all told by the court's I.T. Department that it was okay to log into their personal, Facebook, email, and other online accounts from their work computers as long as they got their work done, none of which were blocked by any type of **firewall**.

62.     Because of her personality and sense of humor, the Plaintiff met and became personal and Facebook friends with everyone at the courthouse, including: (a) Ms. Lovett; (b) the Plaintiff's co-clerk, AUSA Ryan Dickey, who had the required technology-related degree and went on to work in the Cybercrimes Division of the Department of Justice in Washington D.C.; (c) U.S. District Court Judge David A. Ezra, who is now in Texas, and both of his law clerks, Jackie and Zana; (d) Magistrate Judge Barry Kurren's daughter, Amy Kurren, who also has a J.D. from Yale like Ms. Manheim and clerked for Ninth Circuit Judge Clifton; (e) Judge Seabright's law clerk, Laura Sullivan, who went on to clerk on the Second Circuit; and (f) Judge King's law clerk, Ryan Bickmore, who went on to work for the same Hogan & Hartson that the Plaintiff also wanted to work for.

63.     Between December of 2009 and March of 2010, and as is now widely and publicly known, operatives from the NSA and GCHQ were hacking the largest SIM card manufacturer in the world, a company called Gemalto, for the purpose of stealing the encryption

keys used by almost every cell phone service provider including AT&T.[27] At the same time,

between December of 2009 and January of 2010, the Plaintiff and Ms. Lovett came up with an

idea for an iPhone application called Lovetaps, which specifically happened after the Plaintiff

was rejected romantically by someone she really liked because she **wasn't** a Hawaii local and

**didn't** attend the same Punahou High School that President Obama attended. As a consequence,

the Plaintiff ordered and switched from her Perkins Coie I.T. Department provisioned Blackberry

to an AT&T Apple iPhone in January of 2010, and Ms. Lovett switched to the first Google

phone. Upon making that switch, the Plaintiff transferred all of her cell phone, Facebook, and

email contacts to her new iPhone. Furthermore, because the Plaintiff and Ms. Lovett were

required to house-sit for Judge Gillmor while she was in California receiving cancer treatment,

this also included Judge Gillmor's home address.

      64.     On January 5, 2010, and just as unexpectedly, the Plaintiff's first love from high

school, David Wing, found her on Facebook, who the Plaintiff's stepmother forced her to break

up with in 1995. On January 21, 2010, the Supreme Court issued its decision in *Citizens United*

*v. Federal Election Commission*, 558 U.S. 310 (2010). Mr. Wing ultimately lied to the Plaintiff

about everything including who he was as a person, and while Judge Gillmor was absent from

chambers, he convinced the Plaintiff to move back to Michigan.

      65.     Sometime in February or March of 2010, the Plaintiff emailed Judge McKeague

about her changed relationship status; specifically, she told him that she had reconnected with

---

[27] *See*: How Spies Stole the Keys to the Encryption Castle, available at https://theintercept.com/2015/02/19/great-sim-heist/ (last retrieved December 26, 2022) (Explaining that employees of both agencies stalked employees of Gemalto to learn passwords and inside information that they could exploit, and that the operation was so sophisticated that it didn't leave a trace in Gemalto's systems).

her first love from high school and wanted to move back to Michigan at some point, and he told

her to come interview with him for a clerkship that would have started in September of 2011. In

March of 2010, the Plaintiff paid to fly from the Honolulu International Airport ("HNL") to GRR

to interview with Judge McKeague in Lansing, and with AUSA Tim Verhey in Grand Rapids for

an appellate specialist position with the U.S. Attorney's Office for the Western District of

Michigan the same week. During the Plaintiff's interview with Judge McKeague, she told him

that Mr. Wing said that he planned to marry her. At the time, the Plaintiff would have asked him

to preside over their wedding and invited Judge Gillmor, Judge Ezra, Lisa and Nick Manheim,

Ms. Lovett, and all of her friends and co-clerks from Hawaii.

66.     Almost immediately upon returning to Oahu after that combination of interviews;

specifically, with her oldest (2004), most important, and most valuable cell phone and email

contact, Judge McKeague, Defendant Priest sent the Plaintiff a Facebook friend request, who

Facebook informed her was "mutual high school friends" with the same civilian air traffic

controller in Chicago and the Plaintiff's high school classmate, Joe Thue. Although the Plaintiff

didn't know Defendant Priest in high school, she vaguely remembered his name and accepted the

friend request from him for three reasons: (a) she is the same childhood emotional abuse victim

that has been relying on air traffic controllers for her physical safety since 1986-1987; (b) she

was aware from Judge McKeague's class and her work on *In Re: 9/11 Litigation* that the FAA

had federally preempted the entirety of air traffic safety and regulation, and that Mr. Thue was

required to have a security clearance to be an air traffic controller; thus, he would have had to re-

count his contacts all the way back to high school; and (c) she expected the Government to

investigated and fully prosecute if Defendant Priest, or anyone else, ever became a threat to her

later since it isn't "optional" to investigate on behalf of a judge or one of their daughters.

67.     The Plaintiff vividly remembers accepting the friend request while she was

standing in her kitchen in Kailua. Shortly thereafter, Defendant Priest posted a comment on the

Plaintiff's Facebook page that said: "You guys make me believe in love," but the Plaintiff deleted

the comment because Mr. Wing was already behaving in a jealous manner.

68.     After returning to chambers sometime in April of 2010, the Plaintiff and Judge

Gillmor discussed her changed relationship status. Judge Gillmor offered the Plaintiff the career

position and tried to convince her to stay in Hawaii. She was entirely correct about Mr. Wing, but

the Plaintiff didn't know that at the time, and she turned down Judge Gillmor's career offer. In

May of 2010, the Plaintiff's maternal grandfather, James Lawrence, unexpectedly died, and the

Plaintiff flew from HNL to GRR to attend a family gathering for him over Memorial Day

weekend. In June of 2010, the Plaintiff again flew from HNL to GRR and interviewed with Sixth

Circuit Judge Richard A. Griffin in Traverse City, Michigan, which Judge Gillmor wrote her

letter of recommendation for dated June 22, 2010, and whose confirmation to the Sixth Circuit

was also being held up while the Plaintiff was still in law school. (*See* **Exhibit A** at p. 3).

69.     In July of 2010, Judge Gillmor decided that it would be better for herself to

convert the Plaintiff's two-year minimum term clerkship term to a one-year term so she wouldn't

be left without a law clerk if the Plaintiff found a job in Michigan, and she flew to Washington

D.C. to interview candidates. As a consequence, the Plaintiff had to scramble to find a job,

temporarily gave up on the practice of law because she couldn't find a job in West Michigan that

wouldn't require her to sell her soul while getting her no closer to her previously stated

constitutional law and appellate career goal, decided that she would go back to GVSU and get a

nursing degree like her mother, and she reapplied for federal financial aid.

70.     On August 7, 2010, Justice Kagan was sworn into the Supreme Court by Justice

Roberts. Justice Kagan was nominated for the seat vacated by the same Justice John Paul Stevens

who: (a) was nominated by President Gerald R. Ford (GRR); (b) Judge Yates' former wife, D.C.

Court of Appeals Judge the Honorable Corinne Beckwith, clerked for in 1993-1994 (the same

year Congress enacted the Religious Freedom Restoration Act and the Brady Handgun Violence

Prevention Act); and (c) swore Chief Justice Roberts in back in September of 2005. At that time,

Justice Kagan became the Supervising Justice for the Sixth Circuit. The same week or shortly

thereafter, the Plaintiff was **luckily** and just as unexpectedly contacted by the Honorable

Christopher P. Yates in Grand Rapids, Michigan, a then-Kent County Circuit Court judge who

recruited the Plaintiff to be his first law clerk after he received a copy of her resume from

someone in the U.S. Attorney's Office, which was presumably AUSA Tim Verhey.

71.     Judge Yates received his J.D. from the University of Illinois at Urbana-

Champaign in 1987, one year after the Plaintiff started flying from GRR as an unaccompanied

minor. He started his legal career clerking for another former Chief Judge for the Eastern District

of Michigan, Judge James P. Churchill, and then for Sixth Circuit Judge Ralph B. Guy, Jr. After

his clerkship, Judge Yates worked as an Assistant U.S. Attorney for the Eastern District of

Michigan, then as an attorney-advisor in the Office of Legal Counsel at the Department of

Justice in Washington D.C., and then became the Chief Federal Public Defender for the Western

District of Michigan. After serving as the Chief Federal Public Defender, Judge Yates started two

private law firms: Willey, Chamberlain & Yates, and Yates, LaGrand & Denenfeld, where he had

a thriving criminal defense and appellate practice. His former partner, Larry Willey clerked on Oahu for U.S. District Court Judge Samuel King, the same judge that the Plaintiff's friend on Oahu, Ryan Bickmore, clerked for before Mr. Bickmore moved on to Hogan & Hartson in Washington D.C. Judge Yates was appointed to be a judge on the Kent County Circuit Court in 2008 by Governor Granholm. His partner at his second law firm, the Honorable Paul Denenfeld, was appointed to serve as a judge on the Kent County Circuit Court in 2009. Judge Denenfeld was one of the Plaintiff's Supreme Court Bar sponsors.

72.    When Judge McKeague was elevated to the Sixth Circuit in 2005, he was succeeded by U.S. District Court Judge Janet Neff, who served as an Assistant U.S. Attorney in 1980, the same year the Plaintiff was born, and was as a judge on the Michigan Court of Appeals from 1989-2007, the same year the Plaintiff relocated from Grand Rapids to Seattle to work on the 9/11 Litigation. Judge Neff took senior status on March 1, 2021. Judge Neff was succeeded by U.S. District Court Judge Jane Beckering, who was appointed to the Michigan Court of Appeals in September of 2007, took Judge Neff's position there, and the Plaintiff interviewed with in July of 2011 while she was clerking for Judge Yates and dating Defendant Priest. Judge Beckering was confirmed to the U.S. District Court for the Western District of Michigan on December 21, 2021, and Judge Yates took **her** position on the Michigan Court of Appeals. Thus, if past is prologue, Judge Yates is next in line for a federal appointment.

73.    During their initial conversation by phone, Judge Yates told the Plaintiff about his former wife's career, the Honorable Corinne Beckwith, who served as EIC of the University of Michigan Law Review prior to graduating in 1992, which the Plaintiff was automatically excluded from running for because her law review article was selected for publication. After

60

clerking for the Honorable Richard Cudahy on the Seventh Circuit Court of Appeals and then for Justice Stevens, Judge Beckwith worked as an appellate attorney for the Federal Public Defender's Office in Washington D.C. from 1999, the same year Defendant Priest graduated from Oakridge High School, through 2011. She was nominated to the D.C. Court of Appeals by President Obama on March 31, 2011, two months after the Plaintiff began clerking for Judge Yates, confirmed on November 18, 2011, and sworn in on February 3, 2012. Judge Yates' current wife is a teacher and ran the We The People program at East Grand Rapids High School when the Plaintiff clerked for him. Taken together, the three of them are, for lack of a better descriptive phrase, constitutional law and appellate royalty.

74.    When the Plaintiff relocated from Oahu back to Michigan in September of 2010, she had an extremely expensive flight record beginning in 1986-1987, cell phone, Facebook, and email contacts list, and a judicial interview list that included (in the following chronological order): (a) her mother's family; (b) Professor Barnhizer (2002-2005); (c) Sixth Circuit Judge McKeague (2004-2005); (d) her best friend from law school; (e) her father and stepsister; (f) Sixth Circuit Judge Suhrheinrich (interviewed in 2005); (g) Lisa and Nick Manheim (2007-2009); (h) Magistrate Judge Barry Garber (interviewed in Fall of 2008); (i) Ninth Circuit Judge Tallman (interviewed in April of 2009) (j) Judge Gillmor (2009-2010); (k) Ms. Lovett (2009-2010); (l) AUSA Ryan Dickey (2009-2010); (m) Magistrate Judge Barry Kurren's daughter, Amy Kurren, who clerked for Ninth Circuit Judge Clifton (2009-2010); (n) Judge David Ezra (2009-2010); (o) all of the law clerks on Oahu (2009-2010); (p) AUSA Tim Verhey; (q) Sixth Circuit Judge Griffin (interviewed in June of 2010); (r) Judge Yates (2010-2012), and Judge Beckwith through Judge Yates.

75.     Through an otherwise statistically impossible series of events, after graduating

with a published law review article-Supreme Court amicus brief citation combination that

contained a section titled: "In Defense of the Judiciary," the Plaintiff **also** had both the power and

responsibility for emailing the entire judicial branch in the event of a military or security

emergency on Oahu (@allfeds). That is an **extremely** expensive list in terms of the associated

legal educations and careers, which Defendant Priest had nothing to do with the Plaintiff's

acquisition of. In accepting the friend request from Mr. Priest in March of 2010, the Plaintiff also

did not consent to being part of any classified program. However, out of that entire list,

Defendant Priest ended up being the one "contact" that was the most valuable to her. He was the

**one** person that she wanted from this world. No one fully grasped how exceedingly rare the

Plaintiff's Supreme Court amicus brief citation is, and neither did the Plaintiff at the time

because she was still too young to understand it.

C.     **Clerkship for the Honorable Christopher P. Yates.**

76.     The Plaintiff began happily clerking for Judge Yates in January of 2011 where her

starting salary was approximately $47,000. His first directive to her on her first day was: "your

job is to never get me reversed." Because Judge Yates was only authorized to hire the Plaintiff

for a one-year term and they had discussed her appellate-related career goals at length during

their first conversation from Hawaii, he encouraged her to start taking Sixth Circuit CJA-

appointed cases again to gain experience and to actively seek appellate-level clerkships. The

Plaintiff contacted Ken Loomis again, who was grateful to hear from her and said that he had a

backlog of cases. She reminded him about her rule regarding sexual assault and violent crimes

and told him that she was extremely interested in any cases with "cool Fourth Amendment

issues." Their arrangement was that he would give her a new case after she filed the opening

brief in the previous case. Judge Yates also graciously gave the Plaintiff a flash drive of briefs

that he had previously filed with the Sixth Circuit, and she patterned her briefing after his using

the same format and direct, matter of fact writing style and tone as her law review article.

77.    One of the Plaintiff's first cases after returning to Michigan was *United States v.*

*Hamilton*. As a result of that case, the Plaintiff became acquainted with Attorney Mark

Wohlander in Kentucky, who was Mr. Hamilton's trial counsel. The Plaintiff asked him to review

the opening brief prior to submitting it, who called her on her phone in chambers a few hours

later and told her that it was "the best god—m brief [he'd] ever read." Mr. Wing's response when

the Plaintiff told him about this compliment later that evening was: "He probably just wants to

—k you." As a result of that exchange and Mr. Wing's increasingly jealous, religiously

hypocritical, "anger issues" and related behavior,[28] and the fact that he essentially hated

everything the Plaintiff stands for: love, tolerance, compassion, empathy, she decided that she

needed to break up with him.

78.    On May 2, 2011, Osama Bin Laden was captured and executed. The next day, the

Plaintiff woke up to a text message from Ms. Lovett that said: "We murdered Osama," which she

was both slightly confused and semi-horrified by. In response to the public's reaction to that

event, and almost as if he had read the Plaintiff's mind and most definitely Ms. Lovett's text

message, Defendant Priest posted a brilliantly written Facebook note, which started with the

sentence: "Troubling is the discourse" and ended with the statement: "Patriot. I despite the

---

[28] Shortly after moving in with Mr. Wing in September of 2010, he informed her that he had
what he called "anger issues." *See* **Exhibit B** at p. 1-3.

word." The Plaintiff commented on the Facebook post: "Loved every word." It was the first time that they had ever spoken or otherwise interacted on Facebook. She meant it then, and that agreement has grown exponentially since that time.

79.     At the same time, Mr. Wing's behavior was becoming alarming to the Plaintiff, *see* **Exhibit B**, and she temporarily moved into a condo owned by Judge Yates in downtown Grand Rapids while she began looking for a house in Grand Haven. The Plaintiff and Mr. Priest met for the first time on May 21, 2011 at Grand Haven State Park Beach, and they often stayed in a home that was owned by a retired Secret Service agent, Ron [last name unknown], overlooking Grand Haven State Park, which is on the same Five Mile Hill and one street over from a vacation home owned by Judge McKeague (which the Plaintiff was not aware of at the time). Defendant Priest's friend rented the lower level of Ron's house. On their first date, Defendant Priest asked the Plaintiff to be his date to Mr. Thue's upcoming wedding on September 10, 2011. They had an equally hilarious, **highly** inappropriate, and the Plaintiff believed top secret inside joke about the meaning of the word "jurisdiction," which he texted to the Plaintiff while she was temporarily at Judge Yates' condo. He also referred to himself as a superhero at one point and said that he was "out protecting" during the same text message exchange.

80.     Defendant Priest stayed at Judge Yates' condo with the Plaintiff in early June of 2011, and it was the first time the Plaintiff told him that she loved him while he was sleeping. She closed on the first house that she had ever purchased in Grand Haven later that month, which she purchased for $74,500, and Defendant Priest helped her fix it up. During the beginning of their relationship, they spent 4-5 days a week together, including attending Mr. Thue's wedding

shower in June of 2011. He also texted her at one point and told her that he was "gonna put a double lock on her door so she didn't get stolen." The Plaintiff obviously had no idea what that meant, let alone in any kind of military, encryption, double key, or nuclear weapons-related context. Further, although she was aware of the fact that Mr. Thue had to have a security clearance to be an air traffic controller, she did not learn until July of 2013 when she specifically asked Mr. Thue in response to Edward Snowden's disclosures that he had needed a top secret security clearance, but to quote him "only for purposes of knowing the location of Air Force One." Sometime in 2013, the Plaintiff learned from her co-counsel in the Meade case that Air Force One is also the historically assumed location for the nuclear football.

81.     Defendant Priest told the Plaintiff that he had a degree in criminal justice and he was working on a **book**, which is what the Plaintiff is currently working on because of the same man and the events set forth in this Complaint. After he unexpectedly traveled to Chicago over the Fourth of July weekend, his demeanor towards the Plaintiff changed and she began to suspect that he was something other than what he said he was. The details giving rise to that suspicion will be published in the above-referenced book, and more detailed excerpts can be provided to the Court upon request. When he got back from Chicago, he also made a point to ask the Plaintiff if she knew who John Nash was, told her that he used to memorize encyclopedia entries as a child, and when the Plaintiff asked, he said: "Yeah, I'm pretty good at math" and smirked.

82.     During that summer, the Plaintiff: (a) played softball on a team with Judge Yates and various federal agents, employees, and attorneys in the U.S. Attorney's Office for the Western District of Michigan, including AUSA Tim Verhey, who told her that she was still on the list for an appellate position once they were able to get it re-approved; and (b) she met and

became personal and Facebook friends with Neil Marchand, who clerked for the Honorable

Gordon J. Quist from 2009-2010. In late July of 2011, the Plaintiff woke up to the sound of

Defendant Priest talking to her while she was sleeping. The only part of the soliloquy the

Plaintiff heard was: "I'm sorry...I can't stay...I love you," and then he snuggled her in and made

a point to hold her for the rest of the night. At the same time, in July-August of 2011, the

Plaintiff's iPhone and Facebook account began behaving strangely, and she started receiving

double text messages from Defendant Priest, including one in which she referred to her

friendship with Mr. Marchand.

83.     On August 6, 2011, Mr. Priest texted the Plaintiff the song "California" by Josh

Ritter. Without knowing that the Plaintiff has grapheme-color synesthesia, he also texted her the

song "Colors" by Amos Lee. After one of their last in-person conversations around August 13,

2011, he asked the Plaintiff if she "had ever had to hurt someone intentionally before," to which

she responded "no" especially since every lawyer knows that doing so is its own tort. When the

Plaintiff recounted that conversation to her current boss in July of 2019, her immediate response

was the same as the Plaintiff's at the time: "Why, because he's, like, CIA or special forces or

something?" That is exactly what the Plaintiff believed. She has been reading people since the

age of six when she used to sit in airports to see if they were safe, she absorbs the emotions of

other people, and he made that statement deliberately.

84.     As his angst over leaving became increasingly obvious and excruciatingly painful

for the Plaintiff for the same reasons referred to above, he told the Plaintiff in a Facebook

message that he couldn't take her to Mr. Thue's upcoming wedding on September 10, 2011. The

Plaintiff broke down, sent a message to her high school friend, Holly Pontius (who was with

them on their second date), and Defendant Priest came over to her house. The Plaintiff and

Defendant Priest talked, and he was back to being the good person that she knew and loved.

During that conversation, Defendant Priest told the Plaintiff: (a) he saw all of the good things in

her ("who says I don't see it?"); (b) that he "never intended to disappear from her life forever;"

and (c) most importantly, he indicated that he would be back in "four years,"[29] but he wouldn't

tell the Plaintiff why he was leaving.

85.     Because the Plaintiff has the same photographic memory that she has always had

and she knew that it would be too painful for her to stay in Grand Haven and be reminded of

Defendant Priest everywhere she went, she began looking for jobs in Washington D.C. As a

consequence, the Plaintiff applied to the NSA's Appellate Division for two reasons: (a) she

already believed that Defendant Priest worked for the same agency or did something else a lot

more classified; and (b) she had **already** been vetted and approved for the top secret security

clearance required by the job posting two years earlier. During a subsequent cell phone

conversation, the Plaintiff told Defendant Priest about that application. He somehow already

knew that she had applied ("I know. It's…it's a good opportunity"), and he got mad at her for

wanting to leave ("I can't believe you're going to let some guy make you run away."). At the end

of their conversation, he reassured her that he still didn't intend to disappear from her life

forever, and that he would be back, but he said that she needed to go live her life in the

meantime.

---

[29] The Plaintiff: How long? Defendant Priest: Have you ever seen the show Californication?
There's this scene where a husband and wife have to say good-bye because he goes to prison.
The Plaintiff (again): How. Long. Defendant Priest: Four years."

86.     At the same time, Defendant Priest began dating someone ten years younger than the Plaintiff, Lauren Link, who behaved in the above-described jealous, catty, vicious manner towards the Plaintiff, he took as his date to Mr. Thue's wedding, and who Mr. Marchand referred to as "trailer trash Barbie" when the Plaintiff showed him a picture of the two of them during an evening out in Grand Rapids. Shortly thereafter, the Plaintiff's friend from law school, Tom James, posted a Facebook poll: "Will Katie ever find Prince Charming?" Defendant Priest voted in the poll, but because he was already hurting her intentionally via photos of himself and Ms. Link, the Plaintiff deleted him as a Facebook friend and didn't see his response. The Plaintiff immediately regretted that decision and texted Defendant Priest to let him know after she tried to find his profile again but couldn't. In the text message, she explained that it hurt her too much to see him get involved with someone else and said: "You didn't need to block me." His response was: "Ah. I didn't block you. I have always been un-searchable to non-friends."

That is what the Plaintiff believed she was.

It shouldn't have been possible for anyone to find her or view her information who she did not want or authorize to do so, **including** Defendant Priest in March-April of 2010, and because she is a crime victim, she was extremely careful about who she gave her phone number or any other information to.

87.     At the time of the Plaintiff's application to the NSA's appellate division in early September of 2011, she had no idea who Edward Snowden was, that her maternal uncle is best friends with the father of a Navy SEAL, or that the NSA coordinates the communications for the Navy SEALs. Further, **all** of the Justices, including Justice Scalia, were Fourth Amendment originalists just like the Plaintiff. *See United States v. Jones*, 565 U.S. 400 (2012) (opinion

authored by Justice Scalia, with concurring opinions by Justice Sotomayor and Justice Alito

holding that attachment of GPS tracking device to vehicle is search within the meaning of the

Fourth Amendment); *Riley v. California*, 573 U.S. 373 (2014) (unanimous opinion authored by

Justice Roberts stating that if police want to search a cell phone, then "get a warrant."). The

Plaintiff did not know at the time that she is personally adverse to the domestic surveillance

practices revealed by Snowden. The Plaintiff further assumed that because of her age, actual

innocence, and lack of the same military, foreign language, math, or technology background that

**disqualified** her for employment with the Secret Service and the CIA post-9/11, that she could

never in any way, shape, or form be capable of being associated with, let alone somehow blamed

or outright harmed for: (a) the same military event that took place on May 2, 2011; or (b) the

same commitment to fighting for constitutional rights, law review article-Supreme Court amicus

brief citation, academic credentials and professional qualifications that resulted in her own

federal clerkship offer, top secret security clearance application and approval and clerkships.

88.    At the same time, another law school classmate, Nick Mathieu, sent the Plaintiff a

Facebook message and invited her to visit him in Washington D.C. over the weekend of

September 23, 2011. Mr. Mathieu joined the Air Force *after* they graduated from law school

because he couldn't find a legal job, sent her a Facebook friend request from a desert in

Afghanistan sometime in 2007 while she was working for Perkins Coie, and he was in

Afghanistan while the Plaintiff was clerking for Judge Gillmor. Because the Plaintiff was so

heartbroken over her separation from Defendant Priest, she agreed to fly to Washington D.C. and

Mr. Mathieu paid for her plane ticket. While the Plaintiff was in Washington D.C., they met up

with her former co-clerk from Hawaii, AUSA Ryan Dickey, and the Plaintiff learned that he was

now an AUSA in the Cybercrimes division. Mr. Mathieu was sent to Oahu *after* that trip. He lived in the same small town as the Plaintiff, Kailua, received a $2400 military housing allowance while the Plaintiff barely scraped by, and paid no federal taxes. In a private Facebook message with what was by then her third Facebook account in February of 2014, he thought it was funny to inform her that, actually, he knew "war lords in Afghanistan" and a human trafficking market where the Plaintiff would "fetch a hefty price." *See* **Exhibit B**. A short time later, he informed the Plaintiff that he could only get a job at Blackwater now. When the Plaintiff posted that on Facebook later, Steve Tubergen, an already-enlisted Marine and another one of the Plaintiff's law school classmates said: "Dude?! You're Air Force!" The Plaintiff had no idea what that meant or why this was a problem, but when Mr. Matthieu offered to pay for another one of her plane tickets and meet her in Washington D.C. so she could hand-deliver another filing to the Supreme Court, she declined the offer.

89.     While the Plaintiff was in Washington D.C., she took a photo of Air Force One flying overhead with the caption: "Welcome home Mr. President" and posted it on Facebook. While she was in Washington D.C., her iPhone and Facebook account were behaving strangely. On or about September 23-24, 2011, while the Plaintiff was standing in a Washington D.C. airport waiting to board her flight back to GRR, and notwithstanding the fact that the **only** people who were even permitted to have her cell phone number for the same physical safety-related reasons were her mother's family, her father, stepsister, best friend from law school, Judge McKeague, Ms. Lovett, Judge Gillmor, her friends from Oahu, Judge Yates, and Defendant Priest, the Plaintiff received a text message that was sent directly to her cell phone number from

someone with an Arabic name, Abdo_Sayed_009@yahoo.com. The text message said: "A Yahoo user is burning for you, text REPLY to find out who." (*See* **Exhibit C** — FOIA Request at p. 6).

90.     Had the Plaintiff received a security briefing while she was clerking on Oahu, or had she been aware of the fact that her uncle's best friend is the father of a Navy SEAL, she would have refused to get on the plane given the timing. Because the Plaintiff and Defendant Priest shared the same open mindedness and tolerance towards all religious views, he was fond of saying "Thank Allah" while they were dating, and most importantly, he posted a video for the song Fever by Michael Buble' on his Facebook page that day, the Plaintiff believed it was from him. Upon returning home, the Plaintiff randomly decided to type the name Abdo Sayed into the Facebook search function, and she found a Facebook page with a picture of a heart drawn in beach sand that she thought Mr. Priest had added to his 'likes' a few weeks earlier. She clicked on it and was lead through a series of pages, and she ended up 'liking' several Arabic pages. The Plaintiff texted Defendant Priest about it shortly thereafter because she thought it was a cute way of asking her if he could come back. He became unreasonably angry and sent her an email in which: (a) he said stop CONTACTING me; (b) he called the Plaintiff "pathetic," (c) he said that he was going to block her on Facebook; and (d) he said "What am I, Bruce Wayne?" The Plaintiff forwarded the message to her friend, Holly Pontius, later.

91.     The Plaintiff was, once again, heartbroken over their email exchange, so she set up an alias gmail address, jardin.angelos.008@gmail.com and Facebook account, Ava Rose, and she emailed the Abdo_Sayed email address from the alias gmail account. (*Id.* at p. 5). In it, the Plaintiff asked for a sign that it really was Defendant Priest and that he really would be back in "four years." In response to that email, Defendant Priest unblocked the Plaintiff's named,

established in August of 2006 facebook account for exactly four days and then re-blocked her.

However, in that four day time period, the Plaintiff noticed certain anomalies about his Facebook

account and later when viewed publicly, including the fact that he had an abnormal level of

control over what numbers and information was publicly visible, and that the Plaintiff appeared

to be on some type of parallel Facebook page when she logged into her alias account.

 92. The Plaintiff's nickname for Defendant Priest while they were dating was

Vacation. The only photo album that he left publicly visible after four days when he re-blocked

the Plaintiff was: "Brian goes to Orange County" (California — just like the song that he texted

her on August 6, 2011). He had also added a bunch of different bands, certain books, movies, and

T.V. shows to the 'likes' section of his page. Among those listed were: (a) Jason Mraz and

Michael Buble; (b) A Heartbreaking Work of Staggering Genius, The Little Prince, The Portrait

of Dorian Gray, Kitchen Confidential by Anthony Bourdain, Catch-22, and 1984 by George

Orwell, which the Plaintiff quoted on the first page of her law review article; and (c) Lost in

Translation, which he made a point to bring to her house and watch with her the same day that

she told him she was sexually assaulted after graduating from law school. (The Plaintiff: "They

love each other, don't they? Defendant Priest: "Yes. But they can't be together."). Most

importantly, Defendant Priest could control the manner in which certain numbers were displayed

on his wall, which had a line underneath each entry and looked like this:

Brian changed his profile picture 3 times

———————————

Brian added 1 new likes to his page.

———————————

72

Brian changed his profile picture 1 time.

311, which is the Plaintiff's birthday and the name of a band and song that they had listened to together ("However far away, I will always love you.").

93.     The Plaintiff started typing the numbers that were displayed on his page into the Facebook search bar, and she got lists of resulting combinations of letters and numbers that looked like this: 4 — love4ever, loveevery4, lvevry4, love4evr, l4veevery4, 4everlove, lvevry4yrs, love4ever, l4ve8. There were hundreds of results like that. Since there were sixteen photos on the Abdo Sayed Facebook page, the Plaintiff tried 16 next. The results were P798, P162, P7912, and again, there were hundreds of them like that. If P has a numerical value, and remembering Defendant Priest's comment about John Nash, the Plaintiff wondered if he was using their initials. Since his middle initial is J, the Plaintiff typed it into the Facebook search feature and got: BBYJURSAYYES, babyjussayys, bbyjustsyyes, which is an abbreviated version of the lyric: "Baby just say yes" from the song Love Story by Taylor Swift. *See* **Exhibit** at p. 2 (with handwritten notation "79854131bbyjursayyes"). The Plaintiff kept going, though, because she got there too fast, one of the "answers" on the Abdo Sayed page was "the one," and she wanted to understand all of it. So, she wrote out a grid, and because she's had the alphabet memorized backwards for years, the Plaintiff decided to write it backwards as well:

A B C D E F G H I J K L M N O P Q R S T U V W X Y Z

1  2  3  4  5  6  7  8  9 10  11 12 13  14 15  16 17 18  19  20 21 22  23  24 25  26

Z Y X W V U T S R Q P O N M L K J  I H G F E D  C B A

94.    K and P always line up, and since the Plaintiff automatically adds numbers horizontally, the letter B can equal 2 or 7, the letter K can equal 2 or 7, and the letter P can equal 2 or 7, all of which equal 9. As for their middle initials, J can equal 1 or 8; L can equal 3 or 6. All of which, again, also equal 9. Adding their initials together going forwards looks like this: BJP = 217 = 10 = 1 + KLM = 234 = 9; 1+ 9 = 10; 1+0 = 1. Furthermore, since there were four rows of photos on the Abdo Sayed page, the Plaintiff assumed four sentences, so she started sliding certain letters by the number combinations from Facebook, which were too numerous for her to list from memory here but included 978, 897, 798. At one point, the Plaintiff emailed the Abdo Sayed account and said something along the lines of: "Wait, are you going backwards and forwards?" Switching back and forth, and moving each letter by the above-referenced combination of numbers, the Plaintiff ended up with a grid that looked like this:

I LOVE YOU

I CANS EE EVRYTHNG IN YOU

YOU ARE EVRYTHNG

KATI E JAM ESPRIES T

This mirrored what he said to her during their last in-person conversation, which the Plaintiff concluded could not be a coincidence.

95.    At the same time, the Plaintiff attended the Irish Festival in Muskegon, Michigan with her high school friend, Shannon Johnson, and her husband, Garry Johnson. After the festival, Mr. Johnson got belligerently drunk, began screaming obscenities at the Plaintiff, picked her up, threw her into a brick wall, and then threw Mrs. Johnson to the ground. As was

previously stated, had Defendant Priest been with the Plaintiff that night, he would have beaten

Mr. Johnson into a bloody pulp. However, Defendant Priest is also the reason the Plaintiff cannot

now purchase a gun to physically protect herself.

### D.   Electronic Stalking

96.      Sometime in October, the Plaintiff communicated her belief that Defendant Priest

was in fact CIA or some other type of classified person to the Abdo Sayed email address. Shortly

thereafter, she logged into the same Facebook account that she established in August of 2006 at

the insistence of her cousin, Justin Lawrence, whose father is best friends with the father of a

Navy SEAL, and she typed the name of the alias account into the Facebook search bar to view it

publicly. Upon doing so, she discovered a photograph of what appeared to be herself lying on a

floor somewhere with tears in her eyes and duct tape over her mouth. (*See* **Exhibit C** —

February 6, 2014 FOIA Request at p. 8). The Plaintiff was terrified, but she couldn't explain how

it was technologically possible. As a consequence, she began having nightmares and stopped

sleeping, at first, for 1 to 3 days at a time, meaning that she would stay awake for 1 to 3 days,

sleep for a night, and then do it over again.

97.      The Plaintiff continued to check Defendant Priest's Facebook page on a daily

basis because of the above-described discovery and what appeared to be a marriage proposal, his

"Bruce Wayne" related statement, and how much she loved(s) him.

98.      On November 5, 2011, Defendant Priest changed his Facebook relationship status

to say that he was in a relationship with Ms. Link. The Plaintiff emailed the Abdo Sayed email

address and said that after discovering what she had, she wanted to take a pair of scissors to her

wrist; however, the same day, he rearranged the numbers on his Facebook wall to 3412. Typing

that number combination into the Facebook search feature lead to 3412 — I'm Yours by Jason Mraz. Right around the same time, someone with a profile picture of Batman looking out over a fire and an email address proekt13@gmail sent a friend request to the Plaintiff's alias Facebook account. Kt is an abbreviated spelling of the Plaintiff's first name; Defendant Priest's birthday is 3.1. Another one of the pages that she had 'liked' changed its name to "everywhere all the time," which is the CIA's general motto. (*Id.*)

99.    On November 8, 2011, the Supreme Court heard oral argument in *United States v. Jones*, 565 U.S. 400 (2012), and held that collecting GPS data constitutes a search within the meaning of the Fourth Amendment. In that case, Justice Sotomayor wrote a concurring opinion in which she stated:

> With increasing regularity, the Government will be capable of duplicating the monitoring undertaken in this case by enlisting factory or owner-installed vehicle tracking devices or GPS-enabled smartphones…GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations…And because GPS monitoring is cheap in comparison to conventional surveillance techniques and, by design, proceeds surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices: limited police resources and community hostility. Awareness that the Government may be watching chills associational and expressive freedoms. And the Government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse.

100.    The Government's Petition for Writ of Certiorari in *Clapper v. Amnesty International* was actually due on December 9, 2011. Instead of filing it on time, the NSA sought extensions and waited until the Court's decision in *United States v. Jones* was released on January 23, 2012. It then filed its Petition on February 17, 2012. It already knew that it was doing everything identified by all nine Justices in *United States v. Jones*, and that every concern and caveat expressed by Justice Sotomayor was taking place. Ten days after the Supreme Court

76

issued its decision in *United States v. Jones*, on November 18, 2011, Judge Beckwith was

confirmed to the D.C. Court of Appeals. Judge Yates offered to give the Plaintiff a glowing

recommendation and hand her off to Judge Beckwith, who was looking for a career law clerk at

the time, if the Plaintiff still wanted to go to Washington D.C. He also had to submit paperwork

for purposes of her confirmation as a former spouse. While he was filling out the paperwork in

his office, the Plaintiff explained her suspicions about Defendant Priest's employer; specifically,

that he was "CIA or NSA," and she asked Judge Yates why he and Judge Beckwith had broken

up since they were still such good friends. Judge Yates told the Plaintiff that it was because of the

distance; that they eventually just grew apart. Since being with Defendant Priest was the only

thing the Plaintiff had ever wanted, she told Judge Yates that she was going to stay in Michigan

and wait out the four years.

101.    Beginning with the above-described discovery in October of 2011, the Plaintiff

was electronically stalked across every electronic device and account, which included: (a) the

Yahoo email address listed on the cover of her top secret security clearance application

(established in 1998); (b) her gmail account (established in 2004); (c) her Facebook account

(established in 2006); (d) her alias gmail and Facebook accounts (established in September of

2011), which she deleted sometime in 2012; (e) her computer inside Judge Yates' chambers; and

most importantly (f) her cell phone. *See* **Exhibit C** at p. 1-5. She tried to explain it to Judge Yates

at the time but she couldn't because does **not** have a technology degree for the exact reason that

she has a legal education. This most recently included hacking into Verizon's system and

changing the SIM identifying information for her cell phone on the eleven year anniversary of

her first date with Defendant Priest (May 21, 2022). The Plaintiff has had so many devices, email addresses, and passwords at this point in her life that she can't remember them all.

103.    In February of 2013, the same Sixth Circuit Judge McKeague who swore the Plaintiff in via a private swearing-in ceremony in April of 2006, was one of three people that convinced her to apply for federal clerkships in 2008, and she flew from HNL to GRR to interview with in March of 2010, insisted on what resulted in a Secret Service investigation that was deliberately discontinued in June-July of 2013, immediately after Edward Snowden came forward. *See* **Exhibit B**. In July-August of 2022, the Plaintiff went to the Michigan Attorney General's Office in-person and spoke with a female attorney in the Civil Rights Division via a secure phone from the front desk. She listened to the entire story, was incredibly empathetic, kind, and compassionate, and like Judge McKeague, told the Plaintiff that most of what she had described was "criminal." She further gave the Plaintiff a plan and told her to start with local law enforcement. Local law enforcement, including an officer who **also** has a J.D. from MSU and actually had Judge McKeague for federal jurisdiction, Grand Haven Officer Nick Sheridan, doesn't know what to do with this case. Between that time period, and again in the following chronological order:

104.    In November-December of 2011, the Plaintiff formed The Law Offices of Katherine L. MacPherson, PLLC, and her contact information for purposes of her Sixth Circuit CJA cases was her Kent County email address, katherine.macpherson@kentcountymi.gov, and then kmappeals@gmail.com. *See* **Exhibit C** at p. 5. In January of 2012, the Plaintiff received a glowing review from Judge Yates and he extended her clerkship for another year, which would have otherwise ended in January of 2013.  A detailed, daily account of events from February 16,

2012 through May 4, 2012 is included in the letter to Judge Yates incorporated by reference and attached hereto as Exhibit F. (*See* **Exhibit F** — May 19-21, 2012 Letters to Judge Yates, Human Resources, and I.T. Department Report). On Defendant Priest's birthday, March 1, 2012, the Plaintiff's computer inside Judge Yates' chambers somehow visited websites that were blocked by the court's firewall, including Facebook, Google, Twitter (the Plaintiff didn't even have a Twitter account anymore at that point), and multiple websites for "contacts," even though the Plaintiff had perfect vision at the time. *Id* at p. 6.

105.     On or about March 4-5, 2012, the Plaintiff confronted Defendant Priest about the stalking via email. She also asked him not to respond. Instead, she received a nearly unintelligible email back that repeatedly stressed the word "**contacts**," and he said that he was "**blocking**" her number for some inexplicable reason. In addition to insulting the Plaintiff, he also made reference to "**all**" of the Plaintiff's "writings to him," when in fact, the only emails the Plaintiff sent him since the one in September of 2011 had all been sent to the Abdo Sayed email account. *Id* at p. 3.[30] The Plaintiff was furious. She sent him an email back that said: "F——k you.

---

[30] Stating:

> He responded anyway. He opened his email with the statement: "Katie L. MacPherson, read this message carefully," proceeded to insult me and call me crazy, but in doing so, he: (1) made various numerical references and other symbolic ones; (2) he bolded a series of words; (3) he repeated himself twice at the end; (4) he talked about calling Sprint and blocking my phone number, noting that it was the 4th avenue to close. He also completely mis-quoted me and accidentally implicated himself. Specifically, he referenced 'all' of my writings to him, when in fact, every single email has been sent to the Abdo Sayed account only. I was furious. I told him never again, period, no matter how many changes were made, I described for him EXACTLY what this had been like for me, I told him to go ahead and sit there and picture me 'reading his message carefully,' trying to read something into it for him that he was too weak to tell me himself because it wouldn't happen, and I called him a narcissistic prick."

Never again like this." In response, Defendant Priest made a prior Facebook post that said: "K, come back, we miss you already," publicly visible on his Facebook wall, which normal users did not have the ability to do at that time (Facebook users could not selectively choose what status updates to make publicly visible back then), and he changed his Facebook profile photo to a picture of himself and Ms. Link.

106.    Immediately after the above-described email exchange with Defendant Priest, between March 5, 2012 and April 19, 2012, the Plaintiff received a relentless series of phone calls from blocked, unknown, or +three digit numbers that: (a) either spelled out his or their combined initials (+216) and were deliberately grouped in multiples of four (four years); (b) totaled the number four (+202); (c) were from California area codes; or (d) were from Bensalem, PA, which are also his initials and is where her Facebook logins were being generated from. *See* **Exhibit C** at p. 3. The Plaintiff accidentally answered one of the calls while she was driving, heard a distorted voice on the other end that said "goodbye," took a screenshot of the call because it frightened her so badly, and it showed up on her cell phone bill the following month as an incoming call from her own phone number, which AT&T could not explain and said was technologically "impossible." (See **Exhibit C** at p. 3-4; **Exhibit G** — March-April, 2012 Screenshot and Cell Phone Bill). In May of 2013, Mr. Kobza informed the Plaintiff that "**only**" the NSA has the technological power to deceive a cell phone tower in that manner because it coordinates the communications for his son.

107.    At the same time, Defendant Priest wiped all of the publicly visible information from his Facebook page except:

Brian changed his profile picture 3 times

---

Brian changed his profile picture 1 time

---

Brian changed his profile picture 1 time

The Plaintiff called Ms. Lovett in Hawaii and asked her to visit Defendant Priest's

Facebook page so she could verify that it looked the same (311), and she sent Ms. Lovett a

message about some of the above-referenced series of events on April 19, 2012 via Facebook;

however, she didn't think to tell Judge Gillmor about the stalking. (*See* **Exhibit F** at p. 3-5).

108.     At the same time, the Plaintiff learned that Defendant Priest had just started

working for her cell phone service provider, AT&T, from their mutual high school friend, Holly

Pontius, after Ms. Pontius ran into Defendant Priest and Ms. Link at 22-Below in Grand Haven

while they were out celebrating his new job. According to a reporter that the Plaintiff recently

spoke with, Defendant Priest's LinkedIn profile now says that he began working for AT&T in

May of 2011, the same month that Osama Bin Laden was captured and executed. As is also

widely known, AT&T and the NSA have an extremely close relationship. In May of 2013, Mr.

Kobza informed the Plaintiff that the NSA coordinates the communications for the Navy SEALs.

After learning that Defendant Priest was now working for AT&T, the Plaintiff called AT&T from

her phone inside Judge Yates' chambers, and she asked to change her cell phone number, which

went from 808.366.1789 to 808.321.7958. The technician told her to turn off her cell phone, and

when she told him that it was off, he said: "That's weird. I'm showing that your SIM card is still

in use."

109.     On May 3, 2012, the Plaintiff tried to contact Facebook via a faxed letter but received no response. (*See* **Exhibit E** — May 3, 3012 Faxed Letter to Facebook). In that letter, the Plaintiff stated: "I gave my address to one of my 'friends' the other day in a private Facebook message — If this is visible to some crazy psycho, then I'd say that's a huge liability on Facebook's part." The "friend" referenced was Joe Thue.[31] During recent congressional testimony by Mark Zuckerberg, and in response to a question from Senator Sheldon Whitehouse inquiring where Mr. Zuckerberg had stayed the night before, Mr. Zuckerberg did not want to give Senator Whitehouse that information. It is also beyond dispute that if the Plaintiff had accessed the client list for Perkins Coie and stolen and sold the private home addresses for its clients and CEO's, **she** would have been criminally prosecuted and probably disbarred. Doing that to her is no different.

110.     In April of 2012, the Plaintiff reported the electronic stalking of herself to an employee at the AT&T store in the Woodland Mall, Jamie Vincent.[32] On May 4, 2012, the Plaintiff contacted the regional manager at AT&T, explained the situation with Defendant Priest, and she asked to be let out of her contract. (*See* **Exhibit F** at p. 5). The regional manager declined the Plaintiff's request because according to her, "it wasn't really AT&T's problem," and if the Plaintiff felt threatened, then she should just "go to the police;" the same Michigan **state** and local police who would not then, and most recently demonstrated still do not have either the technological power or the jurisdiction to investigate. At that time, the Plaintiff also asked to

---

[31] The Plaintiff sent him a gift because he and his wife had just had a baby, and they wanted to send her a thank you note.

[32] Ms. Vincent (soon to be Veen) now works at Mama's Thai in Grand Haven.

know the name and identity of AT&T's **outside** counsel, not AT&T's inside (CYA) counsel.[33] No one seemed to either know or be willing to provide that information to the Plaintiff. She also conferred with one of Apple's Geniuses, who gave her an alternative explanation for how her cell phone bill from March-April of 2012 might be possible. *See* **Exhibit F** at p. 5. An AT&T technician later said that this was incorrect, and that "no one" could deceive a cell phone tower in that manner.

111.     The same day the Plaintiff printed off her application to become a member of the Supreme Court Bar, she downloaded and printed off the NSA's Mac Hardening Guidelines for Snow Leopard over her lunch break. (*See* **Exhibit H** — NSA Mac Hardening Guidelines; Router Information; Sudo Nano Commands). On or about May 19, 2012, Judge Yates informed the Plaintiff that beginning on Defendant Priest's birthday, March 1, 2012, her computer inside chambers had somehow visited multiple websites that were all blocked by the court's firewall, none of which were blocked while she was clerking on Oahu,[34] and he presented her with the I.T. Department generated list of websites attached hereto as **Exhibit F** at p. 6-7. According to Judge Yates, the court administrator, Jack Roedema, was "pissed." For that reason and the fear associated with the fact that whomever was responsible was able to get to the Plaintiff inside the chambers of her own judge, she purchased a brand new MacBook Air for the sole purpose of typing a letter to Judge Yates explaining all of the above. *See* **Exhibit F** at p. 2-5.

---

[33] In the same manner that Perkins Coie does not actually represent Boeing; it represents Boeing's insurance company, AT&T also has outside counsel.

[34] On that list was also the Weight Watchers website. The Plaintiff was and still is 5'1" and weights between 100-105 lbs; however, one of Judge Yates' assistants, Jenny, who was insanely jealous of the Plaintiff, treated her abysmally behind Judge Yates' back, referred to his then-six year old twin girls as "brats," and used to tell the Plaintiff that she "looked like she needed to eat a sandwich" was doing the Weight Watchers program at the time.

112.     On May 21, 2012, the one year anniversary of her first date with Defendant Priest

and the same day the Supreme Court granted certiorari in *Clapper v. Amnesty International*, 568

U.S. 398 (2013), the Plaintiff lost her job clerking for Judge Yates. Notwithstanding the fact that:

(a) the Plaintiff does not have a technology degree for the exact reason that she has a legal

education; (b) she could not explain how the above-referenced list was possible given the

screenshots of her own browser history attached hereto as **Exhibit D**; and (c) she detailed the

electronic stalking of herself using a form of technological power that she could not explain in

**Exhibit F**, Jack Roedema gave the Plaintiff the choice of resigning with a severance package or

being fired.

113.     Before leaving her job, the Plaintiff emailed AUSA Tim Verhey and asked him if

he would be opposed to an extension in one of her Sixth Circuit CJA cases that he was opposing

counsel on, *United States v. Priester,* but she didn't tell him why it was necessary at the time.

(See **Exhibit D** — May 21, 2012 Email to AUSA Tim Verhey). The Plaintiff's mother flew into

town that day. As her top secret security clearance application discloses, the Plaintiff was given

the same choice, resigning with a severance package or being fired, when she was let go from

her position at Dickinson Wright because of the same male partner in the Grand Rapids office

who called Judge McKeague an expletive and enjoyed screaming at a sexual assault victim. (*See*

**Exhibit A** at p. 38 of application). When her mother asked the Plaintiff how she was doing, the

Plaintiff said: "To be honest, I kind of want to kill myself right now," and she told her mom

about the loss of her job with Judge Yates.

114.     The same week that her mother was in town visiting, the Plaintiff: (a) called and

reported those acts to Ken Loomis and Bryant Crutcher at the Sixth Circuit Clerk's Office, who

tried to give her some advice on computer security; (b) she requested extensions in her affected

Sixth Circuit CJA-appointed cases; and (c) she called a partner at Perkins Coie in Seattle, Joe

Silvernale, and asked him if he knew who Facebook or Google's **outside** counsel is, to which he

responded "no" and instead gave her the name of an AUSA in Portland, Greg Nyhus. Perkins

Coie later represented both corporations in the FISA court post-Snowden disclosures and denied

any knowledge of the NSA's PRISM program; except, the Plaintiff also doesn't recall them

bringing a Fifth Amendment Taking Clause claim and she would very much like to know how

they were alternatively compensated since stealing and selling the private home addresses and

contact information for the Plaintiff, federal and state judges, their law clerks, and classified

persons is **so** lucrative.

115.    The same week that her mother was in town, the Plaintiff independently

researched and switched to what turned out to be the same heavily-encrypted **Lava**bit email

service provider that Edward Snowden used while sobbing in the Grand Haven Public Library

after she discovered the phrase: "If he dies, he dies" typed into her Google search history. Thus,

the Plaintiff, who again graduated from Oakridge high school the same year that Daniel Lewin

named his company after the Hawaiian word for intelligent, had a series of email addresses and

extensions that went from: (1) katherinelou0311@yahoo.com (1998); (2) @dickinsonwright.com

(2005-2007); (3) @perkinscoie.com (2007-2009); (4) katherine_l_macpherson@hid.uscourts.gov

(2009-2010) — a **Hawaii** judicial branch email address; (5) @kentcountymi.gov (2011-2012) to

klmlawoffices@lavabit.com (also a Hawaii reference). She also downloaded TOR Browser and a

program called Little Snitch. Upon connecting her MacBook Pro to the internet, multiple

connection attempts from "Akamai" were made to the Plaintiff's computer that Little Snitch informed her of. **That** was how the Plaintiff discovered the origin of Daniel Lewin's company.

116.    The Plaintiff further attempted to run the sudo nano commands from the NSA's Mac Hardening Guidelines on the MacBook Air that she purchased for the purpose of typing her letter to Judge Yates. She received an error back that said: "NS/Track persistent URLs," which the Plaintiff interpreted as: "National Security track persistent URLs." *See* **Exhibit H** at p. 3-4. The Plaintiff called Apple Support about it and was immediately elevated to a top level Apple genius. When she explained what she was seeing, he became extremely nervous on the phone and gave the Plaintiff a sudo nano command that nuked the operating system. *Id.* at p. 3 (handwritten notation: "877-416-4271 ext: 69804, ccameron@apple.com). The Plaintiff drove back to the Apple Store in the Woodland Mall with her mother, returned the MacBook Air, and instead had the hard drive and logic board in her existing MacBook Pro replaced, which was approximately $800. The old hard drive is still forensically sealed and available for examination.

117.    Next, the Plaintiff walked down to the AT&T store inside the Woodland Mall and talked to Jamie Vincent. She explained the electronic stalking of herself further, the fact that she thought Defendant Priest was responsible, and she asked Ms. Vincent if she could set up a pre-paid number on an iPhone. Ms. Vincent told the Plaintiff no, because according to her, "iPhones are mini-computers that can be used by terrorists." The Plaintiff had noticed.

118.    On June 29, 2012, the Plaintiff met a man named Derek Vogelar and they began dating. Between October and November of 2012, she was forced to sell the first house that she had ever purchased because she could no longer afford the mortgage being self-employed, and

she and her two golden retrievers moved in with Mr. Vogelar in Cedar Springs, Michigan. This was supposed to last until the Plaintiff could get back on her feet financially.

119.    On November 3, 2012, the Plaintiff saw Defendant Priest at the AT&T store on Henry St. in Muskegon when she went in to find out how much longer she had on her contract, and while she was packing her things to move into Mr. Vogelar's house. She was surprised to see him working in what appeared to be a retail sales capacity. Later that month, the Plaintiff's maternal grandmother, Joan Lawrence, unexpectedly died. The Plaintiff saw Defendant Priest again at 22-Below in Grand Haven when her mother flew into town for that event, who was there with some men that the Plaintiff had never seen before. Defendant Priest waited for the Plaintiff to come out of the bathroom, walked past her in the hall, raised his hand, looked her in the eye, and mouthed the word: "Hi," as if to say: "I'm so sorry." When the Plaintiff and her mother got into her car, she told her mom: "Oh thank God, mom. Thank God he's okay and he isn't crazy."

120.    In November-December of 2012, the Plaintiff gave her first oral argument in **any** case and before any court before the Sixth Circuit Court of Appeals in *United States v. Schwartz*. Thus, and to be clear on this, when the Plaintiff graduated from law school in May of 2005, the home addresses of neither federal judges nor their law clerks were publicly available. While Judge McKeague has a blind chambers inside a **Post Office**-like federal building in Lansing, Michigan, the Plaintiff did not speak for the first time in any court until **after** she had been electronically stalked to the home of Mr. Vogelar, who lived within 100 yards of a **Post Office** in Cedar Springs, was required to have a **P.O. Box** for that reason, and no one had her home address. Likewise, every brief that she filed with the Sixth Circuit was drafted while she was not sleeping for 1 to 3 days at a time, and every extension that she sought in her Sixth Circuit CJA-

appointed cases became necessary because of various computer and email-related issues that she was having.

121.    According to Judge Yates, the Plaintiff just needed one "big" case and she would be back on her feet in no time. He encouraged her to start her own appellate practice with her CJA-appointed cases and to rent office space inside the Barrister's Building in downtown Grand Rapids where one of the Plaintiff's Supreme Court Bar sponsors, Frank Stanley, also rented office space. The Plaintiff used some of the proceeds from the sale of her house in Grand Haven to do so starting in November-December of 2012. On or about January 2-5, 2013, while the Plaintiff was standing in her office inside the Barrister's Building, her cell phone SIM card was remotely hacked and locked, which AT&T once again confirmed that it does not have the

technological power to do. (*See* **Exhibit C** at p. 3.).[35] It happened on three different occasions within a week-two week time span, which rendered her phone completely inoperable and required her to drive to an AT&T store and have the SIM card physically replaced. The third time it happened, the Plaintiff drove from Grand Rapids to the AT&T store on Henry St. in Muskegon because that seemed to be what Defendant Priest wanted her to do. Although the Plaintiff was working with another customer service representative, she believes that Defendant Priest offered to go in the back and get a new one for her. It didn't happen again after that.

122.    Those events prompted the Plaintiff to finally email Judge McKeague from her Lavabit email account in February of 2013, who the Plaintiff had not seen or spoken to since she flew from HNL to GRR to interview with him in March of 2010, and she asked him to meet her

---

[35] Stating:

> The acts themselves are too numerous and complicated to describe here, but they number into the hundreds at this point and include: (1) the phone calls described in footnote 2 [and in paragraph 105 of this Complaint]; (2) sending emails that showed up in her email account on dates that were months or years in the past and were emotionally significant to her and one other person [they were either the Plaintiff or Defendant Priest's birthday, or the anniversary of their first date]; (3) logging into her Facebook account and/or redirecting her login requests from her home computer to servers located in Washington D.C. and Bensalem Pennsylvania (screenshots of which she still has); (4) editing information or adding certain icons to her Facebook page that were of a threatening nature or of personal significance to her; (5) changing the name of one of the Facebook pages that she had liked to "everywhere all the time," which she was sent an email notification of, saw the next time she logged in, and was just plain creepy not to mention horribly frightening, given what was happening with respect to her email and other online accounts at the time; and (6) locking her out of her own cell phone in January of 2013, specifically, by sending a command that locked the SIM card, which even AT&T cannot do, another person witnessed when it happened, and which, Ms. MacPherson (again) still has screenshots of. And most recently, in October of 2013, changing the time zone for her katie@wohlanderlaw.com account, which runs on a gmail platform, to the time zone for Casablanca, which again, is also the name of a movie that has emotional significance to herself and to one other person [Defendant Priest].

for lunch. The specific question the Plaintiff asked him as he was walking her back to her car was: "Hypothetically, let's say you knew a girl, we'll say it's me, who is in love with someone that she is positive is either CIA or NSA, but she's being electronically stalked and doesn't know what to do. How would she go about finding that information out?" *See* **Exhibit B** at p. 1-3. He asked her why she believed that, and the Plaintiff briefly described an encrypted language that Defendant Priest "taught" her, the stalking with respect to her cell phone, and the fact that he began working for her cell phone service provider in March of 2012. The reason the Plaintiff went to Judge McKeague was because she needed an **objective** opinion from someone in a position of authority who she believed was safe. Further, since the Plaintiff also objectively earned the second highest grade in his federal jurisdiction class, he was the judge who the Plaintiff was thinking about when she drafted certain portions of her law review article, and advocating on behalf of federal judges, Justices, and herself should never become dangerous, he also shouldn't know **any** person or politician who would want to hurt the Plaintiff, her mother's family, Craig Kobza or his son, Judge Yates, his daughters, Judge Beckwith, or Defendant Priest.

123.    Judge McKeague instead immediately called those acts "criminal," which they are regardless of the identity of the responsible parties because "no man is above the law," and he insisted that she go talk to the same AUSA Tim Verhey in Grand Rapids,[36] who: (a) the Plaintiff interviewed with during the same trip and flight home in March of 2010 when Defendant Priest sent her the Facebook friend request; (b) she played softball on a team with during the summer that she and Defendant Priest dated; and (c) was opposing counsel in the same case that she needed an extension in due to the stalking, *United States v. Priester*. Judge McKeague

---

[36] *See* **Exhibit B** at p. 6, 11-12.

specifically told the Plaintiff to use his name and tell AUSA Verhey that he sent her, *see* **Exhibit B** at p. 1, 6-8, which was presumably because he expected his name to mean something and that she would get both answers and an actual prosecution. ("Katie, that's **criminal**. Where are you? Grand Rapids? Go talk to Tim Verhey, **and you tell him I sent you**."). He also called Defendant Priest a "loser," to which the Plaintiff responded by rolling her eyes and saying: "You sound just like my father." *See* **Exhibit B** at p. 1, 6, 11-12.

124.    The Plaintiff won her first appeal in *United States v. Priester* in November of 2012 due to an error made by the Probation Office in calculating the defendant's sentencing guidelines range, and she stayed on to handle the resentencing at the defendant's request. At that point, the Plaintiff was still so traumatized that she wasn't sleeping for 1 to 3 days at a time, and she was extremely nervous during the sentencing hearing because she and AUSA Verhey had agreed to meet after the hearing. The Plaintiff recounted the story to AUSA Verhey, including her own embarrassment and the toll it had taken on her, and she gave AUSA Verhey the first portion of the letter that she had given to Judge Yates in May of 2012 attached hereto as **Exhibit F** at p. 2-5. He also agreed that what she had experienced was "criminal." After their meeting, the Plaintiff faxed him the additional documents incorporated by reference and attached hereto as Exhibit I. (*See* **Exhibit I** — Faxed Letter and Documents to AUSA Verhey). Although the Plaintiff's former co-clerk is an AUSA in the Cybercrimes Division of the Department of Justice in Washington D.C., she didn't call him because **she** didn't want to do anything that could be perceived as "unethical."

125.    The Plaintiff's in-person conversation with AUSA Verhey after the re-sentencing hearing in *United States v. Priester* further resulted in a Secret Service agent contacting her in

March of 2013, Agent Bruce Cain. *See* **Exhibit B** at p. 5, 10-12. Agent Cain spoke with the

Plaintiff for nearly an hour and looked at Defendant Priest's Facebook page while the Plaintiff

was on the phone with him. *Id.* He was **extremely** concerned about those acts with respect to her

cell phone, separately confirmed his intent to investigate with AUSA Verhey, told her to gather

all of the evidence and screenshots that she had saved onto a flash drive, and he set up a meeting

with her to review them. *Id.* Agent Cain further informed the Plaintiff that some Secret Service

agents use alias names on Facebook, which is what CIA agents do in general and the Plaintiff

had already done once. In response, the Plaintiff told him that anyone who wanted to find her on

Facebook could always do so through her mother. At the end of their conversation, and as was

stated above, Agent Cain set up a meeting with the Plaintiff to review the screenshots and

evidence. *Id* at p. 12-13. However, and just as inexplicably at that time, he didn't show up to

their scheduled meeting. Over the course of the following weeks, the Plaintiff left three

voicemail messages to reschedule. *Id.*

126.    During the summer of 2012, shortly after the Plaintiff lost her job with Judge

Yates, she consulted with trial counsel and then filed an Anders Brief and a Motion to Withdraw

with the Sixth Circuit in *United States v. Grooms*. Sometime in February or March of 2013,

Attorney Mark Wohlander in Kentucky contacted the Plaintiff and asked her to handle the appeal

in two cases: (a) *Hocker v. City of Pikeville*, which was an unlawful use of deadly force case

involving Kentucky police officers that had been dismissed on summary judgment and the

Plaintiff took on a contingency; and (b) *United States v. Meade*, which was a money laundering

case in which Mr. Wohlander represented a co-defendant, John Slusher, and also involved

Kentucky police officers. After driving to Kentucky and meeting with Mr. Meade's trial counsel,

Mike Curtis, and the defendant, Richard Meade, the Plaintiff was retained to handle two matters: (a) a motion for release pending appeal to be filed in the district court on behalf of Mr. Meade; and (b) the direct appeal on Defendant Meade's behalf. This was the Plaintiff's first, one, and for the reasons explained herein, ended up being her only retained case and appeal.

127.     In April-May of 2013, and with a portion of the retainer fee that Mr. Meade paid her, the Plaintiff traded in the Honda CR-V that she bought before relocating to Oahu in August of 2009, and she purchased a used, red, 2013 Audi A4 from a dealership on Henry St. in Muskegon located a few blocks from the AT&T store. After making that purchase, the Plaintiff drove her new car to the AT&T store and used another portion of the retainer to pay off her cell phone and end her contract with AT&T. It was the first time that the Plaintiff and Defendant Priest had actually spoken since September of 2011. During their conversation, he told the Plaintiff that he "loves Audis," but he made a point to look directly at her when he said it. At the same time, the Plaintiff left a hand-written note on his car informing him about the Secret Service investigation. Shortly thereafter, the Plaintiff attempted to purchase an unlocked Blackberry at Best Buy so she could switch to Sprint. After three weeks, Best Buy returned her money and told her that it could not sell her the phone with no explanation. The Plaintiff switched to Sprint anyway and ported her Hawaii cell phone number over, but she did so without signing a contract.

128.     On May 11, 2013, the Plaintiff attended a joint memorial celebration for her maternal grandparents in Whitehall, Michigan, where she met and learned for the **first** time that her maternal uncle, Jim Lawrence, is best friends with the father of a Navy SEAL, Craig Kobza, and that Mr. Kobza had known her grandparents for longer than the Plaintiff had been alive. As

was stated above, his son, Justin Lawrence, convinced the Plaintiff to set up her first Facebook account in August of 2006. The Plaintiff described the electronic stalking to him, who, like Judge McKeague, was extremely concerned. Mr. Kobza immediately informed her that: (a) "**only** the NSA has the technological power to deceive a cell phone tower" in the manner evidenced on her cell phone bill and the accompanying screenshot from March-April of 2012 "because it coordinates the communications for his son," which he knows from personal experience; (b) he wasn't even allowed to **have** a Facebook account at that point; and (c) he had to be extremely careful about who he disclosed his status as the father of a Navy SEAL to. *See* **Exhibit B** at p. 5, 12.[37]

129.    Like Judge McKeague, Mr. Kobza essentially went into over-protective military-dad battle mode when the Plaintiff described those acts to him. He explained the concept of

---

[37] Stating:

> Finally Re: Lying to a Federal Marshall [sic] — the result: Contrary to what **you** were told, a Secret Service Agent, Agent Bruce Cain, contacted ME in March of 2013, and in addition to speaking with him for nearly an hour, discussing all of the issues with respect to Facebook, the fact that those acts started upon me receiving a text message from someone with an Arabic name, and gathering together all documents and an entire flash-drive of screenshots and evidence — *at his request* — he set up an actual meeting with me to review all of that evidence, but was inexplicably out of the office the day we were supposed to meet, and the agent further confirmed that phone call and conversation with Mr. Verhey and his intent to investigate…Three subsequent phone calls to the agent to reschedule between March and May of 2013 were not returned, and THEN, in May of 2013, I met my uncle's best friend at my grandparents' memorial service who was extremely disturbed by those acts immediately upon me describing [them] to him with respect to my cell phone and specifically in response to learning that his son is a Navy SEAL — who immediately told me that the NSA coordinates the communications for his son and to contact the Secret Service immediately, because those acts are a threat to his physical safety, and to download an iPhone application called Red Phone (Hm, wonder what that could be a reference to) — to which I responded that I had already been contacted by an agent and was waiting for a response.

"leaving a zero carbon footprint" to her, told her to start using an external hard-drive for everything, explained to her how to Velcro it to the back of her laptop, remove and functionally "detonate" it if it were ever confiscated in the context of an example involving C-4, and he told her to download and start using the Red Phone iPhone application, which requires both users to have it installed for the same double-key nuclear reasons. *Id.* However, because the Plaintiff is a **lawyer** and does not have a military background, she had no idea what "red phone" was a reference to at the time, let alone in the specific context of Defendant Priest texting her while they were dating and saying he was "gonna put a **double lock** on her door so she didn't get stolen," the fact that he made a point to ask her if she knew who John Nash was after he returned from Chicago in July of 2011, or cell phone encryption. Most importantly, Mr. Kobza told the Plaintiff to contact the Secret Service immediately while she was still waiting for a call back from Agent Cain to reschedule their meeting. She also never imagined that anyone would sell their contact information or conversations to a "terrorist." *Id* at p. 12.

130.    During the same conversation, the Plaintiff specifically asked Mr. Kobza if he knew of any reason that his son, a CIA agent, or any other classified person couldn't be with someone he loved. He told her "no, absolutely not," and that Defendant Priest was just "f__king with her head," but he was clearly using NSA technology to do it, so again, she needed to contact the Secret Service as soon as possible. *Id.* The Plaintiff reassured him that she had already done that and was waiting for a call back from the agent to reschedule their meeting. *Id.* Three weeks later, on June 5, 2013, Edward Snowden came forward. The information that he provided regarding the NSA's "back-door access" via its PRISM program to the servers of Yahoo (established by the Plaintiff in 1998 and acquired by the NSA on March 12, 2008), Google

(established by the Plaintiff in 2004 and acquired on January 14, 2009), Facebook (established by the Plaintiff in 2006 and acquired June 3, 2009), and Apple (established by the Plaintiff in January of 2010 and acquired in October of 2012),[38] its control over the "backbone of the internet," which is the same "spinal column of American democracy" identified by Justice Scalia in *Neder v. United States* on which the First, Fourth, Fifth and Sixth Amendment depends, and revelations regarding its extremely close relationship with AT&T explained to the Plaintiff how it was possible for those acts to have extended across **all** of her electronic accounts and devices.

131.    Edward Snowden fled the country in March of 2013, the same month the Supreme Court issued its decision in *Clapper v. Amnesty International*, 568 U.S. 398 (2013), from the same Honolulu International Airport that the Plaintiff flew home to Michigan from for the last time in September of 2010. Instead of being treated as a whistleblower, he was charged with violating the same Espionage Act that was at issue in *United States v. Gowadia*; however, the Plaintiff still had no idea what that case was about yet. At the time, the Plaintiff wondered if President Obama's daughters had been threatened given his defense of the program and the fact that he taught constitutional law. Snowden further sought political asylum in Russia, the same country that Ayn Rand, who wrote Atlas Shrugged, was from.

132.    Approximately 1-3 weeks after Mr. Snowden came forward, Secret Service Agent Bruce Cain finally called the Plaintiff back, and without ever meeting with her to go over the screenshots that she dropped off at the office, he said that he "didn't think a crime had been committed here," but he couldn't inquire any further or any further **up**, which was **fascinating** to

---

[38] *See* NSA Slides Explain the PRISM Data-Collection Program (https://www.washingtonpost.com/wp-srv/special/politics/prism-collection-documents/m/ (last retrieved March 31, 2023).

her at the time, because in addition to the fact that no man is supposed to be **above** the law, Mr. Kobza and Judge McKeague — who actually has a legal education — both thought that a crime had most definitely "been committed here." *See* **Exhibit B** at p. 12; **Exhibit C** at p. 3. In response, the Plaintiff asked him in the most sarcastic manner possible if he had heard about that whole NSA thing. *Id.*

### E.    The Money Laundering Control Act of 1986

133.    The Money Laundering Control Act of 1986 was enacted the same year the Plaintiff began flying as an unaccompanied minor from GRR, Justice Scalia was confirmed to the Supreme Court, and Justice Rehnquist was confirmed as Chief Justice, and it consists of two sections, 18 U.S.C. 1956 and 1957. Title 18 U.S.C. 1956 states: "whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction, which in fact involves the proceeds of specified unlawful activity…" is guilty of a felony. Title 18 U.S.C. 1957 defines a separate crime and prohibits a person from engaging in a "monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity." The terms "financial transaction," "proceeds," "specified unlawful activity," "monetary transaction," "criminally derived property," and the fact that such a transaction affected "interstate commerce," are essential elements of such an offense. Using the correct definition of proceeds is so critical that it satisfies a post-direct appeal, post-2255, actual innocence claim brought pursuant to 28 U.S.C. 2240-2241. *See Wooten v. Cauley*, (Sixth Cir. Case No. 09-6405) (holding that the Supreme Court's decision in *Santos* is retroactively applicable in the Sixth Circuit). A "specified unlawful activity," 18 U.S.C. 1956(c)(7), encompasses a **vast** array of

offenses, including "(a) any act or activity constituting an offense listed in section 1961(1) of this title." Section 1961(1) defines "racketeering activity," which is defined as "any act or threat involving murder, kidnapping...bribery, extortion," or "any act which is indictable under any of the following provisions of title 18, United States Code...section," including 1503 (relating to obstruction of justice), section 1511 (relating to obstruction of State or local law enforcement).

134.    On June 21, 2013, three weeks after Edward Snowden came forward, the Plaintiff's Motion to Withdraw from *United States v. Grooms* was denied, which she filed shortly after she lost her job clerking for Judge Yates in May of 2012, and she was directed to a missing transcript, which involved the warrantless search of Defendant Johnny Grooms' son's cell phone, Jonathan Grooms, who was indicted as a co-conspirator. The missing transcript presented the first third-party Fourth Amendment standing argument in the specific context of the warrantless search of the Plaintiff's client's son's cell phone after Justice Sotomayor's above-quoted concurring opinion in *United States v. Jones*. At the same time, and in response to Edward Snowden's disclosures, the Plaintiff sent Mr. Thue a private Facebook message. As was stated above, she knew that he had to have a security clearance to be an air traffic controller, but she specifically asked if it was top secret. He said "Yes, but **only** for purposes of knowing the location of Air Force One." The Plaintiff had no idea what that meant at the time, let alone that this is because Air Force One is both the location of the President and the historically assumed location for the nuclear football, which she learned from her co-counsel in the Meade case, Michael Curtis, who was a Vietnam veteran.

135.    The same month, in July of 2013, the Plaintiff filed a notice of appearance ("NOA") in *United States v. Meade* with the U.S. District Court for the Eastern District of

Kentucky, and she listed her Lavabit email address on the NOA. The Meade case was before

Judge Gregory F. VanTatenhove, who was confirmed on December 21, 2005, the same year the

Plaintiff graduated from law school and Judge McKeague was confirmed to the Sixth Circuit.

Judge VanTatenhove served as a trial attorney for the Department of Justice for four years before

becoming Chief of Staff and Legal Counsel to Kentucky Congressman Ron Lewis. He then

served as the U.S. Attorney for the Eastern District of Kentucky and was nominated upon the

recommendation of Senators Jim Bunning and Mitch McConnell. Everyone with cable news

access is aware of what Senator McConnell did to the judicial confirmation process particularly

in the context of Attorney General Merrick Garland's nomination to the Supreme Court.

136.    The Defendant in that case, Richard Meade, was a conservative, Christian,

Republican small business owner, Vietnam-era veteran, and a Boy Scout who had previously

reported that certain Kentucky State Police officers were running drugs and had never had so

much as a parking ticket prior to being indicted. He owned a Hertz rental car dealership in

Ashland, Kentucky and sold used cars. The facts of the Meade case were simple. Ten to fifteen

years earlier, an entirely different group of defendants ("the Chapman Gang") stole motorcycles

from various bike rallies held throughout the country. The Chapman Gang drove them back to

the State of Kentucky, stripped them for their component parts and frames, stored those parts and

frames for several years, and then used them to build choppers, which were otherwise known as

"kit" bikes. The bikes were then inspected by Kentucky state police officers, which entailed

running the serial numbers of their parts through a database. After passing inspection, they were

issued clean titles by the Kentucky Department of Transportation. Mr. Meade saw some of the

bikes, thought they looked cool, and purchased a few of them to park outside the windows of his

business to attract customers, as did two other small business owners. Once in a while, Mr.

Meade would re-sell one of them. When he was arrested, it was done very loudly at his business

with guns drawn. He was then handcuffed and thrown into the back of a police cruiser. A

Kentucky State Police officer was waiting for him in the back of the cruiser. His statement to Mr.

Meade was: "You don't f—k with me, understand? Do you understand me?" (*See* **Exhibit P** —

Sixth Circuit Filings in Case No. 14-5209).

137.    The language used in the indictment in the Meade case was that the defendants

"knowingly engaged in financial transactions in criminally derived property, affecting interstate

commerce, which they knew involved the proceeds of a specified unlawful activity, that is

interstate shipment of stolen vehicles, knowing the transaction was designed to conceal and

disguise the nature, location, source, ownership, and control of the proceeds of said specified

unlawful activity," and the only statute identified in the indictment was 18 U.S.C. 1956. None of

the other lawyers could figure out what "criminally derived property" was, or where that

language came from, and their previous attempts to learn this information were rebuffed by the

Government. The fact that the alleged transactions took place wholly within the State of

Kentucky meant that they had no effect on interstate commerce as is required by the money

laundering statute and is necessary to give rise to federal jurisdiction, per Judge McKeague's

teachings. This fact was the subject of several conversations between the Plaintiff, Mr.

Wohlander, and Mr. Curtis.

138.    Prior to trial, the defendants filed a motion to dismiss the indictment. In it, they

argued the same Fifth Amendment double-jeopardy merger-related issues identified by the

Supreme Court in *United States v. Santos;* however, because they were all older and either didn't

have or know how to use the LexisNexus and Westlaw databases, they were not aware that the case existed. On December 5, 2012, Judge VanTatenhove denied their pre-trial motion to dismiss the indictment in an opinion that contradicted *Santos* on this issue. As a result of that decision, all of the defendants pled guilty except Mr. Meade and another similarly situated defendant and small business owner. The Federal Rules of Appellate Procedure further require a defendant to affirmatively state that the district court had subject matter jurisdiction in the opening brief on direct appeal. At the time, the Plaintiff had no idea that the Supreme Court's 2008 decision in *Santos* existed, that 18 U.S.C 1956 had a companion statute, 18 U.S.C. 1957, which was where the language "criminally derived property" had come from, or that the Plaintiff herself was the victim of the same money laundering offenses.

139.    In July of 2013, the Plaintiff filed a Motion for Release Pending Appeal ("Motion for Release") with the district court, which raised the interstate commerce federal jurisdiction issue along with a handful of other issues, including: (1) an error made by the district court when instructing the jury at trial; (2) the court's refusal to let the ringleader of the Chapman Gang testify that Mr. Meade had no knowledge that any of the bikes were made from stolen parts, and that he was actually a victim of the crime that he was charged with; and (3) an instance of improperly trying to influence the jury by a government lawyer at trial, which the Chairman of the Kentucky Bar Association Ethics Committee, who testified as a character witness on behalf of Mr. Meade at trial, witnessed and relayed to the Plaintiff.

To emphasize this fact, the actual Chairman of the Kentucky Bar Association Ethics Committee testified as a character witness on behalf of Mr. Meade at trial.

140.    After filing the motion for release pending appeal, the Government responded by personally attacking the Plaintiff in its response, which she had never experienced before. AUSA Verhey, and every other AUSA with whom the Plaintiff had worked up until that point were perfectly respectful in their filings and professional to deal with. Most importantly, the Government made various misrepresentations about the same principles of federal jurisdiction that Judge McKeague taught the Plaintiff in its response, which she could still recite from memory. Thus, the Plaintiff wondered why it was being so defensive on the issue of federal jurisdiction, and to such an extent that it would personally attack her. The Plaintiff filed a response, and in that response, she dropped a footnote explaining that she clerked for a federal judge and would never, ever misrepresent the law. The Plaintiff should also never need to state in a filing: "My federal jurisdiction professor is a Sixth Circuit judge and taught me _____ about federal jurisdiction." Citing Supreme Court and published Sixth Circuit precedent should be enough.

141.    After filing the response, the Plaintiff remembered the fact that her predecessor clerk had asked her to print off a copy of the money laundering statute when she started clerking in Judge Gillmor's chambers in September of 2009, so she researched the issue further and found the Supreme Court's 2008 decision in *United States v. Santos* regarding the definition of the term "proceeds" in 18 U.S.C. 1956. Upon making that discovery, the Plaintiff filed a post-verdict, but pre-final judgment, Motion to Arrest Judgement and Dismiss the Indictment.

142.    At the same time, on August 8, 2013, the Plaintiff lost access to her Lavabit email service provider. Specifically, the owner of Lavabit, Lavar Levison, shut down its servers rather than hand over all of its encryption keys to the Government, which the Government demanded so

it could access Edward Snowden's account but would have also permitted it to access the account of every other Lavabit user including the Plaintiff. When the Plaintiff navigated to the Lavabit login page on August 8, 2013, a message was displayed stating that Mr. Levison was terminating the service because he "did not want to be complicit in constitutional crimes committed against American citizens."

143.    Four days later, on August 12, 2013, with the sentencing hearing only two days away in the Meade case and because the Government had yet to respond to the Motion to Arrest Judgment and Dismiss the Indictment, the same *In Re: 9/11 Litigation* on behalf of Boeing lawyer who: (a) began flying as an unaccompanied minor from the Ford International Airport the same year Congress enacted the Money Laundering Control Act of 1986; (b) went to law school because of the events on September 11, 2001; (c) applied for federal clerkships beginning in 2008, the same year the Supreme Court decided *United States v. Santos,* after Professor Barnhizer told her she needed to "launder up" her J.D. by landing a federal clerkship if she wanted to specialize in appeals; and (d) whose federal clerkship started on September 11, 2009, filed a Petition for a Writs of Mandamus and Prohibition ("Writ Petition") with the Sixth Circuit, *In Re: Meade*, Sixth Cir. Case No. 13-6038, in an actual **money laundering** case. In a footnote to the Writ Petition, the Plaintiff explained that a "complete lack and failure of subject matter jurisdiction" is an exception to judicial immunity as a means of giving Judge VanTatenhove a heads up that he should wait to enter a final judgment and impose a sentence until after the *Santos* issue could be sorted out.

144.    After filing the Petition, which the Plaintiff was required to send via email, she drove from Grand Rapids, Michigan to Kentucky so she could be present for the sentencing

hearing on August 14, 2013. On August 13, 2013, the Plaintiff emailed Judge McKeague to inform him that she had just "filed her very first extraordinary writ petition" and said that she thought he might find that ironic since "he taught her everything she knows about federal jurisdiction." *See* **Exhibit K** — Emails to Judge McKeague at p. 1. She also deliberately referenced the electronic stalking of herself in the same email; specifically, because she was afraid of: (a) the implications of a deliberately discontinued Secret Service investigation; (b) the circumstances and timing surrounding her discovery of *Santos;* and (c) what her client had described regarding his arrest and the political reasons underlying the case.[39] *See* **Exhibit K** at p. 12. Judge McKeague responded and said they should wait to grab lunch until after the opinion for a case that the Plaintiff had recently argued before him, *United States v. Healy*, was released. *See* **Exhibit B** at p. 1.

145.    The panel, which consisted of Judge Clay, Judge White, and Judge Kethledge, two of whom were on the panel that decided *Wooten v. Cauley* (holding that *Santos* is retroactively applicable in the Sixth Circuit in the context of a 2241 actual innocence claim) called for a response to the Petition, but from the Government. Per the Federal Rules of Appellate Procedure, it only does so when a Petition presents a "substantial question of law," which is the legal standard for granting the same motion for release pending appeal that the Plaintiff had already filed on Mr. Meade's behalf in the district court. In its response, the Government misconstrued the Plaintiff's argument, she did not have enough time to fully

---

[39] The Plaintiff subsequently translated her email to Judge McKeague as: Dear Judge: What in the hell is this, I have no idea, but I might need a little help on this one from you if it has anything in the future to do with that whole electronic stalking issue that the Plaintiff said she had "much to tell him about" in the same email. (*See* **Exhibit B** at p. 12).

research a reply because she was driving to Kentucky all day, and the Petition was denied on August 13, 2013.

146.    On August 14, 2013, the same *In Re: 9/11 Litigation* on behalf of Boeing lawyer, who **also** specifically chose to attend law school in response to the events on September 11, 2001 and **not** to write the same "blank check" that members of the military write, walked into the same federal courthouse on the mainland in Kentucky that she used to clerk in on a strategically located military base in the middle of the Pacific Ocean that is home to the Navy SEALs — with her laptop already set up like a mini-Navy SEAL. Upon having her laptop confiscated by courthouse security, and because there was something fundamentally wrong about the case, the Plaintiff removed the external hard drive and functionally "detonated" it in the exact manner instructed by Mr. Kobza **before** being physically, professionally, and sexually threatened in the courtroom by the AUSA who returned the indictment and a Kentucky police officer after the hearing, because as she later stated in various emails and Facebook messages, she also gets tired of being psychic and then right about those things **all** the time too.

153.    On August 18, 2014, the Plaintiff sent a letter to then-U.S. Attorney for the Eastern District of Kentucky, Kerry Harvey, which is attached hereto as **Exhibit L**, describing the encounter in the courtroom. She further explained that, per the principles that she was taught in law school regarding the Government's heightened ethical obligations in criminal cases, and per The New Yorker article cited above regarding the Supreme Court's decision in *Citizens*

*United* and the obligations of the Solicitor General's Office:[40] (a) the Government isn't **allowed** to make arguments that contradict its own knowledge of Supreme Court precedent or published circuit court precedent; and (b) it was required to comply with its own ethical obligations and confess error in the case. (*See* **Exhibit L** — August 19, 2013 Letter to Kerry Harvey).

156.    Upon returning home to Michigan from the sentencing hearing on August 14, 2013, and specifically because of the above-described encounter in the courtroom, the Plaintiff did additional research and found the Government's Criminal Resource Manual online. At that time, she learned of the existence of 18 U.S.C. 1957 and figured out that the Government had taken the "monetary transactions" language from 18 U.S.C. 1956, which has a much broader definition than "financial transactions" in 18 U.S.C. 1957, and the "criminally derived property language" from 18 U.S.C. 1957, and essentially, made up a crime that doesn't exist under any single Title 18 statute. Upon making that discovery, the Plaintiff filed a motion so-informing the district court.

157.    On August 21, 2013, the Plaintiff emailed Ken Loomis about the loss of access to her Lavabit email account and her inability to access the Pre-sentence Reports ("PSR's") that he had previously sent her for her other CJA cases.  (*See* **Exhibit J** — August 21, 2013 email to Ken Loomis). In her email, she stated that she was stuck with an "un-secure google based one that Mark Wohlander set up for [her] for now until [she] could find a new, more secure service." (*See*

---

[40] *See* Jeffrey Toobin, Money Unlimited (Stating: Whenever the federal government is involved in litigation before the Supreme Court, the office of the Solicitor General handles the representation…The Solicitor General's lawyers press their arguments in a way that hews strictly to precedent.) (available at: https://www.newyorker.com/magazine/2012/05/21/money-unlimited)

**Exhibit J** at p. 1). Mr. Loomis re-sent the reports but didn't respond to the substance of her message, which the Plaintiff found a little odd at the time but didn't think more of it until later.

158.    On August 27, 2013, the Sixth Circuit issued a published decision in *United States v. Droganes*, 728 F.3d 580 (6th Cir. 2013) holding that the same U.S. Attorney's Office for the Eastern District of Kentucky could not be monetarily sanctioned using a district court's "inherent authority" for engaging in bad faith conduct and lying to the court. One day later, the Government filed a Motion for an Order to Show Cause ("Contempt Motion") as to why the Plaintiff should not be held in contempt — of the Government — for the arguments that she made in the Writ Petition filed with the Sixth Circuit on August 12, 2013, and in the above-described filing informing the district court about the indictment defect. **Exhibit L** — August 19, 2013 Letter to U.S. Attorney Kerry Harvey; **Exhibit M** — September 13, 2013 Email to Judge McKeague; **Exhibit P** — Sealed and Ex Parte Filings in Sixth Cir. Case No. 14-5209).[41]

159.    As was stated above, the Plaintiff was sexually assaulted shortly after graduating from law school. That encounter was contempt of *her*. Had it happened in Judge McKeague's classroom, Judge McKeague would have kicked AUSA Smith, AUSA Ken Taylor, and the responsible officer out of his class and pursued disciplinary action. Had it happened in Judge Gillmor's courtroom on Oahu, especially during the same "espionage case" that ultimately turned out to be about the sale and disclosure of the top secret design documents and

---

[41] **Exhibit P** at p. 15 states: "AUSA Smith then held up the Writ Petition and verbally threatened counsel with a complaint to the Bar over its content, during and after which, one of the above-referenced police officer colleagues-friends kept saying: "C'mon man, let's go," and was trying to, and then finally managed to, pull him away…The worst part: On counsel's way out of the courtroom, she glanced over and briefly made eye contact with one of the other officers — who looked the undersigned attorney up and down slowly, licked his lips and smirked."

specifications for the Plaintiff's former clients' Boeing-Northrup B-2 Stealth Bomber, the building would have actually "blown up" because Judge Gillmor would have lost it on the responsible parties and held them in contempt. The encounter itself lasted approximately two to five minutes. At no point did Judge VanTatenhove come back into the courtroom to intervene even though it happened at counsel's table right in front of the microphones. Several months later, the Plaintiff learned from Mr. Wohlander that: (a) AUSA Smith was "Judge VanTatenhove's boy;" (b) Judge VanTatenhove was the former U.S. Attorney for the Eastern District of Kentucky, got AUSA Smith his job at the U.S. Attorney's Office, and was personal friends with AUSA Smith and the other AUSA working on the case, AUSA Ken Taylor; and (c) defense counsel considered filing a motion to recuse at the outset of the case for that combination of reasons, but they decided against it.

160.    On September 10, 2013, a story was published in The Independent, a local newspaper in Kentucky, entitled: Government Fires Back at Attorney, a copy of which is attached hereto as **Exhibit S**. Excerpts from the article state:

> Assistant U.S. Attorney Ken Taylor last week filed a response to a blistering 17-page pleading by Katherine "Katie" MacPherson of Grand Rapids, Mich., who represents Richard Meade of Ashland. MacPherson's filing was in response to a motion by Taylor requesting that U.S. District Judge Gregory VanTatenhove summon her to court and order [her] to show cause for what Taylor calls "unwarranted and reckless" allegations of misconduct she levied against the government in previous court pleadings. In her response, MacPherson maintained she was merely doing her job as a defense attorney, which is to provide her client with zealous representation and preserve issues for his appeal of conviction... Additionally, Taylor wrote, despite MacPherson's denials, "she certainly did impugn the integrity of the Court by stating that VanTatenhove allowed the case to advance when he knew he had no jurisdiction..Taylor argued there are no grounds that would warrant Van Tatenhove's recusal...However, with regard to the government's pending show-cause motion,'because the defense has accused the trial court itself of misconduct, the United States understands that the court may be concerned about the

appearance of impartiality and would therefore defer to the court's determination as to the best course of action on that limited issue."

*Id.* at p 2. Again, the Plaintiff didn't accuse anyone of misconduct at **that** time. In the Government's reply brief, it clarified that it wasn't relying on the contempt statute and instead demanded that the district court use its "inherent authority" and hold the Plaintiff "accountable" for, again, making what it called "reckless" legal arguments, and it cited the same *United States v. Aleo*, 681 F.3d 290 (6th Cir. 2012) quoted in Section IV of this Complaint in which now-Chief Judge Sutton explained the history and origin story of the contempt statute.

165.    On September 13, 2013, the Plaintiff sent an email to Judge McKeague about those threats, a copy of which is attached hereto as **Exhibit M**. As is clear from the email, the Plaintiff was terrified and she was counting on him to protect her. The same week, the Plaintiff emailed Judge Yates and asked him to meet her for lunch. She explained the circumstances and timing surrounding her discovery of *Santos*, and she asked him if she had somehow done something wrong by filing the Writ Petition that she didn't know about since this was her first retained appeal and she was still a baby lawyer for all intents and purposes. Judge Yates responded by saying: "No, no, no. Of course not. Everyone goes for mandamus before a final judgment gets entered. That's par for the course. Federal judges get them all the time." He also explained that they're entitled to their own lawyer if a circuit court calls for a response. When the

Plaintiff told him that the Sixth Circuit **did** call for a response but from the Government, he said: "That's weird. I wonder why."[42]

166.    The Plaintiff called Judge Gillmor next, who was "very busy" according to Ms. Lovett and was pretty brisk with the Plaintiff on the phone. It was the first time that they had spoken since the Plaintiff left Oahu, and according to Ms. Lovett, Judge Gillmor was still mad at the Plaintiff for turning down the career offer and leaving her. When the Plaintiff explained the procedural posture of the Meade case and the fact that she had filed a post-verdict, but pre-final judgment Motion to Arrest Judgment and Dismiss the Indictment, Judge Gillmor said: "What's that? I've never heard of that before."[43] Next, the Plaintiff called her former co-clerk from Hawaii, AUSA Ryan Dickey. They chatted for a few minutes about life and then the Plaintiff explained the language used in the indictment and the Contempt of "the Government" Motion, which Mr. Dickey had a few choice words about. His response regarding the indictment was: "Hoooolllyyyy sh—, dude. The Money Laundering Division has to approve all money laundering indictments. I wonder who signed off on that?" The answer was no one. No one signed off on that. Later, the Government accidentally admitted in its own pleadings that AUSA

[42] During the same lunch meeting, they ran into his former assistant, Jenny, and he informed the Plaintiff that: "Jenny doesn't like me very much anymore." Remembering what she used to say about her then-six year old daughters behind his back, about the Plaintiff "looking like she needed to eat a sandwich," and the Weight Watchers website listed on the I.T. Department print-out from May of 2012 which Jenny was doing at the time, the Plaintiff sarcastically responded: "Want me to go punch her in the face? Because I kinda wanna punch her in the f—king face at this point," to which he responded by laughing and politely declined.

[43] This is also because Judge Gillmor is a very good, ethical, objective judge who always wanted to be correct on the law just like Judge Yates. Thus, if the Government failed to disclose an entire Supreme Court case to her, and she later found out that it combined the elements from two different federal statutes in a manner that failed to give rise to subject matter jurisdiction, she would have, once again, lit the responsible attorneys on fire and made sure that they never practiced law again.

Smith was instructed to proceed with the case using a "gross receipts" definition of "proceeds," which wouldn't have otherwise fit the facts because the "gross receipts" of the specified unlawful activity would have been the stolen motorcycles, so he instead used "criminally derived property" from 18 U.S.C. 1957, which he defined as the titles to the motorcycles.

**F.      February 6, 2014 FOIA Request**

167.    As a result of those threats combined with the continued stalking, the Plaintiff's insomnia increased to 2 to 4 days at a time, meaning she would stay awake for 2 to 4 days at a time, crash for a night, and then do it over again. In October of 2013, the Plaintiff drove to the AT&T store on Henry St. in Muskegon to see Defendant Priest; specifically, because of the unprecedented nature of those threats, the assumptions underlying them, the fact that public outcry was what resulted in the impeachment of Judge Peck, and if she couldn't count on the security of her own communications then she couldn't count on the same public outcry. Their conversation in October was the first time that they had talked for any length of time aside from their brief conversation in May of 2013. During their conversation, the Plaintiff asked Defendant Priest if it were possible to set up a pre-paid phone number on an iPhone. He said yes, that it was now possible, and he told her to go to the Genius store on Harvey St. in Muskegon, buy a used iPhone, and bring it back to him. He also convinced the Plaintiff to come back to AT&T as her primary cell phone service provider during that conversation, and he gave her one of his business cards.

168.    The Plaintiff returned the following week; however, Defendant Priest told her that the store manager, Jamie Vincent, who the Plaintiff had first encountered and reported the electronic stalking of herself to at the Woodland Mall in Grand Rapids in May of 2012 and was

now managing the Muskegon store, told him that he couldn't be the person that set up the account for that reason.[44] The Plaintiff set it up as a business account, which took an exceptionally and suspiciously long time to be approved. During the approximately two hours that she waited, the Plaintiff made a point to discuss the Meade case and those threats with her co-counsel, Mike Curtis, loudly enough so Defendant Priest could hear her, which was specifically because they had their own inside definition of the meaning of the word "jurisdiction," and for the reasons explained in paragraphs 91-123, the Plaintiff also believed he was "that guy" who could listen to the manner in which she was being discussed in that case and elsewhere.

169.    The Plaintiff returned to the store in November and December of 2013 to pay the bill on her burn phone, they talked briefly, and he was friendly with her. He also made a point to mention things about her that he would only know if he had access to her Facebook page. During the same time period, the Plaintiff argued what turned out to be her last case before the Sixth Circuit. She stopped into the Clerk's Office to say hello to Ken Loomis like she always did, and she told him that she was ready for her next CJA case. He was uncharacteristically cold towards her and told her that he was caught up and it would likely be "quite a while" before she got another case. Again, the Plaintiff was not aware that she had done anything wrong in filing the Writ Petition, and according to Judge Yates, she hadn't.

170.    Sometime in January of 2014, the Plaintiff learned about: (a) the existence of *Clapper v. Amnesty International;* (b) that the Solicitor General had accidentally violated the

---

[44] Ms. Vincent now works at Mama's Thai in Grand Haven, which is right next to the AT&T store located there, and she remembers the events at issue in this Complaint.

duty of candor during oral argument and was refusing to correct the record despite calls from

Senator Ron Wyden and other members of Congress to do so, or alternatively, that the Supreme

Court *sua sponte* reverse its decision in that case; and (c) that the same Senator Feinstein who

voted against confirming Justice Roberts in 2005 for purely political reasons accidentally

admitted to the press that the NSA, which reports to the Department of Defense, began collecting

and sharing illegally obtained information with federal law enforcement agencies in 2004, which

was then covered up through a process known as "parallel construction."[45] So, one year before

the Plaintiff had even graduated from law school, while she was working on a law review article

that opened with a quote by George Orwell, author of the book 1984, and one year before Justice

Roberts became Chief Justice, everything that she learned about the Fourth and Fifth

Amendments was completely meaningless.

171.    The same month, in January of 2014, Defendant Priest changed his profile picture

to one of himself and a new blonde girl, Sara Jo. When Defendant Priest and the Plaintiff were

dating, he told her that he "hates blondes," and he said that if he dated another girl who "went to

hair school, he was going to kill himself." Her Facebook profile indicated that she was so-

educated. Thus, and for the myriad of reasons explained above and in more detail in her

forthcoming book, the Plaintiff believed she was his cover.

---

[45] *See* Parallel Construction: Unconstitutional NSA Searches Deny Due Process
(www.huffPost.com/entry/parallel-construction-unc_b_5606381) ("Parallel construction is a
technique used by law enforcement to hide the fact that evidence in a criminal case originated
with the NSA. In its simplest form, the NSA collects information showing say a Mr. Anderson
committed a crime. This happens most commonly in drug cases. The conclusive information is
passed to the Drug Enforcement Agency (DEA), who then work backwards from the conclusion
to create an independent "legal" body of evidence to use against Mr. Anderson).

172.    On February 6, 2014, the Plaintiff sent the FOIA request attached hereto as

**Exhibit C** to the NSA on behalf of herself, Mr. Wohlander, and Mr. Curtis. In it, she explained:

(a) the electronic stalking and terrorization of herself; (b) the exact combination of persons,

Judge McKeague to AUSA Tim Verhey to Secret Service Agent Bruce Cain, between February

and July of 2013, although she did not identify them by name; (c) she made a series of document

requests based on her personal, and **objectively** verifiable experiences; and (d) she requested any

and all information collected about her for any and all purposes. Among other things, the

requests included information regarding "any agreement or partnership between the government

and internet content mirroring company Akamai," and:

> All records that set forth the organizations, companies, or educational institutions that
> have been given access to the NSA's intelligence gathering tools, technology, or computer
> programs.

The Plaintiff made this request because she wanted to know what organizations,

companies, and specific people knew about her.

> All records that set forth the NSA's policy regarding the hiring or continued employment
> of individuals who have known mental health issues or suspected mental illnesses, **or**
> who have a known or demonstrated obsession, romantic or otherwise, with another
> person, **or** who have used NSA or government-owned resources to electronically stalk,
> harass, or conduct surveillance on a current or former romantic interest, also referred to in
> the intelligence community as love-int.

Most importantly, the Plaintiff requested expedited processing, and in doing so, she

expressly stated:

> Expedited processing of this request is critical. The undersigned attorneys seek expedited
> processing pursuant to Title 5 U.S.C. 552(a)(6)(E), which provides for expedited
> processing of requests for information in cases where the person requesting information
> demonstrates a compelling need for expedited processing. This need is satisfied here, first
> and foremost, because the above-described interactions with respect to Ms. MacPherson's
> accounts and electronic devices is still on-going, and she has reason to believe that the

persons responsible pose an **imminent threat to her life or physical safety**, or to his (or her) own life or safety. Of the many instances of abuse, intimidation, and mental terrorization that were carried out via Ms. MacPherson's email and Facebook accounts, one that still stands out in her mind involved a photograph displayed during a search for her 'Ava Rose' account, which showed...a brunette girl laying on a floor somewhere with tears in her eyes and duct tape over her mouth, who looked an awful lot like Ms. MacPherson. Which was absolutely an overt threat that was either directed at Ms. MacPherson or someone who works for the agency and either loves her or cares about her. Either way, **her physical safety is still or was at some point threatened and/or used as leverage**, and she has every right to know who was responsible and why so she can protect herself. (Emphasis added).

172.   At the time, the Plaintiff was still operating under the belief that the Government was ethically obligated to protect her, and that since the Plaintiff saved the same Government and Department of Defense millions of American dollars in a case involving a Boeing C-17 that she included as part of her OSCAR clerkship application packet, and since it has a multi-trillion dollar budget and can most definitely afford to pay damages, it wouldn't hide documents and evidence that might give rise to liability, nor would it continue to jeopardize the Plaintiff's life or physical safety. Almost immediately after the Plaintiff sent the request and posted about it on Facebook, Defendant Priest changed his Facebook profile picture to one of himself kissing Sara Jo at the same Pere Marquette Beach Park in Muskegon where he and the Plaintiff spent Memorial Day Weekend of 2011, which was like a knife in the chest and definitely "hurt."

173.   On February 10, 2014, four days after the Plaintiff sent the FOIA request, Judge McKeague had his assistant, Bonnie, call the Plaintiff to find out if she had gotten everything taken care of "in that one Kentucky case," which he apparently thought was *Hocker v. City of Pikeville*, and for which Judge Sutton, who the Plaintiff referenced in her email to him on

September 13, 2013,[46] ended up on the panel. (*See* **Exhibit K** at pp. 1-3). As is clear from their

emails; specifically, the Plaintiff's statement that "everything is still pending in the district

court," the same day — after the Plaintiff emailed him back and almost as if someone was

monitoring their communications and knew that the Plaintiff would be meeting with the person

who would have otherwise protected her for the last time — Judge VanTatenhove issued a

decision denying Mr. Meade's Motion to Arrest Judgment and Dismiss the Indictment. In that

opinion, he: (a) rewarded the Government for violating the duty of candor by failing to disclose

*United States v. Santos* to the defendants and held that Mr. Meade had "waived" the issue of

subject matter jurisdiction even though jurisdiction can **never** be waived, once again, per Judge

McKeague's teaching; and (b) he further threatened the Plaintiff with the then-still pending

nature of the Contempt Motion.

174.    On February 13, 2014, the Plaintiff met Judge McKeague for lunch. During their

conversation: (a) he informed the Plaintiff that he owns a vacation home in Grand Haven, and he

asked her to send him a copy of her resume so he could keep it on file in case his career law

clerk, Paul, decided to retire; (b) the Plaintiff mentioned that Judge Yates was married to Judge

Beckwith, which they later discussed via email;[47] and (c) the Plaintiff asked him if Sixth Circuit

Judges actually read all of the briefs that are filed in a given case and what he thought of her

writing since she was still receiving rave reviews from Mr. Wohlander. He said that he hadn't

seen anything with her name on it recently, which she found extremely suspicious because she

---

[46] *See* **Exhibit M** stating that Judge Sutton wouldn't let a district court judge use inherent authority against a lawyer for even an arguably frivolous filing.

[47] *See* **Exhibit K** at pp. 1-3.

had filed a few en banc petitions recently, including the one for *Hocker v. City of Pikeville* that she was drafting on New Year's Eve of 2013 and posted about on Facebook.

175.     During the same lunch conversation, the Plaintiff got choked up when discussing the Meade case because she was afraid of being held in contempt, thrown into the back of a Kentucky police officer's cruiser in the same manner that her client was, and sexually assaulted or worse, and she said: "I didn't do anything wrong, Judge." However, for the same objectivity-related reasons that she didn't tell him about her own sexual assault when he swore her in back in April of 2006, she didn't go into detail because she still thought that she would have a long career before the Sixth Circuit, and she didn't want him to feel sorry for her. She also told him that she had just sent a FOIA request to the NSA that "she might need a little help from him on in the future," and he noted her "penchant for attracting trouble."

176.     Shortly after their lunch date, the Plaintiff filed a motion for reconsideration under Rule 59 and an alternative Rule 60(b) Motion for fraud on the court in the district court case citing the Government's refusal to comply with the duty of candor and prosecutorial misconduct. On February 20, 2014, the Plaintiff filed a timely notice of appeal and took the Meade case back up to the Sixth Circuit under the same double jeopardy exception to the collateral order doctrine identified by the Supreme Court in *United States v. Santos,* Sixth Cir. Case No. 14-5209. Between February and April of 2014, the Plaintiff created a 240+ page record in Sixth Circuit Case No. 14-5209 while also not sleeping for 2-4 days at a time.

177.     On March 7, 2014, the Sixth Circuit granted oral argument in *United States v. Grooms*. Judge Gibbons and Judge Stranch ended up on the panel, who were also on the panel that decided *United States v. Llanez-Garcia,* 735 F.3d 483 (Sixth Cir. 2013). In that case, an

AUSA filed an **unauthorized** sanctions motion against a female public defender, which he later withdrew, and the Government **defended** the defense attorney but the district court proceeded using inherent authority anyway, and he was harshly reversed for doing so. Thus, the Plaintiff was wondering what the Government was counting on with respect to her in the Meade case.

178.    On March 15, 2014, the Plaintiff contacted Professor Erwin Chemerinsky about the case (*See* **Exhibit N** — March 15, 2014 Emails with Chemerinsky) after she received a decision in another CJA-appointed Sixth Circuit case, *United States v. Jones*, Sixth Cir. Case No 13-5107, because it was the functional equivalent of being slapped across the face.[48] Shortly thereafter, the Plaintiff called Judge Yates to talk to him about the Meade case, and he told her to come down to the courthouse. She went back into his chambers and explained how scared she was because her notice of appeal was held back, she had to call the Sixth Circuit for a case number three days later, and the Government was continuing to file motions in the district court suggesting that the case wasn't actually before the Sixth Circuit.[49] Judge Yates was astonished that Judge VanTatenhove didn't rule on the Contempt Motion before ruling on the Motion to Arrest Judgment and Dismiss the Indictment because of the same conflict of interested created

---

[48] Specifically, because: (a) it involved an impeachment principle that comes from the same fifty year old Supreme Court case, *Palermo v. United States*, 360 U.S. 343 (1959) that the Government had improperly relied on all throughout the Meade case; (b) the district court judge himself raised the issue during trial, called a side-bar, and tried to get defense counsel to object who also later raised his own ineffective assistance at the sentencing hearing for failing to do so; and (c) that same hearsay and impeachment-related rule also came up during the Plaintiff's sexual harassment trial in 1999-2000. She didn't even need a legal education to be aware of it.

[49] This included a "Motion to Impose Sentence Immediately" demanding that Judge VanTatenhove enter a final judgment and impose a sentence immediately even though a timely notice of appeal divests a district court of jurisdiction over everything except a motion for reconsideration.

by failing to do so that the Plaintiff had repeatedly identified in her filings in both courts. Again, this wasn't just a "sanctions" motion, nor was this a "p——sing contest" like it was later minimized into by older male attorneys. The Plaintiff was physically, professionally, and sexually threatened in a courthouse over legal arguments that she made in a Sixth Circuit filing on August 12, 2013, and the Government was now threatening **her** with criminal contempt over legal arguments that she made on behalf of Mr. Meade in appellate briefs.

179.    During that conversation, the Plaintiff told Judge Yates how scared she was. He told her not to worry and specifically said: "There's no way the Sixth Circuit is gonna let a district court judge mess with a lawyer like that. Your client is a different story, but you'll be fine. They'll transfer the case to a different judge." He also told her that the case would probably go back before the same panel that decided the Writ Petition filed on August 12, 2013. At the same time, the Plaintiff heard back from Mr. Chemerinsky. In addition to offering to argue the case before the Sixth Circuit if it granted oral argument and further offering to handle it before the Supreme Court if it got that far,[50] he ultimately agreed to file a notice of appearance on the Plaintiff's behalf with the Sixth Circuit on March 21, 2014. (*See* **Exhibit O** at p. 4.) As is stated in their email communications, the notice of appearance was filed for the sole purpose of getting the Sixth Circuit's attention and forcing the Government and Judge VanTatenhove to leave the Plaintiff alone. *Id.* In the same series of emails, Mr. Chemerinsky also informed the Plaintiff that he "doesn't do amicus briefs," which the Plaintiff didn't grasp in the context of her own Supreme Court amicus brief citation, because she was **too young** to understand.

---

[50] Stating: "I am not quite sure what I can do, but I'm glad to try. I apologize, but I do not do amicus briefs. If the Sixth Circuit grants argument on your motion, I would come argue it for you. If you go to the Supreme Court, I'd be glad to consider handling it for you."

180.    On March 22, 2014, the Plaintiff posted on Facebook that she now had the most

famous constitutional law scholar in the country acting as her "bodyguard."[51] On March 31, 2014

and April 3, 2014, the Plaintiff filed a sealed ex parte motion and an emergency motion to

resume the case explaining the history of the case and her discoveries after reviewing the full

record that: (a) Judge VanTatenhove referred to *Santos* at the hearing on jury instructions, told

defense counsel that it didn't apply or wasn't relevant, and then used a definition of "proceeds"

that contradicted the Sixth Circuit Pattern Jury Instructions when instructing the jury; (b) seven

months before the trial in the Meade case took place, the Government conceded that the

defendants' money laundering convictions had to be vacated in another published Sixth Circuit

case, *United States v. Adams*, Case No. 11-5291, because it procured a similar and incorrect jury

instruction regarding the definition of "proceeds;" (c) her own near-physical assault in the

courtroom; (d) the circumstances surrounding Mr. Meade's arrest and the fact that he had

previously reported the same Kentucky police officers for running drugs that testified as expert

witnesses or otherwise worked on the money laundering case; and (e) most importantly, that the

Plaintiff was afraid for her physical safety if she was forced to go down to Kentucky and that her

co-counsel, Mr. Curtis, had instructed her not to come to Kentucky again. (*See* **Exhibit P**).

181.    The next day, and notwithstanding the fact that that motion was filed sealed and

ex parte and should not have been reviewable by the Government or Judge VanTatenhove, on

April 1, 2014, Judge VanTatenhove demanded that a hearing be held in Kentucky on the motion

---

[51] The Facebook post states: "Chemerinsky filed his notice of appearance today with the Sixth
Circuit on my client's behalf — and on mine. I'm gonna go out on a limb here and say there was
probably a whole lot of s—ting of the proverbial pants in the U.S Attorney's Office for the
Eastern District of Kentucky today. I now have the leading expert on Constitutional Law in the
country for a bodyguard, folks. Cheers!"

for reconsideration even though the rules stated that a hearing is not allowed on such a motion. *See* **Exhibit Q** — April 9, 2014 Orders and Filings). On April 10, 2014, a hearing was held by phone. (*See* **Exhibit R** — April 10, 2014 Hearing Transcript). At that time, Judge VanTatenhove insisted that an in-person hearing be held, which was the second time that he tried to induce the Plaintiff, specifically, to appear, and he refused to hold the hearing by phone stating that he was "trying to avoid that for this particular hearing," because it "wouldn't be very [pause] **effective**." (*Id.* at p. 17) (emphasis added). It was ultimately scheduled for April 28, 2014, and the Plaintiff was terrified.

182.    During the same telephone hearing on April 10, 2014, AUSA Taylor didn't understand that: (a) the double jeopardy exception to the collateral order doctrine is literally an **exception** to the requirements of the collateral order doctrine in the context of the final judgment rule; (b) *United States v. Nixon* was decided in the specific context of a pending contempt citation; and (c) Judge VanTatenhove had already ruled that he believed he did have 'inherent authority' to hold the Plaintiff in contempt for legal arguments that she made in the Writ Petition filed with the Sixth Circuit on August 12, 2013 in both his opinion denying the Motion to Recuse, and in the opinion denying the Motion to Arrest Judgment and Dismiss the Indictment. AUSA Taylor further stated that he expected the Sixth Circuit to dismiss the appeal, which was baffling to the Plaintiff because she was being harassed in a manner that violates the same judicial Code of Conduct that she was required to adhere to during her clerkship and satisfied the standards for mandamus relief.

183.    The next day, on April 11, 2014, the Plaintiff received a three page order from the Sixth Circuit that dismissed the case for lack of jurisdiction and pretended that the Plaintiff didn't

exist even though her existence and the deliberately created ethical conflict of interest was the

subject of **every** document filed between February and April of 2014. The case cited for the

proposition that the Plaintiff no longer existed was *In Re: Cheney*. After receiving the order

dismissing the interlocutory appeal for lack of jurisdiction on April 11, 2014, the Plaintiff called

Judge McKeague crying and they had a conversation that she still can't believe actually

happened even though it sounded like his voice. First, their conversation suggested that he didn't

receive copies of her actual pleadings, which he referred to as "over the top," even though they

were patterned after those previously drafted by Judge Yates using the same matter-of-fact tone

and direct writing style; the same matter-of-fact tone and direct writing style recently used by

Jack Smith in a Rule 28(j) Supplemental Brief filed with the Eleventh Circuit in *Trump v. United

States*. And, if they were "over the top," that was because the Plaintiff became an electronic

stalking victim in September of 2011, she was now being threatened with contempt of "the

Government" for complying with her ethical obligations and speaking in appellate briefs, and she

was not sleeping for 2-4 days at a time by that point.

184.     Judge McKeague also somehow didn't know that the Plaintiff was being

threatened with **criminal** contempt, not just monetary "sanctions," for literally, and just as

inexplicably at that time, arguing the same principles of federal jurisdiction that **he** taught her in

appellate filings, and notwithstanding the entirety of now-Chief Judge Sutton's published opinion

in *United States v. Aleo*, which is supposed to be **binding**. Nor did he know that Erwin

Chemerinsky filed a notice of appearance on her behalf and offered to argue the case before both

the Sixth Circuit and the Supreme Court if it got that far even though Professor Chemerinsky's

name was on the pleadings, and the fact that he did so was discussed therein. At the end of their

conversation, Judge McKeague told the Plaintiff that if she was afraid to represent her own client, then she had an ethical obligation to withdraw from the Meade case.

185.    On April 15, 2014, the Plaintiff faxed a letter to Judge McKeague, which is incorporated by reference and attached hereto as **Exhibit T**, but she had to do so electronically through a program called eFax from the same, un-secure gmail-based account that Mr. Wohlander set up for her, and she has no idea if he actually read or received it. In the letter, the Plaintiff explained: (a) her then-existing and extremely distraught state of mind; (b) the fact that as he himself stated during their lunch conversation on February 13, 2014, failing to catch the fact that one's client is innocent as a matter of law is per se ineffective assistance and malpractice; (c) she gave up a six figure salary at Perkins Coie in 2009, took the clerkship with Judge Gillmor, and relocated away from her mother and brothers who she loves very much, all so she could pursue the same constitutional law and appellate practice specialty that Justice Roberts and the same Judge Beckwith that he was so impressed by in their email exchange from February of 2014 pursued, **not** so she could be the victim of ethical violations and felonies; (d) she deliberately split jurisdiction in the Meade case by filing the Motion for Reconsideration and then the Notice of Appeal so she could create a full record in both courts, and so he could see

what the Government was filing and what would happen to her if she didn't; and (e) she repeated

her fear for her safety. *See* **Exhibit T** at p. 5-6.[52]

She received no response.

186.    Between April 15-25, 2014, the Plaintiff happened to notice that oral argument for

*United States v. Grooms,* which again, her motion to withdraw that was filed in the summer of

2012 after she lost her job clerking for Judge Yates was denied by the Sixth Circuit three weeks

after Edward Snowden came forward, was deliberately scheduled to take place on the same day,

---

[52] Stating:

> Do you remember my comment at lunch regarding that whole high attorney suicide rate issue and the alarm of pretty much every bar association in the country? The responsibility of being a defense attorney, and the ethical obligations that come along with this job, are different than every other specialty of law. Those of us who voluntarily decide to take that on and subject ourselves to those ethical obligations, as a first choice — we do it purely on legal principle and a desire to see that everyone's constitutional rights are respected, no matter who they are. Nor does any lawyer leave an almost quarter of a million dollar a year salary at one of the top law firms in the country so she can gain some exposure and some understanding of this area of the law via a federal clerkship; and then turn down a career clerkship when it is offered to her — in Hawaii — for any reason other than sheer academic devotion to Constitutional law and a genuine desire to help other people…Being exposed to the worst of humanity on a daily basis and seeing or reading about the horrible things that people do to one another does not improve one's outlook on life. Yes, things do start to look hopeless after a while. But there are cases that, as I said above, come along every once in a while that make that exposure worth it, because they are the types of cases that an attorney like me lives for. The chance to argue an issue before the Supreme Court. This is one of those cases…So, please understand that it is also very difficult, demoralizing, and depressing, and why I pretty much cried all day last Friday when I see a government lawyer rewarded for doing something that not only hurt an innocent person who the Government itself has admitted to the Sixth Circuit is innocent: He is also rewarded for going after me personally because I did my job and defended my client from him, which I am ethically obligated to do as a member of the Bar…there was a reason why I decided to split jurisdiction between the district court and the Sixth Circuit temporarily, one of the reasons for which was because I knew exactly what was going to happen if I didn't. And I wanted you to watch while the Government proved me exactly right. It did.

April 29, 2014, and at the same time (10:00 a.m.) that the Supreme Court was hearing oral

argument in *Riley v. California,* 573 U.S. 373 (2014) (holding that warrantless seizure and search

of the digital contents of a cell phone during an arrest violates the Fourth Amendment). In the

*Grooms* case, the Plaintiff: (a) made the first third-party Fourth Amendment standing argument

after Edward Snowden's disclosures in the specific context of the warrantless search of her

client's son's cell phone, and in accordance with Justice Sotomayor's concurring opinion in

*United States v. Jones*; (b) expressly stated "**not even the judges on the panel**" were immune

from the NSA's surveillance practices in the briefing filed in the Fall of 2013, which she actually

knows from personal experience since she was stalked inside the chambers of a judge using that

technological power; and (c) she explained the associated First Amendment chilling effect and

fear for herself in making that statement, because by that point, she was also being threatened

with contempt of "the Government" for speaking.

187.    On or about April 23, 2014, the Plaintiff attempted to file an initial petition for

hearing en banc from the jurisdictional order in the Meade case, which was required by FRAP

35(g) (but that rule no longer exists). Beverly Harris in the Sixth Circuit Clerk's Office acted

exceptionally strangely and was extremely rude to her; to the same female crime victim who

repeatedly stated in the documents filed in the Meade interlocutory appeal that all she wanted

was to be left alone to do her job. (*See* **Exhibit P**). She also wouldn't let the Plaintiff attach an

appendix that included both the public and *ex parte* filings even though the Federal Rules of

Appellate Procedure required this. On April 24, 2014, and for that reason, the Plaintiff contacted

Cheryl Borkowski, the case manager for *United States v. Grooms*, and she filed a Rule 28(j)

Supplemental Brief in that case, which is incorporated by reference and attached hereto as

**Exhibit U**. (See **Exhibit U** — Email to Cheryl Borkowski and Rule 28(j) Supplemental Brief).
In her email to Ms. Borkowski, the Plaintiff said that she called the Circuit Executive's Office
but they don't take submissions over the phone, and that the Chief Judge needed to see it. *Id* at p.
1. The Rule 28(j) was long, and it was dramatic, which again, was because the Plaintiff was not
sleeping for days at a time, but it didn't make anything set forth therein less true. The brief
explained that the same waiver and lack of third-party standing argument made by the
Government in *United States v. Grooms* combined with the Government's continued insistence
on adherence to Supreme Court precedent that shields it from appellate scrutiny on those grounds
while simultaneously refusing to acknowledge the same Supreme Court precedent and concede
to binding authority when it does **not** favor the Government in the four cases that she was
working on at the time, *Hocker v. City of Pikeville*, *United States v. Meade*, *United States v.
Grooms,* and *United States v. Jones*, was undermining Supreme Court precedent and had created
a perfect workaround of the Fourth, Fifth, and Sixth Amendments, and a pass through the
ineffective assistance. In the same filing, the Plaintiff expressly stated to Judge Gibbons and
Judge Stranch, who were on the panel in *Grooms*, that *Hocker* also involved Kentucky police
officers in an excessive use of force context, and she was afraid for her physical safety if she was
forced to go down to the State of Kentucky. *See* **Exhibit U** at p. 8-9.

188.     On April 25, 2014, and in the following order, the same female former law clerk
who wrote a law review article in defense and on behalf of the Supreme Court, stare decisis, and
the entire judicial branch between 2003-2005, and then through an otherwise statistically
impossible series of events had the power and responsibility for emailing the entire judicial
branch in the event of a military or security emergency (@allfeds) from the same strategically

located military base in the middle of the Pacific Ocean that Edward Snowden fled the country

from, was electronically walled off from judges so she could **not** seek their help, which included:

(a) Judge McKeague; (b) Judge Gillmor; (c) Judge Tallman; (d) Judge Gibbons; and (e) Judge

Stranch whose email addresses she either already had or knew how to guess. (**Exhibit V** —

Email to Ken Loomis, Cheryl Burkowski, Bryant Crutcher). Next: (a) oral argument for *Grooms*

was cancelled and the docket entry was retroactively modified to say that the case was submitted

on the briefs the same day that oral argument was granted (March 7, 2014); (b) the Rule 28(j)

supplemental brief, which was filed with the Sixth Circuit Court of Appeals on behalf of a

**Tennessee** Criminal Justice Act-appointed defendant, was disclosed to Judge VanTatenhove in

**Kentucky,** who issued a sealing order for a **speech**, and it was subsequently offered into

"evidence" to be used against the Plaintiff in conjunction with the Government's then-still-

pending contempt motion at the hearing held in Kentucky on April 28, 2014. (*See* **Exhibit W** —

Sealing Order and accompanying documents); and (c) the Plaintiff received emails from Erwin

Chemerinsky stating that Sixth Circuit Clerk's Office employees called him and told him that the

Plaintiff had filed a pleading with his name on it even though his name was on every pleading

filed in the Meade case while it was before the Sixth Circuit because he filed a Notice of

Appearance in the case, and the Plaintiff emailed him copies of **all** of those filings. (**Exhibit X**

— April 25, 2014 Emails to Erwin Chemerinsky).[53]

---

[53] *Id.* at p. 1 (Stating: "They're sending me back down there to the district court. This is insane. And there's something going on very, very shady in the Clerk's Office. Please call me as soon as you can… I don't want to die because I'm an appellate lawyer and made a legal argument." Professor Chemerinsky: "I just got a call from 6th Circuit about a document I filed. What is this about? I didn't file anything!").

189.    In those emails, the Plaintiff said that there was something extremely shady and unethical happening at the Sixth Circuit Clerk's Office, she didn't want to die for making a legal argument on behalf of herself and her own judges, and she asked Mr. Chemerinsky to call her so they could discuss next steps. Just as inexplicably, he told her that there was nothing she could do or file at the Supreme Court level and she would just have to go down to Kentucky, and he never called her. *Id.* The Plaintiff called Professor Barnhizer at MSU next, who told her that yes, she was both ethically required and absolutely had to file an emergency application with the Supreme Court, and he told her that she could direct it to her Supervising Justice, which also begged the question of how it was possible that her contracts professor at MSU knew more about Supreme Court practice than the man who wrote her constitutional law textbook and has actually argued before the Supreme Court unless Mr. Chemerinsky's emails to her were fraudulent. At that time, Professor Barnhizer commented on how terrible the Plaintiff sounded on the phone, which was because she couldn't breathe. Finally, the Plaintiff called the same law school classmate, Steve Tubergen, who was an already-enlisted Marine in law school, had his entire legal education paid for, is identified in her letter to Judge Yates from May of 2012, *see* **Exhibit F** at p. 3, and she flew to New Orleans to visit in February of 2012. Mr. Tubergen couldn't pass the Bar Exam after law school, failed flight school, was sent to Afghanistan, and sent the Plaintiff a Facebook friend request from a desert there while she was working at Perkins Coie. Mr. Tubergen offered to send his very large friend, Alex, who has a Purple Heart, to escort her to the hearing and he said that he could arrange to have a sniper waiting inside Judge VanTatenhove's chambers "just in case" she got "star chambered."

190.    On April 28, 2014, and because of that apparent intent, the inexplicable acts at the

Sixth Circuit Clerk's Office on April 25, 2014, her subsequent email and phone communications,

and the fact that she had not slept since the above-described act of disclosure happened on April

25, 2014, the Plaintiff had to seek emergency medical treatment because she couldn't get her

lungs to fill all the way and take deep breaths. The Plaintiff called Judge Yates that day and

explained the situation, who told her that: (a) under no circumstances should she drive down to

Kentucky to attend the hearing; (b) she absolutely did not have to do so since Mr. Curtis was in

the state and was perfectly capable of arguing the Motion for Reconsideration; (c) there was no

lawful, valid reason to require her to go down there; and (d) he told her to "go to the damn

doctor," so she did. At that time, the Plaintiff was diagnosed with acute chostochondritis, acute

chest pain, and physical exhaustion (**Exhibit Y**— April 28, 2014 Emergency Medical Treatment

Documentation). As is clear from the Plaintiff's top secret security clearance application, and as

for the additional conditions listed in that chart, including Anxiety, Depression, and PTSD, the

Plaintiff didn't have any of those conditions prior to September of 2011 when the electronic

stalking began.

**F.    Emergency Application and Petition for Writ of Certiorari**

191.    Between May 5-10, 2014, the Plaintiff drove from Cedar Springs, Michigan to

Washington D.C., which requires a flight and isn't possible to do from Oahu, and she stayed with

the same cousin, Justin Lawrence, who convinced her to set up her first Facebook account in

August of 2006 and lived in an apartment that was within walking distance of the Supreme Court

at the time. The Plaintiff hand-delivered an emergency application that had the burn number that

Defendant Priest set up for her listed on the cover. It was a bit of a mess because she had not

anticipated the need, let alone filed anything like that before. Specifically, the Plaintiff did not anticipate that she would ever need to go back to Justice Kagan and explain that: (a) she was sexually assaulted right after graduating from law school while Justice Kagan was the Dean of Harvard and passed the Michigan Bar Exam on appeal; (b) the only reason she applied for federal clerkships was so she could be an appellate lawyer; (c) she accepted the only career clerkship offer that required her to be vetted for a top secret security clearance between May and August of 2009 just before Justice Kagan assumed her role as Solicitor General; (d) she was electronically stalked inside the chambers of Judge Yates; (e) she was physically, professionally, and sexually threatened in a courthouse in Kentucky on August 14, 2013; and (f) she was now being threatened with the same contempt power that decided *United States v. Nixon,* which was a domestic spying case, for repeating the same principles of federal jurisdiction that Judge McKeague taught her in appellate briefs and arguing adherence to *stare decisis* and binding Supreme Court and Sixth Circuit precedent.

The same arguments that the Plaintiff made in her own law review article.

192.    The application was initially denied by Justice Kagan presumably for the same reason and the Plaintiff's inability to fully articulate the problem, so she re-submitted it to Justice Ginsburg who set it for conference. This resulted in Supreme Court Case No. 13-A-1101, which also happens to be the Plaintiff and Defendant Priest's combined birthdays. However, after having the application served on the Solicitor General's Office, the burn phone developed the same background noise and static that already existed on her other cell phone, which is indicative of eavesdropping and spyware. After hand-delivering the emergency application, and while she was staying with the same cousin, the Plaintiff filed a motion to withdraw from the Meade case,

which Judge McKeague told her to file during their conversation on April 11, 2014. She further attached evidence of her medical treatment on April 28, 2014 and explained that she was physically unable to attend the hearing. While the Plaintiff was staying with Justin, her internet connection was tampered with. Upon returning to Michigan, the Plaintiff filed various motions in *Grooms* asking the panel to either: (a) certify the case to the Supreme Court before the Court issued a decision in *Riley v. California* so as to allow the Court to protect itself and those judges; (b) permit the same ACLU that handled *Clapper v. Amnesty International* and other interested parties and organizations to intervene and take the case off the Plaintiff's hands; or (c) appoint counsel for her for purposes of filing a Cert. Petition since the Government had reached across every boundary of personal, subject matter, and appellate jurisdiction to attack her personally, and she had a conflict of interest with her own clients. Those requests were denied in standard form orders from the Sixth Circuit Clerk's Office. The Plaintiff then emailed various civil rights organizations who filed amicus briefs in *Clapper v. Amnesty International*, including the ACLU which argued the case. She received no response.

193.    The emergency application was ultimately denied and the Plaintiff was directed to file a Cert. Petition. She deliberately filed a Notice of Appeal to the Supreme Court from the order offering her Rule 28(j) supplemental appellate brief into "evidence" to be used against her in conjunction with the contempt proceeding, and she spent the next 90 days slowly killing herself while not sleeping for days at a time trying to draft a Cert. Petition on behalf of all three of her affected clients and **herself** with a list of Questions Presented that were not supposed to be ethically or constitutionally possible. (**Exhibit Z** — Cert Petition Questions Presented). The resulting Petition opened with the following sentence: "A lower court order that threatens or

impairs the ability of a co-equal branch to discharge its constitutional responsibilities is the

standard for shielding executive communications on a Writ of Mandamus," and the Plaintiff cited

*In Re: Cheney* (**2004**), which is what that case actually stands for. It was later revealed the Vice

President Cheney and David Addington were the creators of the NSA's surveillance program,

which started in **2004**. The Petition continued on: "In this case, the co-equal branch threatened is

this Court and the constitutional responsibility interfered with is its ability to decide and declare

two structural errors in three criminal cases, one of which, is also an internal structural crime."

*Id.* at p. 1-3. The first question presented was: Whether the Supreme Court has automatic

appellate jurisdiction in accordance with Sections 1-2 of Article III as a matter of the Justices'

personal right and a Criminal Justice Act-appointed appellate attorney's physical safety over the

denial of a Writ Petition that simultaneously satisfies the standards for shielding executive

communications in a civil separation of powers case, but obstructs the Court's ability to perform

its separation of powers role in a criminal separation of powers case. *Id.* The last question

presented was: Does an attorney who has suffered actual harm in the form of physical, financial,

and professional damages and unpaid attorney fees resulting from a structural failure at the

district and circuit court levels, but who also cannot ethically withdraw at the Supreme Court

level, have the equivalent political right, constitutional power, and a structural right under the

supremacy clause of Section 1 of Article III to initiate proceedings for personal redress on behalf

of herself, her clients, and on behalf of the Justices of the Supreme Court, from the Court in a

civil trial, and Congress simultaneously, in an original separation of powers case?[54] *Id.*

194.    The Plaintiff emailed a copy of the Petition to Judge Gillmor in Hawaii as a

means of giving her a heads up like: "Hey, I didn't agree to be electronically surveilled and I

most definitely did not agree to be electronically stalked, did you? Also, this is judicial

misconduct according to **you**, so please help me and report this," but she received no response. It

is also clear from the petition, particularly the end where the Plaintiff invoked Robin Williams'

then-recent suicide, that her inability and need to speak to her judges or to a Justice in-person —

because she couldn't guarantee the security of anything she sent electronically anymore — was

causing her extreme emotional distress. After looking up the history of the four cases that she

was working on at the time, the Plaintiff filed a very short Supplemental Brief explaining how

specific issues, questions presented, and Cert. Petitions, were being deliberately timed between

the Sixth Circuit and the Supreme Court for the purpose of undermining Supreme Court

precedent and the opinions of certain Justices including Justice Kagan, and the effect of which,

had closed the Plaintiff out of the Supreme Court. The Supplemental Brief stated in part:

> The oppressiveness of this case is exemplified by the fundamentally basic separation of
> powers principles it raises. Given recent events in the news, and upon reviewing the

---

[54] In other words: The Plaintiff found a photograph of what appeared to be herself with tears in her eyes and duct tape over her mouth in October of 2011, and was CJA-appointed in *United States v. Grooms* while she was being electronically stalked inside Judge Yates' chambers. The Plaintiff has stopped sleeping, and had to seek emergency medical treatment on April 28, 2014, which is part of the record in the Meade case. She is now being silenced in the same manner depicted in the above-described picture for complying with her ethical obligations, arguing *stare decisis* under Section 1 of Article III just like she did in her law review article, and speaking about threats to her own physical safety in appellate briefs. Congress and the Department of Defense are encroaching and spying on the entire judicial branch. This is a huge problem.

appellate record in all three cases before the Court, the undersigned counsel respectfully submits this supplemental brief in support of granting certiorari.

First, this case is now entirely about ethically required speech. On April 24, 2014, a defense attorney was forced to file a pre-oral argument supplement with a circuit court discussing a First, Fourth, Fifth and Sixth Amendment structural by-pass to ineffective assistance of counsel created by the NSA's *existence* and information-sharing practices with the DOJ in domestic criminal cases, while simultaneously defending herself for defending and arguing the importance of respecting this Court's clear Fourth and Sixth Amendment structural error precedent and complying with the duty of candor... Furthermore, at no point has either the Office of Professional Responsibility ("OPR") or the Solicitor General's Office stepped in to investigate the filing of a statutorily prohibited contempt motion, let alone ordered the AUSA's who were responsible to withdraw it, even though it has now deprived Meade of his right to counsel of choice and created another automatically reversible structural error in the case...Furthermore, because of the NSA-related issues in Mr. Grooms' case, our February [6], 2014 post-*Clapper* FOIA request, we cannot even communicate by phone with one another, or with this Court, without those communications being monitored. Privilege is now irrelevant, and according to the most recent public revelations regarding the NSA's information sharing practices with federal law enforcement agencies, it has been irrelevant since 2004.

Second, in addition to the statement of facts set forth in the petition for writ of certiorari, counsel would like to highlight the events that took place in the Meade case for the purpose of ensuring that the Court and its clerks are aware of the lengths to which the responsible parties went to circumvent the dissenting opinion of a former Solicitor General and now-supervising Justice for the Sixth Circuit, Justice Kagan. Specifically, by explaining the timing of the events that took place in: (1) *Droganes v. U.S.* (holding that inherent authority may not be used to punish the Government for engaging in bad faith conduct); *Hocker v. City of Pikeville* (section 1983 liability for excessive use of force); *U.S. v. Jones* (Fifth and Sixth Amendment violated and 911 call made by Jones intercepted by the Government); and *U.S. v. Grooms* (Fourth, Fifth and Sixth Amendments violated by virtue of warrantless seizure and search of cell phone; versus (2) those in *Riley v. California* (police must get a warrant to search a cell phone); *Plumhoff v. Richard* (section 1983 action for unlawful use of deadly force), and *NLRB v. Noel Canning* (recognizing that "liberty inheres in structure").

First, the day after *Droganes* was decided (holding that a district court could not use inherent authority to punish the same U.S. Attorney's Office for bad faith conduct and lying to the court), on August 28, 2013, the Government filed its contempt motion...The petition for certiorari in *Droganes* was filed with this Court on December 17, 2013. The same day, the Sixth Circuit issued its decision in *Hocker v. City of Pikeville* (unlawful deadly force), and the electronic record was transmitted to this Court in *Plumhoff v.*

*Rickard* (unlawful deadly force). [Four] days after the undersigned counsel and Attorney MacPherson signed off on a FOIA request to the NSA, on February 10, 2014, the district court in Meade's case denied his motion to arrest judgment and dismiss the indictment. The next day, on February 11, 2014, this Court scheduled the oral argument for *Riley v. California* for April 29, 2014. All briefing for *U.S. v. Grooms* had already been filed at that point, and the Government was aware at that time of the NSA-related third-party cell phone standing and chilling-effect arguments set forth therein.

It was not, however, aware of the double jeopardy exception to the collateral order doctrine, nor was it anticipating an interlocutory appeal in Meade's case, and because of the appeal in his case, it obtained three extensions in *Droganes*. The first extension gave the Government until February 20, 2014, to file a reply; on February 20, 2014, the notice of appeal was filed in Meade's case. The Government then sought a second extension, giving it until March 24, 2014 to file a reply in *Droganes*; however, during that month:

The Government filed its motion to dismiss with the Sixth Circuit on March 7, 2014. The same day, the Sixth Circuit issued its opinion in *U.S. v. Jones*, and that evening, Attorney MacPherson emailed Mr. Chemerinsky about the Meade case.

On March 11, 2014, Meade filed a reply to the motion to dismiss and sought a jurisdictional writ and mandamus relief in the same filing. On March 17, 2014, oral argument in *Grooms* was granted and scheduled to take place while *Riley* was being argued before this Court on April 29, 2014. The next day, on March 18, 2014, the Government sought a third extension to file a reply in *Droganes* until April 19, 2014, and Mr. Chemerinsky offered to argue the Meade case and inherent authority issue on Attorney MacPherson's behalf before the Sixth Circuit. He filed a notice of appearance on March 21, 2014.

On March 23, 2014, Meade filed a motion to resume the case with the Sixth Circuit, and one week later, a motion requesting that a special master be appointed. The next day, on April 1, 2014, the district court insisted that a hearing be held on April 10, 2014 regarding his Rule 59(e) motion, and because nothing had been ruled on by the Sixth Circuit, Meade filed a sealed motion seeking an expedited decision on his pending motions citing the ethical conflict of interest and Attorney MacPherson's inability to argue on Meade's behalf. The day before the district court hearing was scheduled to take place, the court refused to re-schedule or amend its April 1, 2014 order and insisted that Ms. MacPherson attend, even though the motion filed with the Sixth Circuit stating that she did not plan to attend was sealed, and making that trip on such short notice is physically impossible.

On April 18, 2014, the Government filed a reply in *Droganes* and argued that inherent authority cannot be used to sanction the Government for bad faith conduct in a criminal case while an en banc petition was pending in the same circuit in which the Government

invoked that authority on its own behalf to deliberately chill constitutionally required appellate advocacy.

On May 19, 2014, the orders list from this Court's May 15, 2014 conference was published, at which time, the Supreme Court denied certiorari in *Droganes v. U.S.* Forty-eight **minutes** later, Meade's en banc petition was denied via a standard form order that neither acknowledged nor addressed the alternative motion to certify the case to this Court [which explained that only the Supreme Court can decide structural error questions]. These were not coincidences. Likewise, on May 22, 2014, a motion was filed in Mr. Grooms' case requesting that the panel either decide the inherent authority issue for itself before issuing an opinion, or alternatively, that it permit the ACLU to intervene in the case if it wished to do so, further allow various amici to submit briefs in the case, many of which filed amicus briefs in *Clapper v. Amnesty International*, and as a last resort, appoint counsel on behalf of Attorney MacPherson for purposes of filing a petition for certiorari on his behalf with this Court.

No lawyer should ever need to make that request, let alone to a circuit court in a CJA-appointed case.

Four hours later, an opinion affirming Grooms' conviction was instead issued without waiting for this Court's subsequent opinion in *Riley v. California*, and on May 27, 2014, the motion to certify was denied in another standard form blanket order issued by the Sixth Circuit Clerk's Office.

That decision forced a CJA-appointed lawyer to continue to operate under a direct conflict of interest that was deliberately created by the Government.

195.    The Supplemental Brief also explained that: (1) the Plaintiff is "a former law clerk that also worked on the 911 Litigation;" (2) "this case is now a separation of powers controversy because in response to the briefing in the district and circuit courts regarding the jurisdictional defect in the indictment in the Meade case, the Department of Justice itself invoked this Court's original Article III structural authority and contempt power to decide the structural error in the Meade case, to instead threatened the undersigned attorney and Attorney MacPherson [with] contempt for making that argument on behalf of Mr. Meade to the Sixth Circuit; and (3) per the

Supreme Court's decision in *United States v. Shipp*, the Supreme Court is the one and only Court whose contempt power is not and can never be limited by the contempt statute, stating:

> This Court has also recognized that the specific purpose of inherent authority and contempt power is to enable federal courts "to protect themselves and the judicial functions they perform." *In re Manufacturer's Trading Corp.*, 194 F.2d 948, 956 (6th Cir. 1952). Thus, in *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), the same case cited in the Government's contempt motion, this Court discussed inherent authority in the specific context of fraud on the court and stated: "Tampering with the administration of justice in [this] manner...involves far more than an injury to a single litigant. It is a wrong against the institution set up to protect and safeguard the public." Therefore, every court, including the Supreme Court "has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud." *Id.* At 43-44 (emphasis added). This protection is also echoed in Rule 60(b) of the Federal Rules of Civil Procedure, which this Court has also held applies equally in criminal cases. Thus, should the district court deny relief in Meade's case, he will be forced to appeal *again*.

Finally, in *U.S. v. Shipp*, this Court specifically addressed both its exclusive authority to decide all controversies and questions involving judicial power and the inapplicability of any statutory restriction or political attempt to evade or limit that power, stating:

> The power and dignity of this Court are paramount. This Court is preeminent as speaking the last word for the judicial power, and looks to the Constitution, not only for its origin in general, but for its express creation, while inferior Federal courts look to Congress for their actual being, functions and jurisdiction. It may be doubted whether Congress could limit the authority of this court over contempts, and whether the restrictions of Rev. Stat. 725 [the contempt statute] apply to this Court although professing to apply to all courts of the United States. An act of Congress controls the courts of its own creation, but not this Court, if thereby its organic authority and jurisdiction under the Constitution are curtailed. The general and inherent authority of this Court, of whatever nature, does not need any statutory grant of power and is not subject to statutory restrictions...

> Most recently, the Court held that an erroneous deprivation of the right to counsel of choice is a structural error, because this right is "the root meaning of the constitutional guarantee[s] of the Sixth Amendment."

196.    On August 6, 2014, the Plaintiff received a call from someone at the PACER Service Center in Texas informing her that on August 12, 2013, the same day that she filed the Writ Petition with the Sixth Circuit, *In Re: Meade*, Case No. 13-6038, via email and then drove

from the State of Michigan to Kentucky all day, her CJA-PACER account was hacked and her

login credentials were used to remove her CJA designation. According to the person with whom

the Plaintiff spoke, the account was being suspended upon further authorization and a letter from

the Sixth Circuit, which the Plaintiff could not get because of the above-described series of

events at the Clerk's Office on April 25, 2014, and the inexplicable hostility that she experienced

— to the same female crime **victim** — so she could not file the vouchers for her affected CJA

cases.

197.    On October 2, 2014, the Plaintiff received emails from AUSA Ken Taylor and

Professor Chemerinsky, which are incorporated by reference and attached hereto as **Exhibit AA**.

In those emails, AUSA Taylor sent a copy of the above-quoted Supplemental Brief to Mr.

Chemerinsky and stated that he was writing to inform him that the Plaintiff was "**continuing** to

use his name in her very unusual pleadings," which indicated that AUSA Taylor either: (a) had

backdoor access to her prior emails with Mr. Chemerinsky when Mr. Chemerinsky emailed her

about the same thing on April 25, 2014; or (b) AUSA Taylor engaged in prohibited *ex parte*

communications with Sixth Circuit Clerk's Office employees, because those are the **only** two

ways he could have known about Mr. Chemerinsky's email to the Plaintiff regarding the same

issue. The tone of the emails from Mr. Chemerinsky were also inexplicable given the 180-degree

turn from that of his prior emails and the fact that he had graciously offered to handle the case

before both the Sixth Circuit and the Supreme Court. The Plaintiff repeated her request from

April of 2014 that Mr. Chemerinsky call her, but he never did.

198.    On or about October 6, 2014, the Plaintiff received the denial of the Cert. Petition,

and she became so personally worried about the physical safety of the Justices and **herself**;

specifically, because of the associated level of betrayal of both herself and certain Justices, and

the lengths to which certain Government officials went to circumvent the opinions of Justice

Scalia, Justice Ginsburg, Justice Kagan, Justice Sotomayor, and Justice Roberts, that she was so

reminded of, retroactively remembered the name, and decided to look up the facts of the same

"espionage case" for the first time, *United States v. Gowadia*, the Ninth Circuit opinion for which

only became publicly available in July of 2014. She further did so because of: (a) the

implications of ineffective assistance by the Secret Service to the Plaintiff in July of 2013 and to

the same two Chief Justices back in 2004-2005; (b) Justice Scalia's statement that "liberty

inheres in structure" in *NLRB v. Noel Canning*, 573 U.S. 513 (2014), which was a separation of

powers case and opinion issued one day before the Supreme Court issued a unanimous decision

in *Riley v. California* authored by Justice Roberts in which he forcefully stated that if police want

to search a cell phone then "get a warrant;" and (c) the fact that the Plaintiff was now the **victim**

of a structural error.  Upon doing so, she learned for the very **first** time that *United States v.*

*Gowadia* was actually about the sale and disclosure of the top secret design documents and

specifications for her own former clients' Boeing-Northrop B-2 Stealth Bomber.

199.    The Plaintiff didn't know how to process what she was looking at. She was

simultaneously astonished and **horrified**. The Plaintiff recently reconnected with a former

colleague at Perkins Coie, Jared Hager, who now works at DOJ. When she told him what

*Gowadia* was actually about, he sucked in a breath and said: "Whoa." This is exactly right and

putting it mildly. First, because the B-2 is a silent, invisible and lethal for that reason Boeing

warcraft, which also happens to be the **literal** equivalent of a Navy SEAL (May 2, 2011), a CIA

or NSA agent (May-September of 2011), "ineffective assistance" by the Secret Service or a

federal marshal to the same now-Chief Justice Roberts, Justice Kagan, and to the Plaintiff

(September of 2005, August of 2010, July of 2013, April-June of 2015), a sniper or assassin

(May-September of 2011, Steve Tubergen's offer in April of 2014), and cancer, which is what

Judge Gillmor had and is why she had to step down as Chief Judge and transfer *Gowadia* to

Judge Mollway. Second, because no Perkins Coie lawyer would want to get within 100 yards of

certain documents because they are so monetarily valuable. The design documents for the B-2

are those **exact** documents. Third, because there was no **firewall** around her computer on Oahu,

which is part of the Ring of **Fire** and an oversized military base that the Department of Defense

is entirely responsible for.

200.    Shortly thereafter, the Plaintiff received a voicemail message on her burn phone

of a woman crying and speaking in a language that sounded like Arabic. She also received a

message informing her that she now qualified for a free home alarm system. That was supposed

to be a clean phone and number. The one and only time she disclosed it was on the cover of the

emergency application. In October-November of 2014, and for that combination of reasons, the

Plaintiff hand-delivered a draft version of a Supreme Court filing to Defendant Priest at the

AT&T store on Henry St. in Muskegon. In the draft, she reminded Defendant Priest of the two

different ways that he subconsciously identified her as his future wife on their first date, his

promise to come back to her, and she requested an assessment of all costs, attorney fees, and

damages since her appellate CJA-account had been hacked and she could not file her CJA

vouchers electronically. When the Plaintiff arrived at the AT&T store, she didn't see the car that

Defendant Priest drove the summer they dated parked out front, but she went inside anyway. He

was there. He was also insufferable during that exchange, actually said the words: "I'm

awesome" out loud, and wouldn't tell the Plaintiff which car was his when she asked if he had

gotten a new car. The Plaintiff was incredibly hurt and disgusted; specifically given what she had

suffered through **because of** her prior relationship with the same man and the manner in which

he had been burned into her brain. In response, the Plaintiff said: "Just read it," and then left.

201.    The Plaintiff checked Defendant Priest's Facebook page later that evening. In

response to that hand-delivery, he changed his publicly visible Facebook photos to an album of

wedding pictures; thus, **deliberately** leading the Plaintiff to believe that she was right about his

identity if she could only figure out what to file to get the relief that they both needed.

### G.    Social Security Disability and Suicide

202.    Between the time of that hand-delivery and October of 2015, the Plaintiff stopped

sleeping for 4-7 days at time and suffered through a nervous breakdown while trying to draft and

revise the filing, because: (a) Judge VanTatenhove was deliberately sitting on her motion to

withdraw from the Meade case, which Judge McKeague told her to file during their last

conversation in April of 2014, so she could **not** file a complaint for judicial misconduct or

otherwise file a lawsuit, and while the contempt of "the Government" motion still remained

pending; (b) the Plaintiff was running out of money and could not file her CJA vouchers for the

*Grooms* and *Jones* cases; (c) her relationship with Mr. Vogelar had deteriorated because the

Meade case had completely taken over her life and he wanted her to move out of his house; (d)

she was threatened by the same Steve Tubergen who first offered to send his friend Alex to escort

her to the hearing in April of 2014 and to have a sniper waiting inside Judge VanTatenhove's

chambers "just in case," but then told the Plaintiff in November-December of 2014 that she

would have to cuddle with him and pretend to be his girlfriend when she asked him to help her

hand-deliver the filing to the Supreme Court, further joked about rape in the context of a security clearance, and told her he could "sell" her location in a cell phone call while she was still living with Mr. Vogelar in Cedar Springs; *see* **Exhibit B** at p. 9; and (e) although the Plaintiff **still** has the pair of "gum-ball machine wedding rings" that Defendant Priest referenced in a Facebook post in August of 2011 and the Plaintiff subsequently found in her car, she was afraid that he would be harmed by his own employer or by someone else if she went back to see him in-person.

203.    On March 2, 2015, the Plaintiff posted a publicly visible Facebook note titled: Breach of Article III (breach of contract), and she sent Defendant Priest the same Facebook friend request that he sent her in March of 2010 after she interviewed with Judge McKeague and told him about her impending wedding to Mr. Wing. She also sent Defendant Priest a private Facebook message that day, and a series of them between March and October of 2015, which explained: (a) that exact wedding-related expectation, timing, and her **reliance** on Defendant Priest that he actually meant it; (b) her conversation with Mr. Kobza in May of 2013 and his statement that Defendant Priest was just "f——king with her head," but was clearly using NSA technology to do it; (c) her belief that Defendant Priest is exactly as silent, lethal and classified as she previously expected; (d) the same "double lock on your door so you don't get stolen," Red Phone iPhone application (which uses double encryption and requires both users to have it installed on their phones), Air Force One location, Joe Thue top secret security clearance requirement, nuclear football (which requires two keys), "What am I, Bruce Wayne," Batman reference from his email to her in September of 2011, and subsequent reference on her alias Facebook account in November of 2011 when someone sent her a friend request with an image of Batman looking out over a fire and email address proekt13@gmail.com; (e) her subsequent

discovery that she and Defendant Priest were both born the same year and term (1980-1981) that

now-Chief Justice Roberts started his legal career clerking for then-Associate Justice Rehnquist,

the only criminal case that a **Chief** Justice presides over is the impeachment of a President,

Justice Roberts was sworn in by Justice Stevens in September of 2005, who was nominated to

the Supreme Court by the same President Ford that pardoned Richard Nixon and has an

international airport named after him in Grand Rapids that the Plaintiff has been flying from

since 1986, while the Plaintiff was offered and accepted the one and **only** career clerkship offer

from the only other now-former **Chief** Judge for the U.S. District Court of Hawaii that required

her to be vetted for a top secret security clearance in 2009, which was for the specific purpose of

pursuing the same constitutional law and appellate practice specialty that Justice Roberts was

famous for; (f) an original Article III treason case and disclosure of private or classified

information that is so lethal to the Justices and the entire judicial branch that they would need to

wear Kevlar vests if serving as a jury; (g) the fact that her law review article cited the exact

combination of the distance between Justice O'Connor (retired July of 2005), Justice Ginsburg

(then-Supervising Justice for the Second Circuit where Lisa Manheim clerked before clerking for

Justice Kennedy), Justice Kennedy (then-Supervising Justice for the Ninth Circuit), Justice

Stevens (then-Supervising Justice for the Sixth Circuit), Justice Rehnquist (deceased September

of 2005), Justice Roberts, Justice Sotomayor, and Justice Kagan in a manner that would have

otherwise required her to be psychic; (h) the location of the associated international airports and

former Presidents (Honolulu International Airport to Ford International Airport) when Defendant

Priest sent her the Facebook friend request after she flew from HNL to GRR and back to

interview with her oldest, most important, and most valuable cell phone and email contact in

March of 2010, Judge McKeague, who was interviewed by Justice Roberts for purposes of his

nomination to the federal bench in 1991-1992; and (i) because of Defendant Priest's prior and

repeated reference to the word "contacts," the Plaintiff gave him Judge Gillmor's home

address.[55]

204.    The Plaintiff has the same temper as Judge McKeague, but **only** when it comes to

incompetence, gross injustices, greedy, grossly negligent acts that jeopardize her physical safety,

hatred, bigotry, violence, misogyny, religious hypocrisy, and all of the things that her own father

taught her to fight. However, she was also estranged from her father and stepmother at the time.

The Plaintiff further explained that: (a) she deliberately set her Facebook privacy settings as

---

[55] Stating: Incidentally, TREASON is spelled [and the Plaintiff gave Defendant Priest her
stepmother's name], 343 N. Broton Rd. — home purchased from the parents of Derek Foster —
U.S. Air Force — whose father built home. Purchased in 1992(ish) by [insert Plaintiff's parents
names], entire mortgage and subsequent sale funded by childhood trauma to K. MacPherson
from age 3-17, and from which, she escaped on 3/31/1997 by climbing out of bedroom window.
Sworn into Sixth Circuit in private swearing-in ceremony jointly presided over in April of 2006
by Judge McKeague (one of two oldest cell phone contacts stored in T-Mobile RAZR since
2004) — **legendary temper** — and by Judge Batani, U.S. District Court, E.D. Michigan. K.
MacPherson, recruited by Perkins Coie in 2007 to work on 9/11 Litigation on behalf of Boeing,
whose client for purposes of case was called Global Insurance, whose entire application packet
for purposes of federal clerkships addressed her work in that case, and after becoming
colleagues, personal, and Facebook friends with Lisa Marshall Manheim (J.D. from Yale), prior
work: Hamdan v. Rumsfeld, law clerk to Justice Kennedy, wife of Nick Manheim. The former of
which, is now teaching constitutional law at U.W. In Seattle. Nick and Lisa hated being
superficially referred to as "the pretty couple" for the same reason they were both cheerleaders in
high school, and K. MacPherson is somehow always "too pretty" to be a lawyer, let alone
graduate at nearly the top of her class from law school in May of 2005, and WAY too goddamn
young to have ANY personal, professional, let alone political or military enemies. Because in
May of 2009, K. MacPherson interviewed with Judge Tallman (Ninth Circuit) in Seattle, WA,
and Helen W. Gillmor in Honolulu, HI, and accepted prospectively offered and intended career
clerkship from the ONLY other former Chief U.S. District Court Judge from the U.S. District
Court of Hawaii in May of 2009, who was presiding over treason and espionage trial, U.S. v.
Gowadia, involving Boeing-Northrup B-2 stealth bomber…[insert Judge Gillmor's home
address].

tightly as possible when she established her Facebook account in 2006, she had no idea how

Defendant Priest found her after she reconnected with Mr. Wing and flew from HNL to GRR, he

"sure as hell turned out to be" her first and only love, and no one would presumably instruct him

to send her that friend request specifically and deliberately when he did, "arrange" the **exact**

same romantic relationship between two people who went to high school together, and then

deliberately separate them by lying to Defendant Priest and telling him that he had to hurt the

Plaintiff "intentionally;" (b) the Plaintiff would have asked Judge McKeague to preside over the

same wedding in March of 2010; and (c) the one and only thing she has wanted from the time

she was six years old and began **flying** from GRR the same year Congress enacted the same

money laundering statute that was at issue in *Santos* and in the Meade case was to meet Prince

Charming, fall in love, get married, live happily ever after, and most importantly, be "left the hell

alone." Thus, she expressly stated that if Defendant Priest did not want to marry her in a

ceremony presided over by Judge McKeague (or ideally a Justice), then he had better clear up

any misrepresentations on his Facebook page quickly.

      205.    Just as importantly, the Plaintiff was posting publicly visible Facebook status

updates calculating damages on behalf of the same combination of Justices, Sixth Circuit, Ninth

Circuit, federal and state judges, and law clerks who the Plaintiff was either electronically walled

off from, whose Fourth, Fifth and Sixth Amendment-related opinions were being openly ignored

and end-run, and-or whose contact information was stored in or otherwise accessible via the

Plaintiff's non-firewalled computer on Oahu or her iPhone, which someone creepy behind the

scenes began reporting for "nudity."

      So, they were literally threatening the same sexual assault victim with rape.

206.    At the same time, the Plaintiff was emailing Judge McKeague and Judge Yates trying to explain and further figure out the legal implications of the same competing top secret security clearance with Joe Thue and what a Solicitor General is because she wasn't actually old enough to know; however, as she said in emails to them, she most definitely knows what solicitation to commit rape and murder is and why the surreptitious, meaning un-consented to, theft and sale of the **entirety** of her flight record, cell phone, Facebook, and email contacts encompasses multiple felonies. *See* **Exhibit B** at p. 7-10. She further explained the illegality of "end-running" the opinions of specific Justices as it relates to the Fourth Amendment while further engaging in acts that jeopardize the physical safety and privacy of the entire judicial branch and every current and former law clerk from the "Facebook generation" graduating from law school in May of 2005 or later. *Id.* at p. 1-10.

207.    On March 25, 2015, the Plaintiff publicly posted the following on Facebook:

Just had one of those gleeful moments over the idea of actually needing to remind "the Government" that it deliberately chose to federally preempt and is exclusively responsible for the entire field of aviation, and then, actually being so concerned for the physical safety of a Sixth Circuit Judge [Judge McKeague] AND his family members in an email demanding that named employees at a courthouse in Cincinnati confirm receipt. Who also don't grasp their immediate expendability if I ever actually need to explain why a former Dean of Harvard and the first female Solicitor General should scare the s——t out of them.

The same day, the Plaintiff sent an email to Judge McKeague attached as **Exhibit B** at pp. 1-7 explaining: (a) all of the above; (b) her own extremely tragic story; and (c) that the same sexual assault victim from May of 2005 had been threatened with rape over a filing informing every federal judge and Justice about a security-related threat and encroachment on their own privacy and power.

146

208. On April 14, 2015, almost a year since the events at the Sixth Circuit took place and Judge McKeague told the Plaintiff to file a Motion to Withdraw from the Meade case, Judge VanTatenhove finally issued a decision denying the Motion for Reconsideration. *See* 11-cr-00051-GFVT. In it, he held that: (a) a Rule 60(b) Motion dealing with fraud on the court did not apply in criminal cases, notwithstanding binding Supreme Court and published Sixth Circuit cases that were directly on-point holding the exact opposite to which the Plaintiff referred in the supplemental brief; (b) he stated that "[t]he case quickly devolved into name-calling, finger-pointing and disorganized, excessive briefing," and "extensive, and often argumentative, briefing ensued for months; amidst the briefing, Defendants (meaning the Plaintiff) also asked for attorney's fees and that sanctions be imposed against the Government;" (c) "[d]espite an explicit Court Order to the contrary, Ms. MacPherson, Defense Counsel primarily responsible for the framing of the arguments before the Court, was not in attendance" at the hearing on April 28, 2014; and (d) that, because the Defendants raised the issue of the sufficiency of the indictment for the first time after trial, the indictment was to be construed "liberally in favor of sufficiency." Last, he stated that "issues related to Ms. MacPherson's non-attendance at the April 28 hearing will be addressed by subsequent Order of the Court."

Again, the Plaintiff was physically unable to attend the hearing because she couldn't get her lungs to fill with oxygen, and Judge Yates specifically told the Plaintiff that she absolutely did not have to and should not go down to Kentucky for that hearing.

209. Most importantly for purposes of this filing, that same month, the Plaintiff and the public were informed for the **first** time that there was a hidden component of the same AT&T/ Apple iPhone operating system that the Plaintiff switched to in January of 2010 while she was

clerking for Judge Gillmor that let any application downloaded surreptitiously steal and sell a user's entire cell phone, Facebook, and email contacts list without their knowledge, awareness, consent, or permission, which made the Plaintiff cry so hard that her nose started bleeding profusely and she couldn't make it stop. The Plaintiff has described it in emails to her judges as "pouring blood;" it was not an exaggeration. Shortly thereafter, two federal marshals showed up at Mr. Vogelar's house. The Plaintiff learned sometime in June or July of 2016 that they were sent by Judge McKeague. They didn't listen to a single thing she said. During their initial conversation, which took place in Mr. Vogelar's driveway, the Plaintiff explained: (a) the entire story and exactly how the stalking began in September of 2011, which they minimized ("So what. Lots of people have Arabic names") without grasping the timing (four months after Bin Laden was executed); (b) the fact that it was technologically impossible to send a text message by email directly to her cell phone number at that time, and exactly who, how, and **why** the Plaintiff deliberately limited the individuals that were permitted to have her cell phone number; (c) the fact that her maternal uncle is best friends with the father of a Navy SEAL; and (d) that Steve Tubergen had threatened to "sell" her location in a cell phone call, and that Nick Mathieu, the same Air Force Officer who the Plaintiff flew from GRR to D.C. to meet up with in September of 2011, informed her in February of 2013 via a private Facebook message that he knew "war lords in Afghanistan" and a human trafficking market where she would "fetch a hefty price." (Their response: "So what some jerks said that."). *Id.* at p. 8-9.

210.    Steve Heatherington, the male federal marshal, who was so old then that he retired the following year, specifically asked the Plaintiff "what she needed," her response to which was: "**BRIAN**!" and she couldn't have said it any louder or more crystal clearly. Instead

of just doing what the Plaintiff asked and bringing her to Defendant Priest and to Judge

McKeague so they could all sit down in a safe place, talk in-person, and the Plaintiff could verify

what communications Judge McKeague had received from her, he further asked the Plaintiff

"what her relationship with her father was like," but then didn't listen when the Plaintiff told him

**not** to contact her father because they were estranged at the time and he is still married to the

person who the Plaintiff climbed out of her bedroom window to escape from in 1997. **Exhibit B**

at p. 9-12.

211.    During that initial meeting, Steve Heatherington gave the Plaintiff a new, in-

chambers email address for Judge McKeague. On April 29, 2015 and May 11, 2015, the Plaintiff

sent the emails to Judge McKeague and Judge Yates that are attached hereto as **Exhibit B** at pp.

8-15 explaining who she and Defendant Priest are, threats to her own physical safety **and** to their

own, **and** to their female family members. The Plaintiff was not aware that her emails to Judge

McKeague were not received in which she explained her own, extremely tragic personal history

and story, identified Mr. Priest as "that guy" "who every single federal judge in the country

should already know about and be scared s—less of," and told them that they were owed a **lot** of

money the day that: (1) repeating the same principles of federal jurisdiction that Judge

McKeague taught the Plaintiff in appellate briefs is contempt of "the Government;" and (2) being

the same appellate lawyer that Justice Roberts, Judge Yates, Judge Beckwith were is contempt of

"the Government." *Id.* at p. 9-15. Instead, Steve Heatherington told the Plaintiff that she needed

to watch her "language," notwithstanding the fact that the Plaintiff stated that since the same

Government that she saved millions and millions of dollars in the Boeing C-17 case was now

crushing her out of existence, she was no longer communicating with them in a professional

capacity. *See* **Exhibit B** at p. 4, 13. She was explaining the sexual assault-related threats and how

their own wives and daughters would feel about why the Plaintiff now regretted her entire life,

legal education, and career.

212.   The Plaintiff was not sleeping for up to a week at a time and suffering through a

nervous breakdown, but it didn't make what she said any less true. Her messages and Facebook

posts were an outpouring of love, rage, and grief between that time period because her entire

legal career was pointless. She made a lot of **other** people rich, and it was all for nothing. For

example, on April 22, 2015, the Plaintiff posted the following message on Facebook publicly,

and she sent it to Defendant Priest via a private Facebook message:

> Second update on that [damages] calculation...I can guaran-goddamn-tee that an entire
> team of Navy SEALs, three actuaries, and two Vice Presidents at Swiss Re...would most
> definitely be capable of explaining why: (1) I was pretty astonished to learn what "re-
> insurance" is for the first time (had no idea such a thing existed) and even more
> astonished to learn that Swiss Re actually paid the same two billion dollar property
> damage claim on the same 9/11 Litigation that I was specifically recruited by Perkins
> Coie to work on in March of 2007; (2) according to [the Plaintiff's cousin Jeremy Lane]
> (and I'm assuming this is the general understanding of non-lawyers), this was a pretty
> simple decision because "if the property's destroyed, it's destroyed." Except, in addition
> to being lied to by the same Perkins Coie law firm in 2007 and in May of 2012...I'm also
> having an exceptionally difficult time right now over the idea that no one gets how
> offensive it is to me when I actually need to explain why, if that was the case and there
> was no fault assessment or any type of legal defense, then Swiss Re should most
> definitely be demanding a refund — so add two billion to that check total as well.
>
> Third, when the idea and fear associated with Supreme Court Justices being lied to, or
> about...and while they're actually being betrayed by the ignorance of their own goddamn
> country, technologically, and from the inside out so no one can see it happening, via an
> electronic filing system that I can also most definitely explain the "coincidences"
> associated with the 2004 start date of and what eleven years of Section 1983
> liability means...and all while they're actually talked about in a manner using adjectives
> like "corrupt," the Justices along with the entire judicial branch are actually paying taxes,
> which are being used to commit constitutional crimes against them. Meanwhile...also not
> bothering to respond to an email to the same male Sixth Circuit and Michigan judges,
> both of which, I also now regret even meeting in 2004 and 2010 for that reason, **gender,**

wrong historical order, [the fact that I've been harmed for even knowing them] and complete f—king failure [of everyone] to listen to me explain how upset Chief Justice Rehnquist and Chief Justice Roberts, and Justice Kagan, Justice Kennedy, and every single Justice that has ever **lived** would now be over why I actually regret my entire legal education and life right now. More specifically, because in addition to the fact that I actually had to ask post-Snowden disclosures in June of 2013 if the same air traffic controller who I went to high school with even had a top secret security clearance, and even better, the timing, stupidity, and cruelty associated with a career clerkship offer in Hawaii with a start date of September 11, 2009, and his alleged "friend" from high school who I had never met, actually trusted and accepted a Facebook friend request from HIM in 2010, a military event in 2011 THAT I AM NEVER IN ANY WAY SHAPE OR FORM RESPONSIBLE FOR, let alone capable of being associated with, but YEP, they somehow also both owe their lives to me and give zero f—ks about why a burn number on the cover of an emergency application filed with the Supreme Court is also kind of a big deal to me too. However, I also think the friend in question should probably feel pretty f—king horrible about, and be further forced to read and then re-read an email he sent to me and I forwarded to Holly in 2011, and THEN, further regret every single act and minute of the entire last four years of his life too. Last but certainly not least, since I'm not even supposed to know about, but I'm quite positive that nuclear football and Washington D.C. in the same sentence as Princess of Justice wishing she had never been born *should* be an issue — I'm not sure how to calculate that one, **but if MY death was purchased and paid for — fill in the amount for yourself.**

Given what the Plaintiff suffered through after October of 2015, current political reality in the specific context of the theft of classified documents, the post-*Roe v. Wade* suffering of little girls and women in states like Texas where Judge Ezra lives, and the recent shooting at Michigan State University, the Plaintiff hopes that Defendant Priest filled in an **extremely** high dollar amount.

213.    On April 25, 2015, the Plaintiff posted the following Facebook message publicly and sent a copy to Defendant Priest via a private Facebook message:

Third update on that calculation (and hopefully the guilt associated with those acts being sufficient): In the event that I somehow become a threat to my own physical safety or that of anyone else; specifically, BECAUSE OF my own obvious innocence, reliance on the honesty of others, complete lack of information or the possibility of any kind of threat to myself in-chambers, in my own home — and most definitely in a f—king airport in Washington D.C. — that flight should have NEVER happened to begin with. The fact

that it is and did result in me being electronically stalked was EVERYONE ELSE'S FAULT AND THEIR RESPONSIBILITY to inform me of honestly and affirmatively — so I can actually be the same goddamn lawyer that knows what to do, what to ask for, can protect YOU, and would very much like to be informed of the EXACT names, corporations, [and] private home addresses associated with the last four years of my life. Except, since I would instead prefer to have, and I think Justice Roberts has what I'm *guessing* actually is the exact contractual right, constitutional power, and breach of contract that I've been referring to and quite frankly fantasizing about the fury associated with all eleven Justices at once…and it should totally scare the s—t out of the DOD and Congress both when they've apparently forgotten why systematically betraying **them** using the exact lack of Article III standing, waiver argument, let's pretend that argument doesn't exist and commit ethical violations pattern is noticed by me, and in the exact context, timing, and contempt-of-the-Government-that-can-go-f—k-itself Rule 28(j) oral argument, the reaction to which upon filing most definitely should be discussed in a few Constitutional Law and history textbooks.

So, in the following order: (1) the betrayal associated with built on the water courthouse that reminded me of my grandfather everyday and can be bombed by air or by sea sure as f—k better mean something…(2) but in case anyone missed the memo on this one, further means so f—king vulnerable because 'has keys to chambers of;' has home address, keys, and alarm codes for;' and 'sealed inside largest building full of federal judges everyday in courthouse on strategically located in the middle of the Pacific Ocean military base for a year, and NUMBER ONE TARGET; and (3) why oh sh—t a wife being a lawyer to and advising THAT guy on how to "renegotiate" the illegality of a contract and take every last dime of the DOD by herself and on behalf of the entire federal judiciary is supposed to make people actually be honest, be nice to her, and to leave her the f—k alone. Meanwhile, she also operates under the basic f—king assumption that she can actually rely on information that she is provided with by I.T. Departments, and that the DOD is always COMPLETELY responsible for maintaining military grade level of security and firewall around entire goddamn island — which is part of what I think is called the Ring of FIRE if I remember correctly. Second, being aware of, providing me with information about, and most definitely not straight up f—king lying to me, or to a Supreme Court Justice, or to the Solicitor General.

However, since the entire monetary value of THAT particular island sure as f—k better never actually need to be explained by ME as stealth technology plus CERN: Fill in the total thus far _____.

214.     On April 25, 2015, the Plaintiff called out the fact that someone creepy behind the scenes was reporting her Facebook posts for "nudity," and she noted that "whomever has now reported far too many of my posts for 'nudity' is creating a fantastic record." At the same time,

Steve Heatherington called the Plaintiff and informed her that Secret Service Agent Cain lied to

him and told him that there was no investigation, who also apparently didn't realize that, given

her age, the fact that the Plaintiff even has his **name** means there was, and the Plaintiff

documented the same investigation in her February 6, 2014 FOIA request to the NSA. *See*

**Exhibit B** at p. 12.

215.    After the encounter with federal marshals in Mr. Vogelar's driveway and learning

about the above-referenced hidden component of the AT&T Apple iPhone operating system, the

Plaintiff sent Defendant Priest a Facebook message between June 1-3, 2015: (a) screaming at

him over the same repeated reference to "contacts" in his prior communications to her and his

failure to inform the Plaintiff why this was an issue even though he had to have known;[56] (b)

informing him that federal marshals had showed up at Derek's house even though she lived

within 100 yards of a Post Office, was required to have a P.O. Box for that reason, and **no one**

was allowed to have her home address; and (c) her own absolute disbelief that even **he** didn't

grasp the legal significance of that fact if he ever lied about it later.

---

[56] Stating: By the way, I honestly don't know who in the f—k you think you were making ANY KIND
OF JUDGEMENTS ABOUT ME EVER IN ANY WAY, SHAPE, OR FORM YOU F—KING PRICK!!!
Guess who filed an 'eviction' proceeding against me? That would be Derek. Yep…because why was it
again that it is NEVER MY F—KING JOB TO PHYSICALLY DEFEND YOU IN A BAR, OR IN ANY
COURTROOM, OR BEFORE CONGRESS?!!! So, wait, let me get this straight — 1. Every single f—
king minute of my entire life, legal education, and career, every hour spent WHEN YOU SURE AS F—
K WEREN'T THERE BETWEEN 2002-2005, was completely and totally f—king pointless; MY BEST
FRIEND IN THE WHOLE WORLD, A GOLDEN RETRIEVER NAMED BEAR, DIED IN 2009, SO A
PIECE OF — LIKE YOU COULD COMPLETELY F—K UP MY LIFE? So you could later use my
legal education and my entire cell phone and email contacts list in March of 2010, and the value of my
ENTIRE F—KING LIFE to later pay for a wedding for a CIVILIAN air traffic controller in Chicago, IL?
Meanwhile, the one and only thing I've ever wanted or expected IS TO BE LEFT THE F—K ALONE,
HAVE MY OWN F—KING HOUSE, AND BE SAFE. So, while my ENTIRE LIFE HAS BEEN F—
KING HORRIBLE, I had three months of happiness between May and August of 2011, finally had my
own house — AND EVERYTHING SINCE THAT TIME HAS BEEN TOTALLY F—KING
POINTLESS TOO? Meanwhile, I was crying so hard when the federal marshals showed up at my house
that I gave myself a nosebleed, I'm sick, I'm wasting away, AND YOU GIVE ZERO F—KS?!

216.    On June 28, 2015, the Plaintiff publicly posted another calculation and sent it to

Defendant Priest via a private Facebook message that stated, in part:

> …Because yeah, it actually is just as f—king s—ty as it sounds for: (1) "the
> Government" in August of 2009 to even permit me to relocate to Oahu, while all of the
> other a—hole associates treated me…a certain incredibly intelligent blond that has a J.D.
> from Yale, and Amy Kurren [on] Oahu in exactly the same s—ty, physical appearance-
> based manner, or subsequently based on a Punahou high school name [on an island] that
> is President Obama's childhood and high school home; (2) meanwhile, since I not only
> didn't go to Punahou High School, I also didn't know anyone that did before I moved to
> Oahu, I sure as f—k am not somehow required to stay there and die alone and
> miserable, didn't make nearly enough money, and was vetted for a top secret security
> clearance between May and August of 2009, because every single f—king person knows
> the only reason I applied to begin with was because of how personally attached to the
> Supreme Court [I am], and apparently if it was that f—king obvious to ME that I don't
> know what in the hell a Chief Judge or a Chief Justice is yet, but I definitely know who
> Justice Roberts is, my own year of birth, and the fact that I somehow couldn't talk to him
> in 2005, or work for him yet — I couldn't even f—king apply to him yet for a Supreme
> Court clerkship — or to his former law firm; (3) BECAUSE I HAVE THE EXACT
> GODDAMN LAW REVIEW ARTICLE THAT WAS THEN AND STILL IS THE HOLY-
> F—KING-S—T-IS-SHE-PSYCHIC?! citation of the combination of the distance between
> Justice O'Connor (July of 2005), Justice Kennedy, Justice Stevens, and the fact that
> Justice Rehnquist didn't just retire but actually died, and I was SO f—king upset that I
> couldn't even watch, let alone attend the funeral, but yes, in fact, I actually know that a
> fly-over took place, period, BECAUSE THEY'RE REALLY F—KING LOUD OVER
> LAKE WASHINGTON IN SEATTLE; (4) this is a HUGE problem for me when my cell
> phone and email contacts list is SO retroactively incriminating all the way back to 1997,
> because the same Dan Barnhizer contracts professor former Hogan & Hartson associate
> sure as hell should know what in the f—k breach of contract in general is, and why
> Breach of Section 1 of Article III is such a big deal…Thus, since I was actually required
> to apply for federal clerkships ELECTRONICALLY via OSCAR, [and I don't know
> anything about technology] I'm kind of curious right now if ANYONE ELSE ON
> OAHU, WHICH IS PART OF THE RING OF **FIRE**, CARE TO EXPLAIN TO ME
> WHAT or WHY IN THE HELL I EVEN KNOW WHAT IN THE F—K A **FIREWALL,
> LAVA**BIT, **OR WHO DANIEL LEWIN IS NOW**?!

The same day, the Plaintiff sent a private Facebook message to Joe Thue that stated in

part:

> By the way, I'm not sure if you're aware of when or what the FAA and the concept of
> federal preemption is (before we were born), and why I'm so f-king pissed off at Brian

(who I am also quite obviously still in love with and you sure as f—k better care about his physical safety, life, and checking up on him)…

217.     On August 14, 2015, attorney Mike Curtis was informed by the same Sixth Circuit Clerk's Office employee from April of 2014, Beverly Harris, that the 240+ page record in the Meade interlocutory appeal was somehow "missing" and he could not cite to it when filing the opening brief on direct appeal, which the Plaintiff called out and documented on her Facebook page and in a message that she copied Defendant Priest on as well.

218.     Between March and October of 2015, the Plaintiff told Judge McKeague and Judge Yates that she wanted to unite and bring down the wrath of the entire judicial branch on the heads of single politician or person that has ever threatened a federal judge or one of their loved ones or law clerks, including the Plaintiff, and further made it possible for their home addresses to become publicly available, which at that point, was basically all of them. *See* **Exhibit B** at p. 10-12. But, she also received no response to her emails, because "someone" blocked them.

219.     Every Facebook message the Plaintiff sent to Defendant Priest was marked "read." He read every single last message. In those messages and in publicly visible Facebook posts, the Plaintiff openly advocated on behalf of the entire judicial branch and the same combination of Justices, federal and state judges, and law clerks, including but not limited to: Justice Rehnquist's family (2004-2005), Justice O'Connor (July of 2005), Judge McKeague (2004-2005, 2006, 2008, 2010, 2013, 2014), Justice Ginsburg (then-Supervising Justice for the Second Circuit where Lisa Manheim clerked before clerking for Justice Kennedy), Justice Scalia (Fourth Amendment originalist and Justice Ginsburg's best friend), Justice Kennedy (then-

Supervising Justice for the Ninth Circuit who wrote the opinion in *Citizens United* after an

inquiring about the possibility of banning books sent him down a censorship path, which is what

is now happening in Florida, Texas, and Tennessee), Lisa and Nick Manheim (2007-2009), Judge

Tallman (2009), Justice Sotomayor (2009-2010, 2012, 2014), Judge Gillmor (2009-2010), Judge

Ezra (2009-2010), Judge Griffin (2005, 2010), Justice Stevens and Justice Kagan (2010), Judge

Yates (2010-2012), Judge Beckwith (1992, 2011), Judge White and Judge Clay[57] who were on

the panel for *In Re Meade*, Case No. 13-6038 and were extremely kind to the Plaintiff on one

very memorable occasion during her first oral argument, Judge Karen Nelson Moore, who

authored the opinion in *United States v. Priester* that the Plaintiff won using a FOIA request,

Judge Gibbons, Judge Stranch (2012-2014), now-Chief Judge Sutton (2012-2014), and Chief

Justice Roberts (1980-1981, September of 2005, who wrote the unanimous opinion in *Riley v.

California*).

220.    The Plaintiff also told Mr. Priest at various times that she both still loved him and

hated him. He didn't respond, or call the Plaintiff "crazy," or block her. Instead, he let her hang

herself. Between October 6-8, 2015, the Plaintiff paid $500 to have the same combination of

people from March of 2010 personally served with a copy of the resulting 100+ page filing:

Judge McKeague, AUSA Tim Verhey, Defendant Priest, and Judge Yates, which was titled: "In

---

[57] During the Plaintiff's first oral argument before the Sixth Circuit, *United States v. Schwartz*, which she did not give until after she had been electronically stalked to within 100 yards of a Post Office, Judge Clay pointedly noted that the Plaintiff took the case "as a service to the Court" and thanked her for doing so after a district court judge who was sitting on the panel by designation berated the Plaintiff over how horrible her client was and tried to make her cry. This has always stood out in her mind as an example of kindness and empathy from the bench, his demeanor reminded her of Judge Yates, and it was exactly what she needed to hear in that moment.

Re: Blank Check," "**In Re Members of the Federal Judiciary**, Anonymous Supreme Court Bar

Member, Anonymous Government Agency Employee." *See* **Exhibit BB** p. 17. In that filing, the

Plaintiff asked for costs, attorney fees, damages, and a federally issued PPO for **both** herself and

Defendant Priest. *Id* at p. 15. In the copy for Judge McKeague, the Plaintiff included a

handwritten note asking if there was any way that she could stay at his vacation house in Grand

Haven temporarily like she had stayed at Judge Yates' condo in downtown Grand Rapids in May-

June of 2011, because she had nowhere else to go with her two golden retrievers.

221.    The Plaintiff then met with Steve Heatherington, his female partner, and a new

federal marshal, Joel Kimmel, at a Starbucks in downtown Grand Rapids. Steve Heatherington

had the copy for Judge McKeague in his hand, sternly informed her that "federal judges don't

like to be personally served," and said he "didn't get it." Again, the specific reason the Plaintiff

had to have them personally served was because she couldn't count on them getting a document

electronically anymore, and Judge McKeague clearly had no idea what he signed off on in April

of 2014. Either that, or he was lied to.

222.    As is crystal clear from the emails attached hereto as **Exhibit B**, the Plaintiff

repeatedly and expressly stated to the same Federal Marshals who she later learned run the

Witness Protection Program that she was the **victim** of numerous committed, discussed, and

intended felonies and financial crimes, **and** so were judges, Justices, and law clerks. They never

responded. During the same meeting, the Plaintiff showed the female federal marshal her iPhone

and the fact that the photo album of wedding photos was still publicly visible on Defendant

Priest's Facebook page after she had him personally served with the filing. Her response was:

"So what. You need to just forget about that." To be clear, it was the **only** thing that the Plaintiff

was still living for. At the same meeting, the Plaintiff brought along the documents and evidence attached to this Complaint objectively documenting her own electronic stalking. They refused to even look at it.

224.   At the exact same time in September-October of 2015, Judge VanTatenhove dismissed the Government's Contempt Motion and the Plaintiff's counter motion for costs and attorney fees without ruling on them, which the Plaintiff filed a notice of appeal from because, once again, she needed to get **paid**. She was further directed by the Sixth Circuit Clerk's Office to show cause as to why it should not be dismissed for "lack of **standing**," notwithstanding the fact that (in the following chronological order): (a) that exact contempt context, appellate procedural posture, exigent circumstances, and inability to obtain alternate relief consideration was addressed in *United States v. Nixon;*[58] (b) the Plaintiff has had a "standing order" on file with the Sixth Circuit Clerk's Office that she would not take any cases involving sexual assault or violent felonies since April of 2006; (c) the Plaintiff specifically stated in the Cert. Petition filed during the summer of 2014 that she had already suffered personal, physical, and financial damages; and (d) the Plaintiff had been harmed by the same "lack of standing" argument made in *Clapper v. Amnesty International* in 2013 by Government officials and multi-billion dollar

---

[58] As was stated above, the Court first examined the issue of jurisdiction and appellate review and held that the district court's order requiring President Nixon to turn over the Watergate tapes was appealable as a "final" order and was therefore properly in the Court of Appeals. In so holding, the Court stated that, "although such an order is normally not 'final' within the meaning of 28 U.S.C. 1291 and subject to appeal, an exception exists in a **limited class of cases where denial of immediate review would render impossible any review whatsoever of an individual's claims.**" Such an exception is proper, according to the Court, "in the unique circumstances of this case where it would be inappropriate to subject the President to the procedure of securing review by resisting the order and inappropriate to require that the District Court proceed by a traditional contempt citation in order to provide appellate review." *United States v. Nixon,* 418 U.S. at 690-692.

corporations lying to federal judges and the Justices to such an extent that she was on the verge of homelessness.

225.    The Plaintiff overnighted a copy of the filing to the Supreme Court, which included a copy of the Proof of Service on Judge McKeague, Judge Yates, AUSA Verhey, and Defendant Priest, along with a ten-page letter to Justice Roberts explaining the above in an extremely condensed fashion, *see* **Exhibit BB** at p. 8-16, and she skated into an apartment in Grand Haven on Mr. Meade's second to the last payment to her of $5,000. Next: (1) her notice of appeal was dismissed by the same Sixth Circuit Clerk's Office employees; (2) the Supreme Court filing was rejected for failing to cite a statutory basis for jurisdiction even though she explained that she was threatened with what was actually Chief Justice Roberts' personal jurisdiction, 'inherent authority' and contempt power to preside over an impeachment trial for being the same, but female, appellate lawyer that he once was; and (3) the Plaintiff checked Mr. Priest's Facebook page to see that she was now blocked. She then looked at the page of the person who appeared to be his girlfriend and the Plaintiff thought was his cover, Sara Jo. Upon doing so, she learned that they had gotten engaged on the exact four year mark when he said he would come back to her.

The Plaintiff almost killed herself that day, which was the intent.[59]

226.    The same day, and just like in May of 2012 when the Plaintiff lost her job clerking for Judge Yates, the Plaintiff's mother flew into town. She almost did so to a dead daughter that

---

[59] At that moment, the Plaintiff posted the following message on Facebook: "I have been falling the f——k apart over the idea that no one understands the significance of my life and legal education to ME. If I can't have the same husband, future, and family that I wanted in 2011, THEN WHAT WAS THE POINT OF ANY OF IT?!"

time. Later that week, and like clockwork, the Plaintiff finally received a response to her February 6, 2014 FOIA request from the NSA, twenty months after she sent it, informing her that all of the documents and evidence that she was seeking about herself and her own electronic stalking were "classified," even though "no man is above the law," she was approved for the same top secret security clearance required to work for that agency in 2009, and her application and approval was on file and still valid.

227.    Shortly thereafter, and for that reason, the Plaintiff emailed Judge McKeague and Judge Gillmor and stated that she had "lost the will to live," she now completely and totally agreed with Judge McKeague's assessment that Defendant Priest was both a "criminal" and a "loser," and that she wanted him prosecuted to the fullest possible extent. She received no response. The same federal marshals saw absolutely nothing wrong with that deliberate timing or the above-described surreptitious theft of the Plaintiff's contacts. Joel Kimmel told her that she needed to just "get over it." The lack of compassion was astonishing. He might as well have told her to "get over" her own life, and since she has a near-photographic memory, doing so is physically impossible for her.

228.    The Plaintiff spent Thanksgiving and Christmas of 2015 alone yet again wishing that she would just die, and she begged God to "please just let [her] die" over and over again on numerous occasions. In January of 2016, she was forced to ask her father for financial assistance because she couldn't afford to pay the same AT&T cell phone bill that she switched to in January of 2010, while she was clerking for Judge Gillmor, and her cell phone service was turned off. He then took over her life. He first offered to pay her living expenses with no strings attached, and then began attaching various strings to it that included community mental health treatment when

what she needed was to get **paid** so she could keep a roof over her head, sleep like a normal human being, and then leave the state.

229.    Between March and May of 2016, the Plaintiff qualified for full Social Security disability benefits in a record two months because: (a) after graduating with a published law review article-Supreme Court amicus brief citation combination in May of 2005, and as she stated in her disability benefits application at the time, she could no longer **write**; and (b) the Plaintiff was googling what prescription drugs she could take to kill herself. She had every intention of requesting Ativan at her next appointment and taking the entire bottle, because her father had decided that he could no longer afford to pay her living expenses, and he was going to force her to move back to the same home that she climbed out of her bedroom window to escape from in 1997; or, she could be homeless with her two golden retrievers and he actually brought along information on nearby homeless shelters when he informed her of that decision.

230.    Between January and July of 2016, the Plaintiff also attempted to draft the opening brief on direct appeal in the Meade case, but again, she couldn't write. A different lawyer was brought in at the last minute, who filed a different brief and made the wrong arguments regarding the money laundering statute. He further elected not to discuss what happened to the Plaintiff at all, even though depriving a defendant of his right to counsel of choice is a structural error and automatically reversible on direct appeal, because he and Mr. Curtis decided that the Sixth Circuit Clerk's Office had it out for the Plaintiff; for a crime **victim**, and that given what happened there in April of 2014, Mr. Meade's conviction and appeal was already bought and paid for a long time ago.

231.    Between January and May of 2016, the Plaintiff's father paid only her living expenses and refused to pay her creditors, which tanked her credit score into the 400's. When the Plaintiff received her social security disability back pay in May of 2016, her father convinced her to sign the entire check over to him, because according to him, he needed to deduct what she owed him for covering her living expenses from January through May of 2016. The Plaintiff had every intention of using the balance to get out of the State of Michigan, get away from her memories of Defendant Priest, move back to the State of Washington to be with her mother and brothers, and start over yet again. Instead, her father refused to return the check, the Plaintiff stopped sleeping **again**, and she blew up at him in a series of text messages.

232.    In June or July of 2016, the Plaintiff established a proton mail account, katherinelou0311@**proton**mail.com, emailed Judge McKeague at the University of Michigan where he had recently started teaching out of desperation, and indicated that he should probably get the nuclear reference associated therewith. Federal Marshal Joel Kimmel responded to the email instead, and once again, treated her like some stupid, hysterical woman. The Plaintiff submitted a complaint to the federal marshal service electronically that was never responded to. Shortly thereafter, and for that reason, the Plaintiff tried to call Judge McKeague at his chambers. Bonnie, his assistant, put his career law clerk, Paul, on the phone, who told her that Judge McKeague was the person who sent the marshals to Mr. Vogelar's home in April of 2015, and they were supposed to take care of whatever the Plaintiff needed. Somehow no one, including the same federal marshals who are supposed to be trained to look for exactly this scenario could understand what the Plaintiff needed. Brian. Money. A safe place to live. It was really, **really** simple.

233.    During that time period, while she was increasingly desperate and out of money, the Plaintiff tried to call, email, or contact via Facebook: (a) Judge Gillmor and Ms. Lovett in Honolulu; (b) AUSA Ryan Dickey; (c) Judge Ezra via Facebook; (d) Professor Barnhizer, who actually told the Plaintiff "not to contact him anymore;" (e) the federal marshals in Honolulu ("You were electronically stalked? That's not in our jurisdiction"); (f) Nick Manheim; (g) the FBI (who hung up on her); and (h) anyone else who might be able to help her. During that series of phone calls, text messages, Facebook messages, and general desperation, the Plaintiff received a notification on her iPhone that her SIM pin had been changed. Shortly thereafter, she received a phone call from someone from a blocked number. The Plaintiff answered the phone, and the person on the other end began breathing very loudly and very angrily into the phone. The Plaintiff was terrified and hung up. She also documented it on her Facebook page. Someone was still terrorizing her.

234.    Sometime in July of 2016, and despite the fact that Defendant Priest had blocked the Plaintiff, a Facebook post that said: "Happy wedding day Mr. and Mrs. Priest" showed up in her Facebook newsfeed. Around the same time, Joe Thue finally and mercifully responded to one of the Plaintiff's Facebook messages. He said that he could see that the Plaintiff was: "clearly going through some s—t," and asked her what was wrong. The Plaintiff hadn't slept for days by that point and her response back was unintelligible.

235.    In August of 2016, the Plaintiff's father filed for a Britney Spears-style conservatorship. The Plaintiff only learned last year that Steve Heatherington not only contacted her father in March-April of 2015 after she specifically told him not to do so, he was in her dad's ear the entire time and advised her father on how to get the conservatorship. The Plaintiff's court

appointed lawyer, Mike Zita, told her that she didn't need to show up for the hearing because in addition to the fact that her own psychologist said that she did not need a conservatorship, and if she did, her father absolutely could **not** be in control of it, Mr. Zita told the Plaintiff that he agreed with that assessment and there was no way her father would win. Despite Mr. Zita's hearsay-related objections at the hearing, the Plaintiff's father used the text messages in which she blew up at him as evidence, and he won.

A conservatorship also tolls any applicable statute of limitations.

### H.    PPO and Perjury

236.    After the Plaintiff's father won the conservatorship, the Plaintiff texted Defendant Priest out of desperation because she still had the AT&T business card that he gave her when he set up the burn number for her in October of 2013 and convinced her to come back to AT&T. In addition to the fact that the Plaintiff referenced a PPO in her letter to Judge Yates in May of 2012,[60] she asked for a federally issued PPO for **both** of them in the October of 2015 filing, and Defendant Priest didn't qualify for the necessary number of "contacts," the entire content of his filing is perjury, defamation, and gaslighting. The filing states as follows:

When: October 2011 — Ongoing

---

[60] *See* **Exhibit BB** at p. 2.

What: Katherine and I dated for about a month and I broke things off.[61] Since then Katherine constantly tried to contact me.[62] I ended up blocking two email addresses, phone number, and her Facebook profile. Katherine kept emailing me. Then last night and this morning Katherine started texting me again on my new personal phone, and this morning on my work number. Katherine sent over 20 messages last night and this morning.[63] Katherine told me I needed to pick her up at her house and gave me her address,[64] and said that her last name better f—ing changing [sic] to Priest soon, and also saying that my current wife Sara Joe must die too.[65] Most of the messages she sent were pure gibberish, talking about her medication, lawyer bills/costs. I never answered her messages.

When: Early September
Where: My work
What: A federal Marshall [sic] called me at work and wanted to alert me that I wasn't the only one she was infatuated with, that she is pursuing a Judge Yates in Grand Rapids.[66]

---

[61] This is impossible since the Plaintiff and Defendant Priest met on May 21, 2011, she didn't interview with Judge Beckering until July of 2011 when she texted Mr. Priest about her interview, and the last time they spoke in-person as he was leaving was September 3-4, 2011, a few days before Mr. Thue's wedding.

[62] The Plaintiff's only "contacts" with Mr. Priest were: (1) when the Plaintiff saw him at 22-Below in November of 2012 and he held up his hand and mouthed the word "hi" at her; (2) May of 2013 at the AT&T store when she paid off her cell phone contract and he commented on how much he loves Audis; (3) October of 2013 when he set up a burn number for her on a used iPhone and then convinced her to come back to AT&T as her cell phone service provider; (4) when she stopped into the store to make the payments on her burn number; (5) October of 2014 when she hand-delivered a draft of the above-described filing to him and he changed his publicly visible Facebook photos to an album of wedding pictures in response; and (6) private Facebook messages between March-October of 2015, and she deliberately had a process server handle service on him in October of 2015.

[63] The Plaintiff sent him one long text message that got broken into several messages.

[64] Defendant Priest created the hazard and had a legal duty to rescue the Plaintiff.

[65] The Plaintiff was referring to her own near-suicide, said that she "hoped" his his wife died too, and Mr. Priest was fully aware of that.

[66] Defendant Priest knew exactly who Judge Yates was. In addition to the fact that Defendant Priest stayed in Judge Yates' condo in downtown Grand Rapids with the Plaintiff in June of 2011 and she was clerking for Judge Yates the summer they dated, he was identified in the October of 2015 filing and Proof of Service.

This agent wanted me to tell my wife to watch out for her red car and Katherine's description.[67] I called him back today to let him know about all the recent text messages.

I feel I need a PPO because I am extremely uncomfortable. My wife has been threatened and a U.S. Federal Marshall [sic] has alerted me. I don't know what Katherine is capable of, Katherine is very unstable, and now I don't know what she will do. Katherine has also been contacting mutual friends. My friend Joe got 29 text messages threatening him and threatening me.[68] Katherine also stated I better be prepared to spend the rest of my life in prison.[69]

237.    The Plaintiff goes by Katie, but using her full name was an excellent means of

dehumanizing her further. At the subsequent hearing, Defendant Priest identified Steve

Heatherington as the federal marshal referenced in his PPO. As a result of the above-described

perjury, the Plaintiff became suicidal again, and her father had her involuntarily committed at a

hospital on the east side of the state the same day she drove to Muskegon and filed a response to

the PPO.  All documents with 16-004640-PP in the upper right hand corner were included with

the Plaintiff's response and were served on both Defendant Priest and Jamie Vincent at the

AT&T store in Grand Haven.

238.    The case was assigned to Judge Gregory Pittman and a hearing was held

approximately two weeks later, one day after the Plaintiff was released from the hospital and

while she was still drugged up and unable to defend herself. In the same Kobza Courthouse in

---

[67] Defendant Priest also knew what the Plaintiff's "red car" looked like, because he commented on it in May of 2013, and she drove it to the AT&T store every time she paid the bill for the burn number that he set up for her between October of 2013-October of 2014.

[68] This didn't happen either, but the gratuitous numerical references were infuriating to the Plaintiff at that point. At one point, the Plaintiff sent Mr. Thue a Facebook message asking him if Brian has an evil twin somewhere that no one knows about, or if he is taking some kind of medication that makes him a cruel sociopath, because she couldn't quite understand how he could let his own friend induce his other friend and former classmate to kill herself.

[69] The Plaintiff was electronically stalked because of her relationship with him, with his full knowledge, awareness, and participation, and then he tried to make her kill herself. She meant it.

Muskegon, Michigan that is named after her maternal uncle's best friend's family where the Plaintiff won a sexual harassment lawsuit before Judge Hicks at the age of 20, Judge Pittman didn't listen to anything the Plaintiff said. He didn't read her response or anything attached to the filing, which included the ten-page single spaced letter to Justice Roberts and her request for a PPO issued by a **federal** judge for **both** herself and Defendant Priest, and he used her vehement protestations regarding the allegation with respect to Judge Yates to extend the PPO to four years.

239.    Judge Pittman was up for election during the mid-terms this year, and a website titled: victimsofpittman explained that he abused his power; specifically, as it related to women in domestic violence and abuse-related situations. The Plaintiff was aware of his reputation. During the hearing, she asked about obtaining discovery from Defendant Priest. Judge Pittman ridiculed her ("**You're** a lawyer?"), essentially forbade it, and made her sit in the courtroom for five minutes after the hearing so Defendant Priest could leave.

240.    In December of 2016, the Plaintiff's father used what remained of her social security disability back-pay as a down payment to purchase a house for the Plaintiff in Muskegon for $69,500. One month later, she watched the inauguration of President Trump, who, in a manner that was shocking to the Plaintiff at the time, attacked a federal judge during his candidacy and continues to do so. Sometime in 2017, the Plaintiff's father, acting as her conservator, directed her to file the CJA-vouchers for the *Grooms* and *Jones* cases. Her PACER account access had either been restored, or she sent them via email. She tried to draft a motion for excess costs and attorney fees, but she still could not write. Also, since it would have had to go through the same Sixth Circuit Clerk's Office employees that were inexplicably hostile to her

in April of 2014 and actually interfered with her attorney-client relationship with Mr.

Chemerinsky, doing so would have been pointless.

241.    The Plaintiff completed one year of court-ordered community mental health

treatment. Her first psychologist in Ottawa county said that Steve Heatherington called him to

discuss her case, which violates the Privacy Act, and he blamed the Plaintiff for "allowing

herself" to be stalked. After that initial meeting, the Plaintiff's care was mercifully transferred to

Dr. Greene in Muskegon County, who tried various drugs, including bi-polar medications and

anti-depressants, none of which did anything because they couldn't fix reality and the Plaintiff's

shattered heart and legal career. At the end of the year, he concluded that the Plaintiff needed

Trazadone to sleep. To be clear, the above-described events and not sleeping for up to a week at a

time altered the Plaintiff's brain chemistry. She can no longer fall or stay asleep, which she can

die from, without a prescription medication.

242.    The kind of trauma described above takes **years** to recover from, as does the idea

that the **one** person who the Plaintiff loved(s) more than anything wanted her dead. She lost her

ability to write, and anytime she tried to do so until recently, she had a PTSD-type response.

243.    After working on the most famous case in the world at Perkins Coie between

2007-2009 where she made approximately $200,000 per year, the Plaintiff received an

"allowance" from her father of $20.00 per week between September of 2016 and May of 2019,

because somehow, no one could grasp the illegality of everything set forth in **Exhibit B**,

electronically stalking and terrorizing the same childhood emotional abuse victim, threatening

her with sexual assault for speaking, cutting her off from speaking to her own judges, and then

funneling her right back to the same parental relationship that she climbed out of her bedroom window to escape from in 1997.

244.    In May of 2019, the Plaintiff began working for her current employer. Her job is to walk around a store, be the same sweet, charming, extremely funny human being with an equally dry, sarcastic, brutal sense of humor that she's had since law school, and sign people up for an [undisclosed] service. She literally collects people's **contact** information for a living. On October 19, 2019, the Plaintiff clawed her way back out of a conservatorship that she never needed to begin with with the support of her father, her doctor, and the same psychologist that she saw in 2015. At the hearing, Judge Feyen called her a "success story."

245.    On November 5, 2019, and for the same chilling effect-related reasons identified by Justice Sotomayor in *United States v. Jones*, the creation of "alternative facts" during the Trump Administration, and the plaintiff's historical mouthiness when it comes to injustice, religious hypocrisy and intolerance, bigotry, misogyny, hatred, violence, and the deliberate fomentation of hatred and violence for campaign dollars and advertising clicks, the Plaintiff deactivated her Facebook account.

246.    On May 21, 2020, on the nine year anniversary of her first date with Mr. Priest, the Plaintiff received a text message from AT&T informing her that she owed an inordinate amount of money for a cell phone bill from a work-related trip that she took in late January of 2020. Upon going into the store to inquire as to the reason and pay the bill, she learned that someone had changed her home address to a location in Lansing, Michigan, 900 Long Blvd., Apt. 559.

247.   On August 31, 2020, shortly before the PPO was set to expire, the Plaintiff had a conversation out loud with her cell phone in the privacy of her own home. She started the soliloquy with the statement: "Hey Brian? If you are what and who I know you are, then I know that you can hear me through my own microphone you gigantic a——hole," and she proceeded to explain that: (a) she had to divide him into two people in her mind because she could not reconcile the person who she met and fell in love with over a brilliantly written Facebook note in May of 2011 with the same person who tried to make her kill herself in October of 2015; and (b) she still loved "Super Secret Agent Batman Brian more than anything." She ended it with the statement: "you better always be there and better never f——king leave me." The next day, the Plaintiff received phone calls from the same Bensalem, PA identified in her February of 2014 FOIA request for the first time again since the stalking started, and her iPhone started automatically connecting to an AT&T Wi-Fi network that was password protected even though the Plaintiff did not have the password. She, of course, took screenshots.

248.   In December of 2020, the Plaintiff purchased another house in Grand Haven, Michigan, which is located almost directly across the street from the house that she was forced to sell between October and November of 2012.

249.   In May of 2021, the Plaintiff sold the house that her father purchased for her in Muskegon for $139,000. Thus, after applying to be a financial advisor and being rejected by Edward Jones pre-9/11 because she didn't have enough contacts to qualify, further emptying her 401(k) at Perkins Coie in 2009 and actually paying tax penalties on it, and being forced to sell her house in Grand Haven in November of 2012 after she lost her job clerking for Judge Yates, the Plaintiff used the proceeds from the sale of **that** house to finally, at the age of **41**, re-establish

a retirement account. At the same Edward Jones where she applied to be a financial advisor in 1999-2000, but didn't have enough contacts to qualify.

250.    The same month, the Plaintiff changed the name of her AT&T business account to Lady Lawyer Properties, which was a nickname that Defendant Priest gave her during the summer they dated. AT&T is the only entity the Plaintiff does business with using that name. Shortly thereafter, the Plaintiff received junk mail from Federal Express at her home in Grand Haven that was addressed to Lady Lawyer Properties; thus, conclusively establishing that AT&T sold her home address information.

251.    On July 2, 2021, the Plaintiff **finally** ran into Judge McKeague again at her current place of employment, who she had not seen or spoken to since their phone call in April of 2014, who she desperately needed to speak with again in-person between March and October of 2015, and who she asked the federal marshals to bring her to so they could talk in-person. The two questions he asked her made it crystal clear to the Plaintiff that somehow, and just as otherwise inexplicably, he didn't receive her emails in 2015 and 2016 identifying Defendant Priest, despite Steve Heatherington giving her an in-chambers email address for him, and the Plaintiff's continued emails to **both** of his email addresses after that. Specifically, Judge McKeague shook the Plaintiff's hand and asked her: (a) "if she was happier now;" and (b) if she had "fixed things with her parents." So, notwithstanding the entire content of every email that the Plaintiff sent to Steve Heatherington and to Judge McKeague identifying or otherwise discussing her own story attached hereto as **Exhibit B**, what she was being threatened with, a technology-related threat to the same judges, and Defendant Priest between April-October of 2015, and again

171

in June-July of 2016 from her protonmail account, Steve Heatherington had communicated to

Judge McKeague that it was some kind of "daddy issue."

252.    Shortly thereafter, the Plaintiff visited with Ms. Lovett in-person who had since

moved to Michigan (but is now back in Hawaii because she wants to live in a reliably blue state

where she can make sure her daughters are safe). The Plaintiff explained the entire story

regarding Defendant Priest, and she asked Ms. Lovett if Judge Gillmor had ever gotten any of

her emails. She said that Judge Gillmor would have responded and answered the Plaintiff's

questions if she knew she was suicidal. After running into Judge McKeague in July, and for that

reason, the Plaintiff attempted to draft a complaint, but she had the same PTSD-type response,

and she ended up pacing around her house crying because she couldn't get the words out.

253.    Instead, she decided to write a letter to Justice Roberts in September of 2021,

which took her weeks, explained what she had been through, the fact that "the Government" had

"literally murdered Bambi here," and the Plaintiff still had no idea why. It was more of a writing

exercise than anything, included some of the documents included with this Complaint, her

security clearance application, and a request that someone — literally **anyone** who is a federal

judge and actually has access to the required inside knowledge and information but preferably

Justice Roberts — assist her in figuring out the legal implications since she isn't old enough, has

never been to federal judge school, and was affirmatively and deliberately harmed for being the

same, but female, appellate lawyer who wanted to be just like him someday, **and** for a romantic

relationship with Defendant Priest. It was returned for failing to cite a statutory basis for

jurisdiction; except, the Supreme Court Clerk's Office actually sent a document containing her

full social security number to some random person who sent it back to her. The Plaintiff has

since found the statutory basis to get it in front of Justice Roberts in the Rules for Judicial

Conduct and Disability Proceedings.

254.    In September of 2021, the Plaintiff ran into a Grand Haven police officer at her

current place of employment, who she worked with when she was in high school, Sergeant Andy

Cannon. She asked him what he would do if he knew a girl who had been electronically stalked.

He gave the Plaintiff his business card and asked her to call him. Importantly, the Plaintiff never

told him Defendant Priest's name. The Plaintiff called and left a message and Sergeant Cannon

called her back. His message was transcribed in the Plaintiff's phone as:

> Hi **Brian and Katie** it's Andy from the police department um sorry I didn't call you back
> yesterday I ___ get your call though end of the shi[ft] here but um I'm on call today till
> six if you wanna give me a call back at the office 616-842-3460 and [I'll] try to give you
> a hand...

Seeing that freaked the Plaintiff out so much that she didn't call him back at the time.

255.    In December of 2021, the Plaintiff began talking to someone as a friend who

owns an extremely successful business in Grand Haven and was going through a difficult time.

The primary focus of their communications was sharing .GIFs and memes to make each other

laugh. Shortly thereafter, that feature stopped working on her iPhone. She spent several hours at

the AT&T store on Harvey St. in Muskegon, which included setting up an entirely new iPhone,

but the problem could not be fixed. For that reason and the fact that she needs to be able to send

photos for work via text message, the Plaintiff kept her service with AT&T, which she refers to as

her "bat phone," but she switched to Verizon for her primary cell phone service.

256.    In January of 2022, the Plaintiff met someone, Kevin Denby, who indicated that

he wanted to marry her very quickly after they began dating, and he took her to Asheville, North

Carolina for her birthday in March of 2022. Upon her return, the Plaintiff received a letter from Social Security dated March 15, 2022 stating that it now somehow thinks it "overpaid" her, and requested that she cut it a check for $55,819.50, which would require her to empty the same retirement account that she was finally able to establish in May of 2021; meanwhile, a month before that, she was notified that the same social security number is now available on the dark web and was used to set up two fraudulent bank accounts. The location of the first account was in California.

257.    Before funding her retirement account, the Plaintiff used a portion of the proceeds from the sale of the Muskegon house to pay off a tax debt that she incurred during 2013 while she was working on the Meade case and was the victim of multiple committed, discussed, and intended felonies. She further paid federal income taxes on the same disability benefits for 2019 and 2020 that the Government was now claiming it "overpaid" her and demanded back. She filed an extension for her 2021 taxes, but she cannot file them, nor can she file her 2022 taxes.

258.    In January of 2022, the Plaintiff began taking a prescribed substance that overcomes her ADHD and writing-induced PTSD but is toxic in sufficient quantities, and she started writing a book about the events set forth herein. In July of 2022, she developed a cancerous tumor on her arm. In March of 2022, the Plaintiff emailed Judge McKeague about the letter from Social Security, a copy of her letter of appeal from the decision, and her own curiosity if he arranged her record two month approval because he knew she was suicidal. She further explained that sleep deprivation is a prohibited form of torture that can kill a person, and she can no longer fall or stay asleep without taking a prescription drug. Furthermore, although she still has a photographic long-term memory, she suffers from occasional short-term memory loss.

Finally, she explained the news about Mr. Denby, who knows the full story set forth herein, the same wedding-related intent, and her desire to live happily ever after, and, once again, **be left alone**. Within days of sending that email, the hardware on Mr. Denby's nearly new cell phone failed, and they broke up shortly thereafter.

259. On May 18, 2022, the Plaintiff paid off her Verizon iPhone. On May 21, 2022, on what would have been the eleven year anniversary of the Plaintiff's first date with Mr. Priest, her Verizon cell phone stopped receiving text messages and she couldn't make any phone calls. She took it to the store and learned that her SIM information was changed and registered to a different device; however, the customer service person at Verizon could not explain: (a) why or how that have happened **at all**; and (b) why it wouldn't have failed on May 18, 2022 instead of on May 21, 2022. Whomever was responsible for making that change also left no trace in Verizon's system, which is (once again) "technologically impossible," and he sent her the screenshots as evidence. For obvious reasons, and again, the Plaintiff is getting really tired of hearing that.

260. The Plaintiff moved into her current house in March of 2021 and had to have AT&T for internet. When the technician came to her house to set up her service and the account, she gave him her wifi password **in-person**. Sometime in 2022, "someone" changed it on the back-end and it stopped working.

261. On May 2, 2022, on the eleven year anniversary of Osama Bin Laden's execution, the Supreme Court's decision in *Dobbs* overturning *Roe v. Wade* was leaked. Shortly thereafter, between June and August of 2022, the Plaintiff drove to the Michigan Attorney General's Office and spoke with a female attorney in the Civil Rights Division via a secure phone line about the

facts of this case, who was extremely empathetic and kind, and listened to the full story. She told

the Plaintiff that, like Judge McKeague stated in February of 2013, most of what the Plaintiff had

experienced was criminal, and she told the Plaintiff to start with local law enforcement. The

Plaintiff contacted Sergeant Andy Cannon again, who referred the case to Officer Nick Sheridan.

The Plaintiff emailed them shortly thereafter and included a screenshot of the voicemail that she

received from Sergeant Cannon in September of 2021, and evidence regarding the identity theft

issue. She didn't hear back for several weeks, and then she happened to run into him in-person.

He informed her that Officer Sheridan had in fact responded by email and cc'd him on the

response. The Plaintiff never received his email. Upon information and belief, their

communications were blocked.

262.    The Plaintiff spoke with Officer Sheridan in-person in November of 2022, who

also has a J.D. from MSU, had Judge McKeague for federal jurisdiction, served as a prosecutor

in Muskegon County briefly before returning to law enforcement, and was well-aware of Judge

Pittman's reputation. She also asked him to make sure that all communications with her about the

case took place in-person. Shortly thereafter, he called the Plaintiff and told her that he doesn't

know what to do with the case because it is a federal matter. The Plaintiff is aware of that, and so

was Judge McKeague in February of 2013. Given recent news regarding former President Trump

and classified documents, and the fact that Congress was deliberately sitting on legislation to

protect the home addresses of federal judges for leverage purposes until this year, which never

should have been publicly available to begin with, the Plaintiff reactivated her Facebook account

in August of 2022 so she could start openly advocating on behalf of (most) of the federal

judiciary (everyone who wouldn't or didn't already try to harm her). In early September of 2022,

the Plaintiff informed Ms. Lovett via text message that one of the board members of the same

Cato Institute that cited the Plaintiff's law review article in *Gonzalez v. Carhart* had recently

purchased CNN and was responsible for its sudden lurch to the right. Her paraphrased response

was: "WTF?!"

263.    On September 22, 2022 in *Snyder-Hill, et al. v. Ohio State University* (Sixth Cir.

Case No. 21-3981) and a case involving now-House Judiciary Committee chairman Jim Jordan,

the Sixth Circuit held that the discovery rule applies in the Sixth Circuit, stating: "The discovery

rule recognizes that, without certain information, a plaintiff has no viable claim."[70] Because the

NSA did not respond to her FOIA request until October of 2015 when the Plaintiff was delirious,

suicidal, and could no longer write to challenge that decision, the Plaintiff has yet to be able to

fully discover all of her claims, nor does she have any idea what forged communications her

judges may have received from her.

264.    On December 27, 2022, the Plaintiff received a letter from the Social Security

Administration stating:

> We stopped your disability payments in the past because of your work. At that time, we
> told you that we could restart your payments without a new application if your work was
> not substantial during your extended period of eligibility. We are now writing to tell you
> that you are no longer eligible for payments on this claim as of January of 2023…
> Because your **extended period of eligibility ended in December of 2022**, we cannot
> restart your payments without a new application. You should contact us to file a new
> application if you think you are disabled and no longer doing substantial work.

---

[70] Further stating: "That he has been injured in fact may be unknown or unknowable until the
injury manifests itself; and the facts about causation may be in control of the putative defendant,
unavailable to the plaintiff or at least very difficult to obtain. This lack of knowable information
leaves the plaintiff 'at the mercy of' the defendant and unable to file suit. To say to one who has
been wronged, 'You had a remedy, but before the wrong was ascertainable to you, the law
stripped you of your remedy,' makes a mockery of the law. The discovery rule ensures that
plaintiffs in this position still have a remedy." *Id.* (Internal citation omitted).

The Plaintiff has no idea what this means. Specifically, exactly when or how SSA determined that she had an "extended period of eligibility" that ended in December of 2022, whether it still thinks that she owes $55,819.00, and whether it intends to attempt to collect from her. To be clear, the Plaintiff has a disability that could kill her, it was entirely caused **by** the Government and Defendant Priest, and she developed a cancerous tumor this summer while attempting to draft this Complaint because she has to ingest a prescription drug that is toxic in sufficient quantities so as to be able to write. Congressman Jamie Raskin, who lost his son to suicide, is also now battling cancer. He deserves so much better from this country as do Judge Yates' twin daughters, Judge Ezra's granddaughters, and Ms. Lovett's daughters.

265.    Given recent news events, the fact that Jared Kushner received two billion dollars for purposes of a hedge fund from the same country that was responsible for the events on September 11, 2001, Judicial Watch was opposite Dick Cheney for purposes of *In Re: Cheney* in 2004, and its President, Tom Fitton, was subpoenaed to testify in the Trump classified documents case, the Plaintiff is now the same Daughter of the American Revolution and high school cheerleader who is openly advocating on behalf of Attorney General Merrick Garland, Dick Cheney's daughter, Jack Smith, Jamie Raskin, and "Team DOJ-National Security" in the classified documents case.

266.    On March 24, 2023, the Plaintiff's high school friend's husband, Garry Johnson, who threw the Plaintiff into a brick wall in September-October of 2011 after Defendant Priest left the Plaintiff, managed to have his conviction expunged, the consequence of which, is that he will now be able to legally purchase a gun. His wife, Shannon Johnson was the original person who

used to tell the Plaintiff "you look like you need to eat a sandwich" in high school, per the eating

disorder listed in her top secret security clearance application. Defendant Priest would have

pummeled Mr. Johnson into a bloody pulp had he been there with her that night; he would have

physically protected her. However, at this moment, and without additional information and an

opportunity for Defendant Priest to explain himself and clean up his own karma, the Plaintiff no

longer sees a meaningful difference between Mr. Johnson and Defendant Priest.

I.       **Timeline of Events**

**1980-1981**: The Plaintiff and Defendant Priest were born exactly ten days and one year

apart; now-Chief Justice Roberts started his legal career clerking for then-Associate Justice

Rehnquist. **2009**: The Plaintiff accepted the only career clerkship offer from the only other now-

former, but still alive unlike Chief Justice Rehnquist, Chief Judge for the U.S. District Court of

Hawaii, learned about the existence and that she would be taking over responsibility for "an

espionage case" upon doing so, which further required to be personally interviewed and fully

vetted for a top secret security clearance. The only reason she applied for federal clerkships was

to pursue the same constitutional law-related appellate practice specialty that Justice Roberts was

famous for. **August of 2010**: Judge Yates unexpectedly contacted the Plaintiff and recruited her

to be his first law clerk for the same academic credentials, constitutional law, and appellate

career-related goals and reasons. **March-November of 2011**: (1) Judge Beckwith was nominated

to the D.C. Court of Appeals by President Obama; (2) Osama Bin Laden was captured and

executed on May 2, 2011; (3) the Plaintiff was separated from Defendant Priest, applied to the

NSA's appellate division, flew from Grand Rapids to Washington D.C., and was sent a text

message from someone with an Arabic name while she was standing in a Washington D.C.

airport waiting to board her flight home; (4) the Plaintiff found a photograph of what appeared to be herself with tears in her eyes and duct tape over her mouth in October of 2011; and (5) Judge Beckwith was confirmed to the D.C. Court of Appeals in November of 2011. The Plaintiff turned down the opportunity to be handed off to her in reliance on Defendant Priest's four year promises and how mad he got at the Plaintiff when she told him that she had applied to the NSA's appellate division and wanted to run away to Washington D.C. **March-May of 2012**: After losing her job at Dickinson Wright in Grand Rapids for being a sexual assault victim who a male partner in office enjoyed screaming at in March of 2007, the Plaintiff lost her job clerking for Judge Yates **also** in Grand Rapid for being an electronic stalking victim. **October of 2015-September of 2016**: Defendant Priest tried to make the Plaintiff kill herself and perjured himself in the PPO attached hereto as **Exhibit BB** in which he used Judge Yates' name and stated that he was told by the same male federal marshal who showed up in the Plaintiff's driveway in April of 2015, Steve Heatherington, that the Plaintiff was "pursuing a Judge Yates too."

**1986-1987**: The Plaintiff began flying from the same Gerald R. Ford International Airport that pardoned Richard Nixon as an unaccompanied minor, Congress passed the Money Laundering Control Act of 1986, Justice Scalia (who the Plaintiff shares a birthday with) was confirmed to the Supreme Court, Justice Rehnquist was confirmed as Chief Justice, and Judge Yates graduated from the University of Illinois at Urbana-Champaign. **1992-1994**: The Plaintiff developed the eating disorder identified in her top secret security clearance application because of her relationship with her parents, Judge McKeague was confirmed as a district court judge in the Western District of Michigan, Judge Beckwith graduated from the University of Michigan where she served as EIC of its law review and started her legal career clerking on the Seventh

Circuit and then for Justice Stevens, and Congress passed the Religious Freedom Restoration Act ("RFRA") and the Brady Handgun Violence Prevention Act in 1993. **1997**: The Plaintiff climbed out of her bedroom window and ran away from home (1997) the same year the Supreme Court struck down the RFRA as applied to the states in *City of Boerne v. Flores*. **1998**: The Plaintiff graduated from Oakridge High School in 1998 and established the Yahoo email address listed on the cover of her top secret security clearance application for purposes of federal financial aid and the FAFSA, and her password was Hawaii00. The same year Daniel Lewin co-founded cloud computing company Akamai which is a Hawaiian word for "intelligent."

1999-2001: Defendant Priest graduated from Oakridge High School; the Supreme Court decided *Neder v. United States*, and Justice Scalia analogized the Sixth Amendment jury trial right and the impeachment clause of Article III to the "spinal column of American democracy." The Plaintiff applied to be a financial advisor at Edward Jones, but because she didn't have enough contacts, she didn't qualify, and she won a sexual harassment lawsuit at trial. **September 11, 2001-2002**: Daniel Lewin was the first victim who died on September 11, 2001; the Plaintiff was home day-trading the S&P 500 e-mini futures contract and witnessed the murder of thousands of American citizens. The Plaintiff applied to the Secret Service and CIA, but was rejected because she didn't have a military background or an advanced math, foreign language, or technology degree, all of which Daniel Lewin had, talked to an Air Force recruiter in Grand Rapids about her interest in intelligence who told her that she would likely be a target for harassment if she did join, and then specifically chose to attend law school in response to those events to "fight back" against the parties who were responsible, because she did **not** want to become the victim of sexual violence and believed that she would always be safe in a courtroom.

**2005-2006**: The Plaintiff graduated from MSU in the top 7% of her class with a published law review article that was written in defense and on behalf of the Supreme Court, the entire judicial branch, *stare decisis*, and women, including female federal judges and law clerks. The Plaintiff was sexually assaulted shortly after graduating from law school and passed the Michigan Bar Exam on appeal in January of 2006 for that reason. Judge McKeague, her federal jurisdiction professor, swore the Plaintiff into the Sixth Circuit in a private swearing-in ceremony in April of 2006 that no one was invited to or permitted to attend for physical safety-related reasons. The Plaintiff established her first Facebook account at the insistence of her cousin, Justin Lawrence, whose father is best friends with the father of a Navy SEAL in August of 2006; the same month, and shortly thereafter, her law review article was cited in a Supreme Court amicus brief filed by the Cato Institute in *Gonzalez v. Carhart,* and the Supreme Court held that a deprivation of the right to counsel of choice is a Sixth Amendment structural error in *United States v. Gonzalez-Lopez*. **2013-2016**: The Plaintiff was the victim of the same structural error because of the same sexual assault-related fears, leverage, and threats that she experienced in May of 2005.

**2007**: The Plaintiff was unexpectedly contacted and recruited by Perkins Coie in Seattle to work on *In Re: 9/11 Litigation* on behalf of Boeing at the same time the firm hired one of Justice Kennedy's female law clerks from that year, Lisa (maiden name Marshall) Manheim, the same year the Supreme Court upheld the PBABA in an opinion authored by Justice Kennedy. **2008**: The Supreme Court decided *United States v. Santos;* Professor Barnhizer told the Plaintiff that she needed to "launder up" her J.D. with a federal clerkship if she wanted to pursue constitutional law and the same appellate-practice specialty that Justice Roberts was famous for

while she was working on *In Re: 9/11 Litigation* on behalf of Boeing, and Judge McKeague and

Lisa Manheim further convinced her to do so. The Plaintiff relocated to Oahu and the home of

the Navy SEALs in August of 2009 in reliance on the express language, reassurances, statutorily

prohibited technologically committed felonies and financial crimes, and the entirety of her top

secret security clearance application, the First, Fourth, Fifth and Sixth Amendments, the binding

nature of *Roe v. Wade* and every case cited in her law review article. **January-March of 2010,**

the Plaintiff: (1) reconnected with her first love from high school who found her on Facebook on

January 5, 2010; (2) switched from a Perkins Coie I.T. Department provisioned Blackberry to an

AT&T Apple iPhone after she was rejected romantically by someone she liked in December of

2009 because she wasn't a Hawaii local and didn't attend the same Punahou High School that

President Obama attended, and the Plaintiff and Judge Gillmor's assistant, Kelly Lovett, came up

with an idea for an iPhone application called Lovetaps; (3) flew from the Honolulu International

Airport to the Gerald R. Ford International Airport to interview with AUSA Verhey Judge

McKeague, who she discussed her impending wedding to Mr. Wing with; and (4) Defendant

Priest sent the Plaintiff a Facebook friend request based on the security clearance "mutual high

school friends" with the same civilian air traffic controller in Chicago, IL that the Plaintiff

graduated from high school with, Joe Thue. **May-September of 2011**: Osama Bin Laden was

captured and executed, Defendant Priest and the Plaintiff dated, they stayed with the Plaintiff at

Judge Yates' condo, and he texted her a highly inappropriate definition of the meaning of the

word "jurisdiction." **February-July of 2013**: The Plaintiff emailed the same federal jurisdiction

professor that held a private for physical safety-related reasons swearing-in ceremony for her in

April of 2006 and convinced her to apply for federal clerkships beginning in the Fall of 2008

from what turned out to be the same Lavabit email service provider that Edward Snowden used,

who insisted on what resulted in a Secret Service investigation on her behalf that was

discontinued shortly after Edward Snowden came forward. One month before that, in May of

2013, the Plaintiff met her maternal uncle's best friend for the first time and learned that he is the

father of a Navy SEAL. Mr. Kobza: (1) informed her that the NSA coordinates the

communications for his son and it's **exclusively** held technological power was responsible for the

electronic stalking of herself; (2) explained the concept of "leaving a zero carbon footprint," and

told her how to set up her laptop like a mini-Navy SEAL in the context of an example involving

C4; (3) insisted that she download and start using the Red Phone iPhone application and that she

contact the Secret Service immediately while the Plaintiff was waiting for a call back from Agent

Cain to reschedule their meeting; and (4) he told her that Defendant Priest was "f—ing with her

head" but was clearly using NSA technology to do it after the Plaintiff gave him a hypothetical

similar to what she gave to Judge McKeague.

**August 12, 2013,** *In Re: 9/11 Litigation* lawyer filed *In Re: Meade* in a money laundering

case. **August 14, 2013**: *In Re: 9/11 Litigation* lawyer walked into the same federal courthouse on

the mainland in Kentucky with her laptop already set up like a mini-Navy SEAL, removed the

external hard-drive in the exact manner instructed by Craig Kobza, and functionally "detonated"

it before being physically, professionally, and sexually threatened in the courtroom, because as

she subsequently stated, she gets tired of being psychic and then right about those things **all** the

time. **August of 2013-2016**: The Plaintiff became the victim of the same structural error

identified in *United States v. Gonzalez-Lopez*, after (1) she was physically, professionally, and

sexually threatened in a Kentucky courthouse, and openly threatened and harassed for over two

years with contempt of "the Government" for repeating the same principles of federal

jurisdiction that Judge McKeague taught her in appellate briefs and arguing adherence to

Supreme Court and published circuit precedent, which were the same arguments made in her law

review article; (2) Erwin Chemerinsky, the man who wrote the Plaintiff's constitutional law

textbook, filed a notice of appearance on behalf of the Plaintiff with the Sixth Circuit Court of

Appeals for the purpose of being her "bodyguard" and forcing the Government and Judge

VanTatenhove to leave her alone; (3) she received fraudulent emails from him and her

communications with Judge McKeague were end-run; (4) she filed an emergency application

with the United States Supreme Court with a burn number on the cover that Defendant Priest set

up for her in October of 2013, and then a Certiorari Petition with a list of questions presented

that weren't supposed to be constitutionally or ethically possible; (5) the Plaintiff was

technologically closed out of the Supreme Court in a timed manner as set forth in the

supplemental brief; (6) she hand-delivered a draft filing to Defendant Priest in October of 2014

who changed his publicly visible Facebook photos to an album of wedding pictures; and (7) she

stopped sleeping for up to a week at a time and suffered through a deliberately caused nervous

breakdown while simultaneously running out of money and being threatened with sexual assault.

**October of 2015-September of 2016**: The Plaintiff became suicidal and was

involuntarily committed because her entire education and legal career was pointless, she was

technologically closed out of the Supreme Court, the Plaintiff was funneled back to the same

childhood parental relationship that she climbed out of her bedroom window to escape from in

1997, and Defendant Priest perjured himself in the PPO attached as **Exhibit BB**. That further

happened after the Plaintiff was threatened with rape for attempting to inform judges about a

technology-related fraud and a security issue associated with their home addresses and contact information, which she wasn't able to fully or coherently articulate because she was in so much pain, and her communications with the same judges were cut off.

**2016-2023**: The same multi-billion dollar corporations and politicians were allowed to continue to profit from judges, current and former law clerks, and then Congress deliberately sat on legislation to protect the private home addresses of federal judges until last year for leverage purposes after Judge Esther Salas' son was murdered by someone who showed up at her **house** with a gun in 2020, which **never** should have been publicly available to begin with. But, the Plaintiff, the same repeated female crime **victim**, currently can't purchase a firearm to protect herself so she is learning the same extremely violent form of self-defense and martial art that Daniel Lewin was intimately familiar with as a member of Israeli Defense Forces for the same hatred, violence, religious bigotry, and misogyny-related reasons that now pervade American society.

Accordingly, the Plaintiff respectfully requests the following relief and brings the following claims:

**VII. COUNT I: FIRST AMENDMENT RETALIATION, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AND FISA**
**(Against All Defendants)**

267. The Plaintiff incorporates the above paragraphs as though fully set forth herein.

268. A Section 1983 First Amendment retaliation claim requires a Plaintiff to show that: (a) she engaged in protected speech; (b) the Government's retaliatory conduct adversely affected that speech; and (c) a causal link exists between the conduct and the adverse effect. To prevail in a claim for intentional infliction of emotional distress, a plaintiff must prove that:

(a) the defendant acted intentionally or recklessly; (b) the defendant's conduct was extreme and outrageous; and (c) the conduct was the cause of severe emotional distress.

269.    The Foreign Intelligence Surveillance Act ("FISA) was enacted in 1978 specifically in response to the Watergate scandal and makes electronic surveillance under color of law a felony unless the warrant-related procedures guaranteed by the Fourth Amendment and outlined in the Wiretap Act are adhered to.[71] Title 50 U.S.C. 1809 prohibits "disclosing or using in formation obtained under color of law by electronic surveillance." Title 50 U.S.C. 1810 states that "an aggrieved person…who has been subjected to electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809 of this title shall have a cause of action against any person who committed such violation and shall be entitled to recover — (a) actual damages, but not less than liquidated damages of $1,000 or $100 per day for each day of violation, whichever is greater; (b) punitive damages; and (c) reasonable attorney fees and other investigation and litigation costs reasonably incurred. Title 18 U.S.C. 2261A(1)(B)(2), which criminalizes stalking, further states that whoever "causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of subparagraph (A); or with the intent to…place under surveillance with intent to kill, injure, harass, or intimidate another

---

[71] *See* 50 U.S.C. 1809 (stating: "A person is guilty of an offense if he intentionally — (1) engages in electronic surveillance under color or law except as authorized by this chapter, chapter 119, 121, or 206 of title 18, or any express statutory authorization that is an additional exclusive means for conducting electronic surveillance under section 1812 of this title; (2) discloses or uses information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized by this chapter, chapter 119, 121, or 206 of title 18, or any express statutory authorization that is an additional exclusive means for conducting electronic surveillance under section 1812 of this title.").

person, uses…any interactive computer service or electronic communication service or electronic communication system of interstate commerce…" is guilty of a felony.

270.   In November of 2018, and in response to an attack by former President Trump on a federal judge, Justice Roberts stated: "We do not have Obama judges or Trump judges, Bush judges or Clinton judges. What we have is an extraordinary group of dedicated judges doing their level best to do equal equal right to those appearing before them."[72] Between 2003 and 2005, the Plaintiff expressed the same sentiment and advocated on behalf of the entire judicial branch, adherence to *stare decisis*; and also, female judges, law clerks, the women described in the footnotes of her law review article, and objective medical reality in the context of women's reproductive health, which the Plaintiff's father thought was the best thing he'd ever read.

This was protected speech, the Plaintiff was ultimately harmed for this speech in violation of the First Amendment while all of the express or implied predictions in the same law review article have since come true.

271.   The Plaintiff submitted two writing samples for purposes of her OSCAR clerkship application packet in the Fall of 2008: (a) a motion for summary judgment that she won during a bench trial involving a Boeing C-17 and saved the same Government and Department of Defense millions of dollars; and (b) a research memorandum from her work on *In Re: 9/11 Litigation* addressing the reasonably foreseeable criminal misuse of a product in the context of gun and ammunition manufacturer cases. Among the threats of intimidation described in the Plaintiff's faxed letter to Facebook attached as **Exhibit E** and in her February 6, 2014 FOIA request

---

[72] *See* In Rare Rebuke, Chief Justice Roberts Slams Trump for Comment About Obama Judge (available at https://nbcnews.com/politics/supreme-court/rare-rebuke-chief-justice-roberts-slams-trump-comment-about-obama-n939016) (last retrieved April 15, 2023).

attached as **Exhibit C** were interactions with her Facebook account in response to a Facebook

note expressing her outrage over the "thoughts and prayers" hypocrisy of the Sandy Hook school

shooting, and Facebook posts about religious intolerance and hypocrisy,[73] Gun violence is now

the number one cause of death of children, which is appalling. The Plaintiff was harmed for this

speech in violation of the First Amendment, and in a manner that caused her extreme emotional

distress.

272.     On May 2, 2011, Judge Gillmor's assistant, Kelly Lovett, sent the Plaintiff a text

message that said: "We murdered Osama." The Plaintiff's first response to Defendant Priest's

subsequent Facebook note about the public's reaction to that event, which started with the

phrase: "Troubling is the discourse" and ended with the statement: "Patriot. I despise the word,"

was: "Loved every word." The Plaintiff was ultimately harmed for that agreement and their

private text messages, email, and Facebook communications were used to harm the Plaintiff in

violation of the First Amendment and FISA.

273.     During a conversation in August of 2011, Defendant Priest asked the Plaintiff if

she "had ever had to hurt someone intentionally before," which is an admission against interest,

and then he began doing that to her via Facebook, her online accounts, and her cell phone.

Shortly after Defendant Priest made that admission, the Plaintiff was electronically stalked: (a)

---

[73] *See* Exhibit E, which states: In addition, prior to me 'managing past post visibility' and
limiting everything to friends only, there were certain specifically selected status updates or
article posts that were visible on my wall when viewed publicly from 2010 that had to do with
my thoughts on Islam and religious insensitivity/bigotry, which I sure as hell did not make
visible to anyone other than friends, and which I could NOT have made visible because that was
back before we could individually control the visibility of our wall posts…**I feel like someone is
doing this to silence me and my views on politics and religion or as some sort of retribution
or punishment for I have absolutely no idea what**. (Emphasis added).

because of her prior relationship with Defendant Priest via her cell phone, online accounts, and

his Facebook page with his full knowledge, awareness, and participation ("K, come back. We

miss you already") in the manner described in Exhibits C, E, F, and G; (b) using what Craig

Kobza informed her in May of 2013, one month **before** Edward Snowden came forward, is the

exclusively possessed technological power of the same National Security Agency whose

appellate division the Plaintiff applied to in September of 2011 the same month the stalking

began.

274.    The Plaintiff filed a Motion to Withdraw from *United States v. Grooms* shortly

after losing her job with Judge Yates in May of 2012. She did not **want** to be involved in that

case, and she was CJA-appointed to handle it while she was being electronically stalked inside

Judge Yates' chambers, which she reported to Ken Loomis and Bryant Crutcher at the Sixth

Circuit Clerk's Office in May of 2012. Her Motion to Withdraw was denied by the Sixth Circuit

on June 21, 2013, three weeks after Edward Snowden came forward. Her arguments regarding

Fourth Amendment third-party standing, the First Amendment chilling effect, and her express

statement that "not even the judges on the panel were immune" from the NSA's surveillance

practices were made: (a) in accordance with her own knowledge, personal experiences, and Mr.

Kobza's statements since she was electronically stalked inside the chambers of a judge using that

technology; (b) in line with Justice Sotomayor's concurring opinion in *United States v. Jones*,

while she was being threatened with contempt of the Government in the Meade case; and (c) in

compliance with her ethical obligations.

275.    The Plaintiff engaged in not just "protected" speech in the Meade case, but

ethically required speech and advocacy, and she was retaliated against and affirmatively harmed

190

for doing so, which violated both her First and Fifth Amendment rights in that case as she also had a property interest in her own reputation and legal career and in not committing ineffective assistance and malpractice by default by failing to catch the indictment defect.

276.    The Plaintiff further attempted to exhaust administrative remedies and was affirmatively harmed for doing so. After sending a letter to OPR in August of 2013 describing physical, professional, and sexual assault-related threats made to the Plaintiff in a Kentucky federal courthouse on August 14, 2013, the Government filed its contempt of the Government motion, which was retaliatory in nature and violated the Plaintiff's First Amendment rights, and adversely affected her speech. The Plaintiff not only briefed that retaliation at length, she briefed it all the way up to the United States Supreme Court in a paid Certiorari Petition and Supplemental Brief. S. Ct. Case No. 14-205.

277.    The Plaintiff further and expressly stated in appellate briefs that she was being threatened in the same manner that resulted in the impeachment of another district court judge two hundred years ago and violated the same judicial Code of Conduct that she was required to adhere to during her clerkship. She was relying on other judges to report that misconduct and take the case off her hands between February and April of 2014, per Judge Yates' statements. But, if they didn't actually get those pleadings; if they were not delivered to Sixth Circuit Judges or not delivered to them as written, then that failure damaged their reputations beyond repair. The negative feedback loop is obvious. Attorneys feel no attachment to judges or any desire to "speak up" to protect the judiciary to quote Justice Ginsburg and Justice O'Connor when they can't count on an objectively applied rule of law and they're treated terribly in courtrooms. The negative feedback loop is obvious.

278.    In April of 2014, the Plaintiff's Rule 28(j) supplemental brief filed in *United States v. Grooms*, a Tennessee Sixth Circuit CJA-appointed case in which she expressly stated her fear for her physical safety if she was forced to go down to Kentucky was disclosed by Sixth Circuit Clerk's Office employees to the Government and to Judge VanTatenhove in Kentucky, who issued a sealing order for a speech and the Government then offered it into "evidence" to be used in conjunction with its still pending contempt of "the Government" motion. This reached across every boundary of federal, state, appellate, and personal jurisdiction for the purpose of attacking the Plaintiff, individually, violated both her First and Fifth Amendment rights, and caused her extreme emotional distress.

279.    The Plaintiff was electronically walled off from Judge Gillmor, Judge Gibbons, Judge Stranch, Judge Tallman, and Judge McKeague between April 15-25, 2014 so she could **not** seek their help, which violated her First Amendment rights, was terrifying to her, caused her extreme emotional distress, and she had to seek emergency medical treatment on April 28, 2014 as a result thereof. Since she expressly stated that she was physically, professionally, and sexually threatened, and that she was afraid of being sexually assaulted or worse if she was forced to go down to Kentucky in both the briefing submitted while the Meade case was before the Sixth Circuit on interlocutory appeal, *see* Exhibit P at pp. 16-20, and in the Rule 28(j) supplemental brief filed in *United States v. Grooms*, she further believed that those judges wanted to see her physically harmed, including Judge McKeague, and she wasn't relieved of this notion until she finally ran into him again on July 2, 2021.

280.    The Plaintiff's communications with Erwin Chemerinsky, actual Sixth Circuit judges, other lawyers, and law enforcement were blocked, controlled, or forged between April of

2014 and March of 2015-the present; specifically, so she could **not** seek their help, which violated the Plaintiff's First Amendment rights, encompasses multiple felonies, and caused the Plaintiff extreme emotional distress as is evidenced by the Rule 28(j) Supplemental Brief, Certiorari Petition, the Supplemental Brief in support, her subsequent Facebook posts, and Exhibit B. It is also literal obstruction of justice.

281.    The Plaintiff cited executive level separation of powers cases in a Certiorari Petition that discussed her February 6, 2014 FOIA request to the NSA and further involved documents about **herself**.

282.    The Plaintiff had a right and a Fifth Amendment property interest in her own life, legal career, cell phone, Facebook, and email contacts list. In January of 2014, she learned that the NSA began collecting and sharing illegally obtained information with federal law enforcement agencies in 2004, one year before she graduated from law school while she was revising a law review article that opened with a quote by the author of the book 1984, and one year before Justice Roberts became Chief Justice. The Plaintiff sought expedited consideration of her February 6, 2014 FOIA request, because she believed the persons responsible posed a direct threat to her life. The NSA deliberately failed to respond to the Plaintiff's FOIA request until October of 2015, after Defendant Priest did the exact thing that was intended to make the Plaintiff kill herself, because of the associated financial liability as to the entire judicial branch.

283.    A person who has testified, is testifying, or is preparing to testify that they know anything about the commission of a crime is eligible for the Witness Protection Program. The Plaintiff had knowledge and information about the commission of numerous financial and other

crimes against herself, judges, and current and former law clerks in 2014-2015, which she expressly stated to actual federal marshals in the emails attached hereto as **Exhibit B**.

284.    The Plaintiff filed a complaint electronically against the same federal marshals over the patriarchal, sexist manner in which they ignored everything she said during her initial encounter with Steven Heatherington in April of 2015 and further ignored everything stated in **Exhibit B**. In 2021, the Plaintiff learned that he he was actually in her father's ear the entire time, who made mental health treatment a condition of his financial assistance when what the Plaintiff needed was to get **paid** in the Meade, Jones, and Grooms cases so she could keep a roof over her head and sleep, and then further advised him on how to get a conservatorship based on that mental health treatment. This was an existential threat to the Plaintiff because her entire identity as a human being was being the girl who climbed out of her bedroom window to escape the same parental relationship in 1997, graduated with a published law review article-Supreme Court amicus brief citation, worked on the most famous case in the world, and clerked for two judges, nor did she ever receive a response back on the complaint.

285.    The Plaintiff hand-delivered a draft version of a Supreme Court filing seeking unpaid attorney fees, costs, and damages to Defendant Priest at the AT&T store on Henry St. in Muskegon in October of 2014, because she had no alternative means of getting paid and she could not file anything electronically. The filing also explained her suspicions regarding his identity and recounted the manner in which he subconsciously identified her as his wife in two different ways on their first date.

286.    Defendant Priest was paid by the Government to electronically stalk and terrorize the Plaintiff, and he was fully aware of the consequences of his actions in this case, because: (a)

he and his girlfriend in college took a break, and then she met and married someone else; (b) his cousin, Brent Priest, was married to the Plaintiff's stepsister's cousin, they went through a divorce during the summer that the Plaintiff and Defendant Priest dated, and he tried to commit suicide which Defendant Priest told the Plaintiff about the last night they spoke in September of 2011; and (c) the Plaintiff expressly and repeatedly stated the same wedding-related dream and her reliance on him in private Facebook messages between March-October of 2015.

287.   Defendant Priest was fully aware of how much the Plaintiff loved(s) him, and the fact that the one and only thing that she has wanted from the time she was six years old and began flying from GRR was to meet Prince Charming, fall in love, get married, live happily ever after, and most importantly, **be left alone**.

288.   Defendant Priest created the peril, he had both a duty to warn and a duty to rescue the Plaintiff, and legal, moral and ethical obligation to respond to her Facebook messages between March and October of 2015 by telling her that he had legitimately met someone else and was planning to marry her instead.

289.   He was personally served with a copy of the resulting filing between October 6-8 of 2015 that took the Plaintiff an entire year to write while she wasn't sleeping for up to a week at a time, which explained the electronic stalking of herself, the fact that she had been locked out of her PACER account and could not get paid any other way, and asked for damages and a federally issued PPO for **both** of them. He left the album of wedding photos publicly visible until the Plaintiff met with federal marshals later that week, who didn't listen to anything the Plaintiff said once again, and failed to do what she asked when she asked them to just bring her to Defendant Priest and to Judge McKeague.

290.    The Plaintiff was threatened with rape for advocating on behalf of herself and

judges, Justices, current and former law clerks, and attempting to inform them about a

technology and security-related threat as it related to their contact information, home addresses,

and forging or controlling in their electronic communications.

291.    Defendant Priest perjured himself in the PPO that he filed in September of 2016,

which almost caused the Plaintiff to commit suicide again and she had to be involuntarily

hospitalized as a result thereof.

292.    The Government and Defendant Priest's conduct was extreme and outrageous and

almost resulted in the Plaintiff's death, twice. Upon information and belief, Defendant Priest was

paid to engage in those acts.

293.    As was the case with her electronic filings with the Sixth Circuit between

2013-2015, her emails to various judges between 2014-2016, her complaint regarding the federal

marshals in 2016, an FCC complaint regarding the above-described identify theft that she filed in

2022, and her recent email communications with local law enforcement, her communications are

blocked and she receives no response, which violates her First Amendment rights.

294.    A cell phone is necessary for speech. The Plaintiff became an emotional abuse

victim and developed the eating disorder that rendered her so small because she couldn't talk to

her own mother as a child without her parents listening to her calls, she had no privacy, and she

had no control over anything except what she ate. She discovered a photograph of what appeared

to be herself with tears in her eyes and duct tape over her mouth in October of 2011, which she

recreated and used as her Facebook profile picture while she was being threatened with contempt

of the Government for speaking about threats to her own physical safety and is attached hereto at

p. 7 of **Exhibit BB**. On May 21, 2022, her Verizon SIM card was registered to a different device so she couldn't make any calls or send any text messages, including to her own. mother. This violates her First Amendment rights.

295.    The Plaintiff's speech was controlled and interfered between February of 2014-the present because of her relationship with Defendant Priest and the financial liability associated with this case. The Plaintiff was not merely "surveilled" in violation of FISA, she was electronically stalked inside Judge Yates' chambers using the exclusively held internet and cellular technology of the NSA, and she was affirmatively harmed for her own ideas and speech in violation of the First Amendment.

296.    The Plaintiff's claims were not ripe for adjudication until: (a) the Plaintiff ran into Judge McKeague again, they talked in-person on July 2, 2021, and their conversation made it clear that he had no idea what she suffered through after April-June of 2015; (b) the Plaintiff talked to Mr. Lovett again in-person the same month; (c) the Plaintiff learned that Steve Heatherington contacted the Plaintiff's father after she specifically told him not to, who manipulated her father into getting a conservatorship after the Plaintiff sent a complaint about the federal marshals, which was also retaliatory in nature; (d) the Supreme Court's decision overturning *Roe v. Wade* was leaked on May 2, 2022, the eleven year anniversary of Osama Bin Laden's capture and execution; (e) her Verizon SIM pin was changed on the eleven year anniversary of her first date with Defendant Priest; and (f) she verified that her email communications with Officer Sheridan were blocked and interfered with.

297.    The Plaintiff has spent countless hours of her life that she cannot get back dealing with the forgoing acts, and thousands of dollars on devices trying to escape from them, including

between March and June of 2012, January and May of 2013 when she met Mr. Kobza and was

informed of their exclusive source, October of 2013 when Defendant Priest set up a burn number

for her on a used iPhone and convinced her to come back to AT&T, January of 2014-October of

2016, May of 2020, and December of 2021-May of 2022 and the present.

298.    The foregoing acts are a continuous, uninterrupted occurrence, the PPO and

conservatorship tolled all applicable statutes of limitations, the Plaintiff has yet to discover the

full extent of the harm, and she needs an order from this Court in order to do so.

299.    The Plaintiff suffered severe physical consequences, mental and emotional

distress, lost wages, costs, attorney fees, and she nearly died as a direct result of the acts set forth

herein and her inability to speak.

300.    The Government, officers, agents, or employees thereof, and Defendant Priest

deliberately created a permanent trauma bond between the Plaintiff and Defendant Priest, and

she suffered catastrophic damages as a result thereof.

301.    Continuing to bubble or otherwise control the Plaintiff's communications violates

the First Amendment.

302.    The foregoing acts violate the First, Fourth, Fifth and Sixth Amendments and 42

U.S.C. 1983, and FISA.

303.    The Plaintiff is entitled to damages in the amount of at least $100 per day

beginning in September of 2011 through the date of this filing, along with all costs and attorney

fees, and actual damages. If the documents that she requested in response to her FOIA request

establish that she was targeted earlier, then she is entitled to a greater amount. Because the acts

set forth herein were so egregious, destroyed the Plaintiff's legal career, destroyed her future,

family, and happiness with Defendant Priest, and she nearly died as a result of her inability to speak, she is also entitled to punitive damages.

304.    Damages can be decided within the four corners of this filing, the documents attached hereto, the Plaintiff's income information, OSCAR Clerkship application packet, her appellate record before the Sixth Circuit and the Supreme Court, the complete futility of that record as explained in the supplemental brief quoted herein, the Plaintiff's email addresses and home addresses between 1998 and the present, and the millions of dollars in costs, attorney fees, expenses, lost opportunity costs, personal, professional, physical, and psychological harm that she has incurred or otherwise suffered through since September of 2011.

305.    Defendant Priest quite literally can't sue the Plaintiff for defamation when she publishes the book, because everything set forth in this Complaint is true. He has no defense except duress, and if that is the case, then the Plaintiff is entitled to know the underlying reasons and the responsible **persons**.

306.    Continuing to bubble the Plaintiff's speech so she cannot communicate with law enforcement, other lawyers, her own friends and family, or with publishers further violates both the First and Fifth Amendments, and the Plaintiff is entitled to damages.

## VIII.   COUNT II: FOURTEENTH AMENDMENT, ARTICLE III, FIFTH AMENDMENT AND BREACH OF CONTRACT POST-DOBBS
### (Against all Defendants)

307.    The Plaintiff incorporates the above paragraphs as if fully set forth herein.

308.    The Plaintiff was extremely familiar with the friend of the court as a child, and since an amicus brief is otherwise known as a "friend of the court" brief, the Plaintiff's law

review article contained a section titled: In Defense of the Judiciary, and it was cited in an

amicus brief at the Supreme Court level, she is a friend of every judge in the country who would

treat her with dignity and respect regardless of her gender or physical appearance, and she has

exclusive standing to bring the following claims.

309.    The Plaintiff's law review article dealt with structural power, separation of powers

principles, and objective medical facts in the context of women's lives and reproductive health.

Every implied or expressly stated prediction has since come true, including the opening quote by

George Orwell: "Political language is designed to make lies sound truthful, murder respectable,

and give the appearance of solidarity to pure wind," and surveillance technology. Section III of

the article, which was titled: An Appropriate Standard of Review for Fundamental Rights

Legislation, states in relevant part:

> ...[A]s the remaining portion of this article clearly demonstrates, the recent politicization
> of the Judiciary by those in power absolutely justifies the Court's use of a heightened
> level of scrutiny. Simply put, the Judiciary is the only branch capable of acting as an
> effective "check" on Congress's unconstitutional activities...[the argument against
> Marbury-style judicial review]...divorces "the People's document" from the actual
> People. It presumes that all "People" affected by a given piece of legislation have access
> to the legislature, are heard from, and most importantly, are actually listened to by
> Congress...it is quite another matter entirely when Congress unequivocally reaches
> across the boundaries of the Constitution and not only takes power directly from the
> Court, but also usurps the Court's primary function...In the context of the PBABA, "the
> gravity of the interests" involved implicate life or death...Although, admittedly, the
> purpose of this Comment is not to delve into the emotional and ethical issues surrounding
> the Act, it bears mentioning that, as Judge Kopf intimated [in Carhart v. Ashcroft, 331 F.
> Supp. 2d 805, 808 (D. Neb. 2004)], the women affected by the PBABA have been
> entirely forgotten about in the politics of the Act. The vast majority of these women do
> not want to have the procedure—they are forced to because their fetus is suffering from

some type of fatal abnormality not detected until the second trimester and their health does not permit them to have any other procedure.[74]

310.     The final section: In Defense of the Judiciary, is now relevant. In a 2006 speech,

Justice Ginsburg stated:

> Essential to the rule of law in any land is an independent judiciary, judges not under the thumb of other branches of Government, and therefore equipped to administer the law impartially…Under our Constitution, federal judges hold their offices essentially for life, with no compulsory retirement age, and their salaries may not be diminished by the legislature. Through life tenure and compensation that cannot be reduced, the Founders of the United States sought to secure the Judiciary's independence from the political branches of the Government; and thus, the judges' ability to decide cases impartially. Yet, I doubt even that insulation would have protected the federal bench if we did not have a culture that frowns on attempts to make the courts over to fit the President's or Congress's image."

311.     Section 3 of the Fourteenth Amendment prohibits a person from holding office if

they've "engaged in insurrection or rebellion" against the United States, or "given aid or comfort

to the enemies thereof," which mirrors the definition of Treason set forth in Section 3 of Article

III. Section 4 of the Fourteenth Amendment further states: "The validity of the public debt of the

United States (the debt ceiling), authorized by law…shall not be questioned. But neither the

United States nor any State shall assume or pay any debt or obligation incurred in aid of

insurrection or rebellion against the United States…" Section 1 of Article III further states that

the compensation of federal judges, during "periods of good behavior," "shall not be diminished

during their continuance in office." Compensation is generally defined as "payment for work

performed, by salary, wages, commission, or otherwise."

---

[74] Katherine L. MacPherson, *Devising an Appropriate Standard of Review: An Analysis of Congress's Findings of "Fact" Within the Partial Birth Abortion Ban Act of 2003*, 2005 MICH. ST. L. REV. 713 at p. 754-756.

312.    The reputations of lawyers, including the Plaintiff, federal and state judges, and the Justices are their most valuable asset, which is an asset that takes years and millions of dollars in educational expenses, lost time with family and friends, acquired experience, client development, and personal relationships to build. The reputations of the federal and state judges identified herein, including but not limited to Judge McKeague, Judge Gibbons, and Judge Stranch, were harmed to the point where the Plaintiff believed that they wanted to see her physically harmed between April of 2014 and October of 2015. This is a decrease in "compensation."

313.    Judge McKeague became a Sixth Circuit Judge in June of 2005. His superiority and ability to protect the Plaintiff in 2014-2015 was "end-run" by the Government, officers, agents, and employees thereof, and a Kentucky district court judge, which damaged his reputation and is a decrease in compensation.

314.    The Justices have a personal right in their opinions being binding and adhered to particularly in the context of the Fourth Amendment since maintaining privacy physically protects them, the judiciary, and everyone else. End-running the opinions of Supreme Court Justices is a decrease in "compensation."

315.    A portion of the compensation paid to judges and law clerks is used to pay their mortgages. Because of the same "activist judge" epithet that inspired the above-quoted section of the Plaintiff's law review article, death threats against judges and their current and former law clerks from the Plaintiff's generation who are now becoming federal and state judges, and the above-referenced technology and contacts-related theft, a person with a gun can now show up at

the home of the Plaintiff and any federal **or** state judge, including Judge Yates. Judges also pay higher insurance premiums, including property insurance. This is a decrease in "compensation."

316.    A portion of the compensation paid to judges, including Judge Yates, is used to pay for the higher educational expenses of their daughters and female family members. Saving money for their educational expenses and then learning that their private information can be used as leverage post-*Dobbs* is a decrease in compensation.

317.    When analyzing Congress's enforcement power under Section 5 of the Fourteenth Amendment in *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court stated: "The design of the Fourteenth Amendment has proved significant also in maintaining the traditional separation of powers between Congress and the judiciary. The first eight amendments to the Constitution set forth self-executing prohibitions on governmental action, and this Court has primary authority to interpret those prohibitions." *Id* at 523-524.

318.    Congress has the authority to define offenses against the laws of the United States, per Article I, section 8. Congress does not have the authority to retroactively end-run or authorize corporations and other agencies to ignore the Supreme Court's First, Fourth, Fifth, and Sixth Amendment decisions and its own federal statutes. The same politicians that inspired the Plaintiff's law review article have further abdicated their enforcement role under Section 5 of the Fourteenth Amendment and are instead enacting laws that are patently unconstitutional. A recent Vanity Fair article titled: Federal Judge Tells Ron DeSantis to Sit Down and STFU specifically addressed the "Stop Woke Act" in Florida and Judge Walker's commentary that such laws are

"positively dystopian."[75] Deciding these cases while being threatened by the same politicians and
organizations is a decrease in compensation.

319.     Per Justice O'Connor's 2006 speech at Georgetown and resulting law review
article cited above, lawyers have an ethical obligation to speak up to protect the judiciary from
encroachments and threats to their power, because "an independent judiciary gives life to the
promise that no person **or group**, however powerful, is above the law."[76] Justice Sotomayor
stated in *United States v. Jones* that Government surveillance can be used to track and discern the
personal, familial, religious, and sexual associations of individuals, and "awareness that the
Government is watching" chills First Amendment-protected speech and associations. From the
Plaintiff's law school graduation year onwards, our private relationship-related information is
available, is, has been, and can be used to inflict harm. The Plaintiff was stalked and surveilled
inside her office in Judge Yates' chambers while she was watching his twin then-six year old
girls, because of her relationship with Defendant Priest. If past is prologue, Judge Yates is next in
line for a federal appointment.

320.     In March of 2022, the Plaintiff learned that an entity called a third-party data
broker exists. The Federal Trade Commission is currently suing Idaho-based third-party data
broker Kochava for selling location-based data that can be used to track people visiting

---

[75] *See* Bess Levin, Federal Judge Tells Ron DeSantis to Sit Down and STFU (available at:
https://www.vanityfair.com/news/2022/11/ron-desantis-woke-act-blocked) (last retrieved April
18, 2023).

[76] *See* Sandra Day O'Connor, *Judicial Accountability Must Safeguard, Not Threaten Judicial
Independence: An Introduction*, 86.1 DENV. U. L. REV. 2, 4 (2008)

reproductive healthcare providers, domestic violence shelters, places of worship, and other sensitive locations.[77]

321.    Spying on federal judges, Justices, and their current and former law clerks and daughters, and collecting private information about them is a separation of powers violation. This is particularly true when personal and private information gathered about them by multi-billion dollar corporations and politicians most notably including information about their romantic relationships and reproductive health, or that of their wives, daughters, granddaughters, and female loved ones, and whether they're taking birth control or have ever had an abortion, can be used as leverage to control their decision-making post-*Dobbs*.

322.    The same politicians who inspired the Plaintiff's law review article continue to make the same threats and deliberately foment hatred and violence for money and campaign dollars as a result of the Supreme Court's decision in *Citizens United*, which caused an insurrection and is resulting in murdered children due to gun violence. They are now holding the debt ceiling hostage while they wear assault rifle pins on their lapels, so the Plaintiff, federal and state judges, current and former law clerks, and children are also now "paying for an insurrection" in violation of the Fourteenth Amendment. This is a decrease in compensation.

323.    Everything the Plaintiff was affirmatively harmed for; her legal education, law review article-Supreme Court amicus brief citation, Bar exams and admissions, acquisition of inside knowledge regarding the 9/11 Litigation, her knowledge of the level of security associated with the manner in which the documents were stored for a civilian aircraft in that case, her entire

---

[77] *See* FTC Sues Data Broker That Tracks Locations of 125M Cell Phones Per Month (available at: https://arstechnica.com/information-technology/2022/08/ftc-sues-firm-for-selling-location-data-that-can-track-abortion-clinic-visits/).

OSCAR Clerkship application packet, security clearance application and approval, her personal and professional relationships, a romantic relationship with Defendant Priest, and what she suffered through as a result — all of it is completely meaningless post-*Dobbs*. There was no point to **any** of it.

324.    Page 61 of the Plaintiff's top secret security clearance application asks: "Have you ever been an officer or a member of, or made a contribution to, an organization that unlawfully advocates or practices the commission of acts of force or violence to discourage others from exercising their rights under the U.S. Constitution or any state of the U.S. with the specific intent to further such unlawful activities." The Plaintiff was threatened with physical and sexual violence for both advocating on behalf of Mr. Meade and repeating the same principles of federal jurisdiction that Judge McKeague taught her (2013-2015), the federal judiciary in Facebook posts (March-October of 2015), **herself**, and exercising her own rights. As the Plaintiff expressly stated in **Exhibit B** at p. 4: "I would also expect every single person who went to law school, period, and all federal judges to realize why doing exactly that is both a constitutional and federal crime and contempt for which there is no sovereign, judicial, or executive immunity, absolutely no defense, and no such thing as "free speech."

325.    The Plaintiff reasonably and detrimentally relied on the entirety of the First, Fourth, Fifth and Sixth Amendment, all privacy-related reassurances set forth in Exhibit A, and the  Government breached its contract with the Plaintiff, with Judge Beckwith, and with numerous other federal judges.

206

326.    The Plaintiff reasonably and detrimentally relied on Defendant Priest's promises and representations between August of 2011-October of 2015, he breach his contract with the Plaintiff, and she suffered catastrophic damages as a result thereof.

327.    The Plaintiff filed a Certiorari Petition in 2014 that cited executive-level, structural power, separation of powers cases and documents about herself. As the Plaintiff stated in the Certiorari Petition filed in 2014, in *NLRB v. Noel Canning*, Justice Scalia stated: "Liberty inheres in structure." Federal courts have broad powers of equity. The reason the Plaintiff wanted to be an appellate lawyer was so she could propose innovative solution to thorny constitutional problems, **not** so she could be a repeated crime victim and argue ethical violations. Since the Plaintiff found the above-described photograph of herself with tears in her eyes and duct tape over her mouth in October of 2011 after receiving a text message from what could have been a "terrorist," she has since learned that AT&T funded One America News Network, the disinformation from which, created stochastic terrorists, resulted in the insurrection on January 6th, created multiple threats to national security, and is resulting in **so** much additional work for federal judges and law clerks, which they don't get paid nearly enough money for for it to be possible for anyone with the mentality of Garry Johnson to show up at their house with a gun, nor was the Plaintiff compensated for a federal clerkship-top secret security clearance combination that became a threat to her physical safety.

328.    28 U.S.C. 2201 provides in relevant part:

> In a case of actual controversy within its jurisdiction…any court of the United States upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

*See* 28 U.S.C. 2201(a) (emphasis added)

The statute further states: "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any party whose rights have been determined by such judgment."

329.    When the Plaintiff graduated from law school, she wanted to practice in the area of constitutional law and appellate work, teach constitutional law, and eventually become a federal judge. Because of the same law review article-Supreme Court amicus brief citation, OSCAR Clerkship application packet, top secret security clearance application, and the subsequent events set forth herein, the Plaintiff can no longer do so. Her legal career was over in 2004; the day the she graduated from law school everything she learned about the Fourth Amendments and every opinion authored between 2004-2014 was already obsolete.

330.    The Government "took" the Plaintiff's career, while simultaneously permitting the surreptitious theft and sale of her entire flight record, cell phone, Facebook, and email contacts list, and then further blocked her communications with her own judges, in violation of the Fifth Amendment Takings Clause.

331.    The Plaintiff has no adequate remedy at law to compensate her for the loss of her legal career, the future and family that she wanted with Defendant Priest, and now, potentially her life and reproductive health, nor should she have have to place her iPhone in airplane mode and turn it off or leave it at home entirely when visiting her doctor.

332.    For the foregoing reasons, the Plaintiff respectfully requests that the Court craft an appropriate order and remedy, including but not limited to specific performance.

**IX.    COUNT III: GENDER DISCRIMINATION, BREACH OF CONTRACT, AND THE RELIGIOUS FREEDOM RESTORATION ACT POST-*DOBBS***
**(Against the Government)**

333.    The Plaintiff incorporates the above paragraphs as if fully set forth herein.

334.    Title VII of the Civil Rights Act and the Elliot-Larsen Civil Rights Act prohibit gender discrimination in employment.

335.    The Plaintiff developed the eating disorder identified in her top secret security clearance application beginning in 1992-1994 soon after she transferred from Shelby Middle School (the Plaintiff grew up on an asparagus farm in New Era that was owned by her stepmother's parents) to the Oakridge School District in Muskegon. During those years: (a) Judge McKeague was nominated to the U.S. District Court for the Western District of Michigan and Justice Roberts interviewed him for purposes of his nomination; (b) Justice Roberts served as Deputy Solicitor General; (c) Judge Beckwith graduated from the University of Michigan where she served as EIC of law review before clerking on the Seventh Circuit and then for Justice Stevens (1993-1994); and (d) Congress enacted both the Brady Handgun Violence Prevention Act and the Religious Freedom Restoration Act ("RFRA") in 1993 in response to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990) (applying rational basis standard of review to generally applicable laws that had incidental burden on religious practices).

336.    The Plaintiff ran away from home the same year the Supreme Court struck down the RFRA as applied to the states in *City of Boerne v. Flores*, 521 U.S. 507 (1997), in a majority opinion authored by Justice Kennedy, which Chief Justice Rehnquist, Justice Ginsburg, Justice

Stevens, Justice Thomas, and Justice Scalia joined. In that case, the Court explained: "The Act's mandate applies to any branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States. The Act's **universal** coverage is confirmed in section 2000bb-3a, under which RFRA applies 'to all Federal and State law, and the implementation of that law, whether statutory or otherwise and whether adopted before or after [RFRA's enactment]." *Id* at 516 (emphasis added).

337.   The Court then analyzed Congress's enforcement power under Section Five of the Fourteenth Amendment and stated: "Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause. Congress does not enforce a constitutional right by changing what the right is." *Id*. at 519. "Requiring a state to show a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law." *Id*. at 534. "If Congress could define its own powers by altering the Fourteenth Amendment's meaning, no longer would the Constitution be superior paramount law unchangeable by ordinary means. It would be on a level with ordinary, legislative acts, and, like other acts...alterable when the legislature shall please to alter it." *Id*. at 529 (citing *Marbury v. Madison*).

338.   In his concurring opinion, Justice Stevens stated that "the RFRA is a 'law respecting an establishment of religion' that violates the First Amendment to the Constitution." *Id*. at 536.

339.   The Plaintiff won a sexual harassment lawsuit under the Elliot-Larson Civil Rights Act between 1999-2001, which her attorney failed to tell her that she had to pay taxes on, and she entered into an installment agreement with the IRS. She was further rejected by the CIA

and the Secret Service post-9/11 because she didn't speak a foreign language, or have a military background, advanced math, or technology degree, all of which Daniel Lewin had; and also, because she is too tiny to be a Secret Service agent due to the same eating disorder identified in her top secret security clearance application. The Plaintiff further chose **not** to join the Air Force due to the possibility of being sexually assaulted or harassed and chose **not** to write the same "blank check" to the Government that members of the military write. As her top secret security clearance application discloses, the Plaintiff was given the opinion to resign with a severance package at Dickinson Wright in March of 2007, *see* **Exhibit A** at p. 38 of application, because of the same male partner in the Grand Rapids office of Dickinson Wright who called Judge McKeague an expletive on the Plaintiff's first day and enjoyed screaming at a sexual assault victim. The Plaintiff was given the same opinion for being electronically stalked inside Judge Yates' chambers.

She should have been safe **somewhere**.

340.    Because the Plaintiff was sexually assaulted shortly after graduating from law school in May of 2005, she deliberately set her privacy and information settings as tightly as possible when she established her first Facebook account in August of 2006 for physical safety-related reasons. The Plaintiff did not **want** to be found by **anyone** in March of 2010 after she reconnected with Mr. Wing and flew from HNL to GRR to interview with Judge McKeague who would later hurt her "intentionally."

341.    The Plaintiff had the right to relocate from HNL back to GRR, learn that Mr. Wing lied to her about everything, purchase her first house in June of 2011, fall in love with

Defendant Priest, who had the same tolerance and open-mindedness about religion, and **be left alone**.

342.    The Plaintiff doesn't particularly care about anyone else's religion; she cares about whether they're a good person. She conducts herself in a manner consistent with the two basic tenants of Christianity: (1) do unto others; and (2) judge not, which are the same fundamental tenants that her parents taught her, and in accordance with the objectivist principles and philosophy laid out in Atlas Shrugged.

343.    After Osama Bin Laden's execution, and after having applied to the CIA and the Secret Service post-9/11, she established an alias gmail and Facebook account, which is what CIA agents use in general. Between March-July of 2013, the Secret Service, which also guards Dick Cheney, failed to investigate on her behalf. In May of 2014, she filed an emergency application with the United States Supreme Court that had the burn number on the cover that was set up for her by Defendant Priest, which is also what CIA agents use. While the federal marshals are responsible for protecting judges and run the Witness Protection Program, the Plaintiff was home and witnessed the murder of thousands of American citizens on September 11, 2001, and wrote a law review article with a section title: In Defense of the Judiciary. She relocated to Seattle in May of 2007 and became personal and Facebook friends with Lisa (maiden name Marshall) Manheim. In April of 2015, federal marshals showed up at Mr. Vogelar's home in Cedar Springs the same day she learned about the above-described hidden component of the AT&T Apple iPhone operating system. Instead of simply doing what she asked and bringing her to Mr. Priest and to Judge McKeague, they treated her like some stupid, hysterical woman, asked the Plaintiff "what her relationship with her father was like," then didn't listen when the Plaintiff

told them not to contact him and further emailed them an explanation of the reasons why. *See* Exhibit B. At that point, she had already been the victim of so many committed, discussed, and intended felonies that she should have been placed into the witness protection program **with** Defendant Priest. She is now reading a book by a federal marshal called *Extreme Privacy: What it Takes to Disappear* that recommends the same protonmail email service provider that the Plaintiff attempted to email Judge McKeague from in July of 2016.

344.    The Plaintiff drafted and revised her law review article between 2003 and 2005 after she read Atlas Shrugged by Ayn Rand who was from fascist Russia. Atlas Shrugged describes the fall of American democracy when facts are no longer facts like Judge Esther Salas spoke about last summer on CNN, and violence is embraced. The Plaintiff's law review article opens with a famous quote by George Orwell: "Political Language is designed to make lies sound truthful, murder respectable, and give the appearance of solidarity to pure wind," and it was further written in the context of abortion. Edward Snowden fled to fascist Russia in March of 2013, the same month the Supreme Court issued its decision in *Clapper v. Amnesty International,* 568 U.S. 398 (2013), and held that lawyers didn't have standing to challenge the FISA Amendments Act while the same National Security Agency was spying on lawyers and judges. On May 2, 2011, the eleven year anniversary of Osama Bin Laden's execution, the Supreme Court's decision in the *Dobbs* case was leaked. Using the same surveillance technology, women, including female judges, law clerks, the female family members of judges, and female federal agency employees, can be tracked to reproductive healthcare providers.

345.    *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2007), was decided in June of 2006, one month after Judge McKeague swore the Plaintiff into the Sixth Circuit, and she had a

standing order on file that she would not take any cases involving sexual assault or any type of

violent felony. The Plaintiff discovered that her law review article was cited by the Cato Institute

in August of 2006, the same month that she set up a Facebook account at the insistence of her

cousin, Justin Lawrence. The only reason she gave up a six-figure salary at Perkins Coie in

Seattle, which was within driving distance of her mother and brothers, and applied for federal

clerkships beginning in the Fall of 2008 was so she could pursue constitutional law and

appellate-practice, and eventually argue before the Supreme Court, which Professor Barnhizer,

Judge McKeague, and Lisa Manheim convinced her was necessary for her to have that career

path. In March of 2014, Erwin Chemerinsky, the man who wrote her constitutional law text

book, filed a notice of appearance on her behalf with the Sixth Circuit for the purpose of being

her "bodyguard," which the Plaintiff documented on her Facebook page, because she was

physically, professionally, and sexually threatened in a federal courthouse in Kentucky, and

threatened with contempt of the Government for repeating the same principles of federal

jurisdiction that Judge McKeague taught her in appellate briefs. Between February of 2014-

October of 2015: The Plaintiff was the victim of the same structural error at issue in *Gonzalez-*

*Lopez* for the previously-described gender-based discrimination, sexual assault-related reasons

and fear.

      346.    Because of the same eating disorder identified in her security clearance

application, the Plaintiff had to have a bone density scan while she was clerking for Judge

Gillmor on Oahu, and she learned that her bones were extremely brittle. As a consequence, she

was prescribed hormonal birth control while she was clerking for Judge Gillmor, and then an

IUD in 2013 when she aged out of birth control, which the Plaintiff discussed with her mother,

who is a nurse, in private Facebook messages. Facebook had to re-brand itself as Meta after it was revealed that it pushed eating disorder-related content onto little girls. Post-*Dobbs*, it turned over private Facebook messages between a mother and daughter in Nebraska so they could be prosecuted over a self-managed abortion.

347.    In *Burwell v. Hobby Lobby*, 573 U.S. 682 (2014), various employers challenged HHS regulations implementing the 2010 Patient Protection Affordable Care Act ("ACA"), which required that non-exempt employers provide coverage for 20 FDA-approved contraceptive methods; specifically including IUD's, on the grounds that doing so violated the RFRA. The Plaintiff read every brief and amicus briefs filed in that case. The arguments set forth in the briefs filed by religious entities, and the various ways that they attempted to get around certifying that they were a religious entity so their female employees could obtain coverage through the alternative mechanism provided for in the ACA disturbing at best. According to those employers, IUD's and other birth control methods are "abortifacients," which contradicts objective medical reality and basic science. An IUD prevents ovulation from taking place entirely, and further provides a hormonal combination and supplement that women like the Plaintiff need. Nevertheless, the Supreme Court held that since corporations are "persons" under its 2010 decision in *Citizens United*, the same corporate "persons" can also have religious beliefs, and the RFRA permits a closely held corporation to deny its employees health coverage for contraceptives.

348.    The same Religious Freedom Restoration Act ("RFRA") that was at issue in *City of Boerne v. Flores*, 521 U.S. 507 (1997) acts as a super-statute that effectively amends every other federal law. Congress's act of mandating strict scrutiny; of essentially, telling the judicial

branch what standard of review to apply, violates separation of powers principles, undercuts the principles of *Marbury v. Madison,* and constitutes gender discrimination in the post-*Dobbs* and post-*Roe v. Wade* era, because the idea that life begins at conception, that a ten year old should be forced to carry her rapist's baby, and that women are inferior are exclusively religious beliefs.

349.    Since the Plaintiff graduated from law school in May of 2005, the RFRA has been weaponized to attack the same women and marginalized groups that the Plaintiff went to law school to advocate on behalf of, and post-*Citizens United*, *Hobby Lobby*, and *Dobbs*, it acts as a de facto constitutional amendment which is both unconstitutional and constitutes gender discrimination. The law is no longer a shield to protect religious people from persecution, which was the original intent and the First Amendment **already** does. The RFRA has been used as a sword to allow religious people and corporations to impose their religious beliefs on others.

350.    In December of 2022, a "pro-life" nurse in Texas who works for the Department of Veterans Affairs ("VA") sued the VA over its policy of performing abortions in the case of rape, incest, or a threat to the life or health of the mother, claiming that it violates her religious beliefs under the RFRA.[78] In April of 2023, the Secretary of Defense testified that Senator Tommy Tuberville is holding up military promotions over the same policy, which is jeopardizing military readiness and is now a threat **to** national security.

351.    These decisions are a threat to the Plaintiff's life and health. Post-*Dobbs*, incorporating the same Religious Freedom Restoration Act into every federal statute is unconstitutional.

---

[78] *See* Pro-Life Nurse Practitioner Sues VA Over Abortion Policy, Religious Liberties (available at: https://nurse.org/articles/nurse-sues-veterans-affairs-abortion-policy/) (last retrieved April 15, 2023).

352. The Declaration of Independence states that all persons are endowed by their Creator with three inalienable rights: life, liberty, and the pursuit of happiness, which are otherwise known as basic human rights. The Fifth Amendment due process clause likewise states that a person shall not be deprived of "life, liberty, or property" without due process of law, which has been further divided into procedural due process and substantive due process. Substantive due process protects certain rights from government interference that are not specifically identified in the Constitution, but courts have identified them as essential to a person's life, including: (a) family autonomy and raising children; (b) the right to marry; and (c) privacy rights.

353. The Ninth Amendment states that the "enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people;" it explicitly recognizes the existence of unenumerated rights outside of those previously conceived of by the Framers and expressly protected by the Bill of Rights. Women are ingrained into the world and workforce, including the military, science and medicine have evolved, and the right to abortion and contraception is protected by the Ninth Amendment.

354. The Plaintiff was and is being denied liberty, the pursuit of happiness in the form of **not** being the same repeated female crime victim, the same romantic relationship with Defendant Priest, a long and happy legal career, and the above-cited decisions are a threat to her life and health. She could die because of someone else's religious beliefs depending upon which state she lives in or travels to. For that reason, what she has suffered through, and the current state of American democracy and public discourse, the same Daughter of the American Revolution and the (literally) the original "patriot" wants to expatriate.

355.    The Plaintiff was constructively employed by the Government, and officers,

agents and employees thereof at all relevant times in the following manner, was never

compensated, and was discriminated against in violation of Title VII. First, she was never

compensated for a law review article that predicted the future to perfection or for a Supreme

Court amicus brief citation that "outed" the same sexual assault and subsequent electronic

stalking victim to a "terrorist." The **only** thing the Plaintiff did between May of 2005-September

of 2011 was collect an extremely monetarily valuable flight record (since 1986), cell phone,

Facebook and email contacts list, which the same multi-billion dollar corporations that contract

with the Government and politicians profited from. After that, the Plaintiff: (a) applied to the

NSA's appellate division in September of 2011, because she had already been vetted and

approved for the top secret security clearance required by the job posting, and she already

believed that Defendant Priest worked for the same agency; (b) her romantic relationship with

Defendant Priest provided "fodder" for someone employed by the Government, including

Defendant Priest, to electronically stalk and terrorize her using what Craig Kobza informed her

in May of 2013 was the exclusively possessed cellular and internet technology of the NSA; (c)

the Plaintiff was appointed by the Sixth Circuit — a government employer — to handle *United

States v. Grooms*, while she was being electronically stalked inside Judge Yates chambers,

downloaded the NSA's Mac Hardening Guidelines for Snow Leopard the same day she printed

off her Supreme Court Bar application, which her own motion to withdraw from was denied, and

her arguments on behalf of herself and **judges** put her personally adverse to the same agency; (d)

the Plaintiff was physically, professionally, and sexually threatened for arguments that she made

in appellate briefs filed with the Sixth Circuit; (e) the Plaintiff sent the FOIA request attached

hereto as **Exhibit C** on February 6, 2014; Judge VanTatenhove issued a decision in the Meade case four days later immediately after the Plaintiff had lunch with Judge McKeague for the last time; (f) the Plaintiff was threatened with rape for publicly posting damages calculations on behalf of specific Justices, herself, current and former law clerks especially female law clerks and federal judges, from her Facebook account in publicly visible posts between March and October of 2015; (g) Judge VanTatenhove deliberately sat on the same motion to withdraw from the Meade case that Judge McKeague **told** the Plaintiff to file in April of 2014 until August-October of 2015 so she could **not** file a complaint for judicial misconduct or a lawsuit, after she had not slept for up to a week at a time for over a year and was suicidal; and (h) the Plaintiff was informed in October of 2015, when the NSA finally responded to her FOIA request after Defendant Priest got engaged to his "current wife" (to quote the PPO), that all of the evidence and documents that she was seeking about herself were "classified" even though the Plaintiff did not **consent** to being part of any classified program.

This was a deliberately coordinated and timed sequence of events, nor was the Plaintiff ever compensated, and she was further harmed because of her gender.

356.    The Plaintiff was further harmed because of a romantic relationship with Defendant Priest, which constitutes gender discrimination. Because he is a man, Defendant Priest was deemed more important and protected. Because she is a woman, the Plaintiff's life meant nothing and she was considered expendable.

357.    The top three books currently being banned are: (1) Kite Runner (Taliban, dystopian, misogyny); (2) 1984 by George Orwell (surveillance state); and (3) Handmaid's Tale (dystopian, misogyny, surveillance state). The Plaintiff would very much like to live in a country

that treats its women better than the Taliban treats women, and where the same female childhood emotional abuse victim that has been flying as an unaccompanied minor from GRR since 1986 doesn't have to put her phone in airplane mode and turn it off, or leave it at home entirely, to prevent herself from being tracked to a healthcare provider.

358.    The Money Laundering Control Act of 1986 was passed the same year Justice Scalia, who was a Fourth Amendment originalist, was nominated to the Supreme Court, Justice Rehnquist was confirmed as Chief Justice, and the Plaintiff began flying as an unaccompanied minor from the same Ford International Airport that nominated Justice Stevens, who Judge Beckwith clerked for and swore Chief Justice Roberts in. In 2008, Professor Barnhizer, who worked at the same Hogan & Hartson that the Plaintiff wanted to work for in 1997, told the Plaintiff that she needed to "launder up" her J.D. by landing a federal clerkship if she wanted to do appellate work and teach constitutional law like Ms. Manheim the same year the Supreme Court decided *United States v. Santos*. In August of 2013, the same *In Re: 9/11 Litigation* lawyer filed *In Re: Meade* in a money laundering case while she was the victim of the same money laundering offenses; that is, surreptitiously stealing and selling the Plaintiff's cell phone, Facebook, and email contacts list is a "financial transaction" or a "monetary transaction" in criminally derived property. In March of 2015, the Plaintiff's cousin informed her that Swiss Re paid the same two billion dollar damages claim that was at issue in the 9/11 Litigation under a reinsurance policy. In 2022, Jared Kushner received two billion dollars for a hedge fund from the same country that was responsible for the events on September 11, 2001, so the parties who were responsible can continue to profit from the destruction of constitutional rights and American democracy.

359.    The Plaintiff met Magistrate Judge Kent at her current place of employment in January of 2023, who took over for Judge Yates as Chief Federal Public Defender, and like the Plaintiff, also has a golden retriever named after Justice Ginsburg. After briefly explaining the threats made in the Meade case and telling him that she "basically wants to sue the entire planet at this point," he laughed and said: "I don't blame you." Perkins Coie's client for purposes of *In Re: 9/11 Litigation* was called Global Insurance; the Plaintiff meant it. She also met a female law clerk recently at her current place of employment who had Judge McKeague for federal jurisdiction and the Plaintiff is certain is equally brilliant. That law clerk is who the Plaintiff is fighting for in this case in addition to herself.

360.    The Plaintiff's religion is kindness, compassion, empathy, tolerance, love, and objectivist philosophy. She is also her father's daughter; she is exactly what he raised, and she made personal, educational, and financial decisions based on Justice Ginsburg's legacy as it related to women's rights, as did numerous other female law clerks and judges, and she incurred significant costs and paid higher taxes as a result thereof. The Government breached each and every reassurance set forth in the Plaintiff's security clearance application and further profited from her.

361.    Since it was all for nothing post-*Dobbs*, the Plaintiff respectfully submits that the Court should craft an appropriate remedy, and she respectfully requests that the Court award all available damages and appropriate injunctive, declaratory, and equitable relief as to the Plaintiff personally, including a declaratory judgment that the RFRA is unconstitutional, and that the right to abortion and contraception is protected by the Ninth Amendment.

## X.    RESTORATION OF GUN RIGHTS — APPLICABLE LAW AND ARGUMENT

The facts in this case are exactly as egregious as stated, and to quote Judge Salas, they are objectively verified by the attached exhibits.

The Plaintiff is a sexual assault victim and electronic stalking victim who was threatened with rape in a Kentucky courthouse, openly threatened and harassed for two years for repeating the same principles of federal jurisdiction that Judge McKeague taught her in appellate briefs, and then further threatened with rape in the manner described in Exhibit B.

And, because of the associated financial liability, her communications with her own judges were cut off.

Nor can the reason the Plaintiff lost her gun rights be separated from her gender and inability to speak. The specific reason the United States was attacked on September 11, 2001 was because the responsible parties hated this country **for** its constitutional rights. As was stated above, the Plaintiff is a friend of every judge and law clerk in the country who would treat her with dignity and respect regardless of her gender. She also should not need to hire a lawyer for being the same, but female, former appellate lawyer to represent her in this case. Her grandfather and father taught the Plaintiff and her stepsister to fight back against bullies and stand up for themselves. In fact, most fathers teach their daughters this principle, but in the Plaintiff's experience, when another man encounters it, it becomes offensive. It can also get a woman killed. Both the Plaintiff's father and Judge McKeague also observed on prior occasions that the Plaintiff is "too smart for her own good" and has a penchant for "attracting trouble," which is rather astonishing to her at this point because of the above-stated wedding-related dream, her

desire to live happily ever after, and most importantly, be left alone. In fact, this has been her only real desire since high school.

## A.    GUN RIGHTS

The Plaintiff went to law school to fight for constitutional rights, to see them expanded under the Fourteenth Amendment, and to see life get better for marginalized groups including women. Notwithstanding that desire, her law review article-Supreme Court amicus brief citation, work on *In Re: 9/11 Litigation*, top secret security clearance application, subsequent clerkships, and acquired knowledge turned her into reflected harm. Taking the cases cited in the same law review article in order, the Supreme Court decided *Employment Division v. Smith*, 494 U.S. 872, in 1990, when the Plaintiff was ten years old, and held that an Oregon law banning the use of peyote was constitutional against a First Amendment challenge. In response to that decision religious groups became concerned that the case would be cited as precedent for further regulation of various religious practices. Between 1992 and 1994, Judge Beckwith graduated from the University of Michigan and clerked on the Seventh Circuit before clerking for Justice Stevens, Justice Roberts served as Deputy Solicitor General, and Congress passed both the Brady Handgun Violence Prevention Act of 1993 and the Religious Freedom "Restoration" Act of 1993 as a means of end-running the Supreme Court's decision in *Employment Division v. Smith* and tried to mandate that strict scrutiny be used in any case burdening the free exercise of religion. In 1995, the Supreme Court decided *United States v. Lopez*, 514 U.S. 549 (1995), which struck down the Gun Free School Zones Act of 1990 because it failed to satisfy the same interstate commerce jurisdictional requirement that was at issue in the Meade case. Gun violence is now the number one cause of death of children.

Two years later, the same year the Plaintiff ran away from home, the Supreme Court

decided *City of Boerne v. Flores*, 521 U.S. 507 (1997). As Justice Stevens observed in that case,

the RFRA is an establishment of religion in violation of the First Amendment. The Plaintiff could

now die because of someone else's religious beliefs

Taking the article section by section and applying it in this case, the title was ***Devising an***

***Appropriate Standard of Review****: An Analysis of Congress's Findings of "Fact" Within the*

*Partial Birth Abortion Ban Act of 2003*. In *Tyler v. Hillsdale County Sheriff's Department*, 775

F.3d 308 (6th Cir. 2014) (2016 WL 4916936), the Sixth Circuit first had to determine what

standard of review to apply to 18 U.S.C. 922(g)(4), which prohibited Mr. Tyler from possessing a

firearm because he had been involuntarily committed after becoming suicidal due to a divorce.

Thus, the Government has always been fully aware of the effects of a romantic relationship on a

person's mental health. In that case, Judge Gibbons, who authored the above-quoted opinion in

*United States v. Llanez-Garcia* stating that an attorney's reputation is her most valuable asset and

was on the panel in *United States v. Grooms,* wrote the lead opinion in *Tyler* and concluded that

"…there is no indication of the continued risk presented by people who were involuntarily

committed many years ago and who have no history of intervening mental illness, criminal

activity, or substance abuse." (*Id.* at 26, 27). Judge McKeague and Judge White wrote separate

concurring opinions. According to Judge McKeague, "mental illness is not static." Consequently,

it cannot be constitutional to permanently prevent someone from exercising his or her 2nd

Amendment right without giving that person an opportunity to show that he or she is no longer

mentally ill. (*Id.* at 28). Finally, the same now-Chief Judge Sutton who wrote a separate

concurring opinion in *United States v. Aleo* explaining the history and purpose of the contempt

statute, concurred in most of the lead opinion but wrote a separate opinion in favor of reversing the law, stating: "Tyler has plausibly alleged that the government's characterization of him is inaccurate, and he is entitled to relief in the absence of contrary evidence about him." (*Id.* at 47). In remanding the case, the Sixth Circuit said that the government could justify the statute's constitutionality by providing additional evidence of the necessity of a lifetime ban, or evidence showing that the statute is constitutional as applied to Mr. Tyler because he would be a risk to himself or to others if allowed to possess a firearm.

## B.    FISA, FOIA, AND THE PRIVACY ACT

In this case, the Government's characterization of the Plaintiff is not only "inaccurate," it was entirely caused by the Government.

First, the Plaintiff's time is valuable and she would have liked to have been informed in 2004-2006 that her career was already over, would ultimately be pointless, and that Justice Roberts' unanimous opinion in *Riley v. California* issued in June of 2014 was already ten years obsolete. The only reason the Plaintiff applied for federal clerkships was for the purpose of pursuing the same constitutional law and appellate practice specialty that Justice Roberts was famous for. However, because she was still a baby lawyer with only four years of experience, she had no idea what or why the Chief Judge on Oahu had to preside over *Gowadia*, or what a Solicitor General, a Supervising Justice, or a Chief Justice is or does yet. The Plaintiff's top secret security clearance application expressly states: "The information you give to us is for the purpose of investigating you for a national security position; **we will protect it from unauthorized disclosure.**" (Emphasis added). When she accepted the position with Judge

Gillmor and relocated to Oahu in August of 2009, the Plaintiff **contractually** relied on this statement as well as: (a) the mental health questions, financial crimes, and statutorily prohibited, technologically committed felonies identified in the application; (b) the reassurances of the Privacy Act information disclosure set forth at the bottom of every page of her top secret security clearance application; and (c) the binding nature of Supreme Court and published circuit court decisions.

Second, the Framers permanently and very deliberately defined Treason inside Article III. The statutory equivalent of treason is espionage, which is otherwise known as "spying," and is what President Nixon was caught doing illegally. Congress enacted FISA in response to the Watergate scandal. The Act states: "there is Federal jurisdiction over an offense under this section if the person committing the offense was an officer or employee of the United States at the time the offense was committed." In terms of civil liability, 50 U.S.C. 1810 states that "an aggrieved person...who has been subjected to electronic surveillance or about whom information obtained by electronic surveillance of such person has been disclosed or used in violation of section 1809 of this title shall have a cause of action against any person who committed such violation and shall be entitled to recover — (a) actual damages, but not less than liquidated damages of $1,000 or $100 per day for each day of violation, whichever is greater; (b) punitive damages; and (c) reasonable attorney fees and other investigation and litigation costs reasonably incurred. The Privacy Act further provides individuals with a means of accessing government records about themselves. The Department of Justice's Overview of the Privacy Act: 2020 Edition states: "[a]gencies should process individuals' access requests for their own records maintained in a system of records under both the Privacy Act and the FOIA, regardless of the

statute(s) cited, and further explains that "a requester is entitled to the combined total of what

both statutes provide."[79] More importantly, 5 U.S.C. 552a(t)(1) states that FOIA exemptions,

including those related to national security and classified documents, cannot defeat Privacy Act

access. Thus, if "John Q. Citizen writes to Agency: Please send to me all records that you have

on me," both the Privacy Act and FOIA apply.[80]

The Plaintiff's February 6, 2014 FOIA request specifically asked for: "All information,

whether of a personal or professional nature, that is or was collected about [the Plaintiff] without

[her] knowledge or consent. In short, [she is] requesting [her] entire government or NSA-

maintained surveillance file…" (emphasis added). This was an **exceptionally** clear request. But,

just in case it was in any way unclear, and given the otherwise fantastical but nevertheless

objectively verifiable series of events set forth in this Complaint, the Plaintiff provided an

extremely detailed explanation of the events beginning in September of 2011, and an even more

detailed list of requests and their associated reasons, including but not limited to:

(a) All documents related to any government access or interception of information or
internet activity conducted on their home or office computers, cell phones, online accounts,
email accounts, electronic communications, and electronic devices…(11) [a]ll records related to
any technique or government program, under which, the psychological, mental, or emotional
control, terrorization, and torture of any American citizen, including Ms. MacPherson, has ever
been authorized, discussed, described, or conducted **for any reason whatsoever**, including for
purposes of protecting the identity or the existence of an undercover government asset or
classified program…(21) All records that set forth the NSA's policy regarding the hiring or
continued employment of individuals who have known mental health issues or suspected mental
illnesses, **or** who have a known or demonstrated obsession, romantic or otherwise, with another
person, **or** who have used NSA or government-owned resources to electronically stalk, harass, or
conduct surveillance on a current or former romantic interest…(22) All records that set forth any

---

[79] *See* Overview of the Privacy Act: 2020 Edition, Individual's Right of Access, A. The Privacy
Act and FOIA (https://www.justice.gov/option/overview-privacy-act-1974-2020-edition/
access#PA&FOIA) (last retrieved January 3, 2023).

[80] *Id.*

exception to the above-described policy, if it exists, that are or have been made for employees who have demonstrated mental health issues or stalking-tendencies, but who are also exceptionally brilliant or of tremendous value to the government or to the Agency.

Page nine of the FOIA request further states: "If this request is denied in whole or in part, please provide the reasons for that denial, pursuant to 5 U.S.C. 552(a)(6)(A)(i). In addition, please release all segregable portions or otherwise exempt material in accordance with 5 U.S.C. 552(b). Furthermore, if any documents responsive to this request are classified, please identify those documents, including a date and document number where possible, so we may begin the process of requesting a Mandatory Declassification Review under the terms of Executive Order 13,526 (2010)...Pursuant to 5 U.S.C. 552(a)(6)(A)(i), we expect a response regarding this request within the twenty working-day statutory time limit." This was also in no way unclear. Nor was the Plaintiff's request for expedited processing and her express statement that the persons responsible posed a direct threat to her life and physical safety unclear. Instead, the NSA waited twenty months until the Plaintiff was barely coherent, unable to write, and suicidal to respond, and informed her that all of the information that she was seeking about herself and her own electronic stalking was classified. But, just like her sexual assault in May of 2005, the Plaintiff never **consented** to being part of any classified program, executive-level discussions, or to quote Mr. Kobza, to Defendant Priest "f—-ing with her head" and using NSA technology to do it.

C.    MONEY LAUNDERING CONTROL ACT OF 1986

Third, the Plaintiff and Defendant Priest were born one year and ten days apart in 1980-1981, the same year and term that now-Chief Justice Roberts started his legal career clerking for then-Associate Justice Rehnquist, who recused himself from the Nixon case. President Nixon was pardoned by President Gerald R. Ford, who has both a Presidential museum and the same international airport (GRR) in Grand Rapids, Michigan that the Plaintiff began flying from in 1986, the same year Congress enacted the Money Laundering Control Act of 1986. Title 18 U.S.C. 1956, states that "whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction, which in fact involves the proceeds of specified unlawful activity…" is guilty of a felony. Section 1961(1) defines "racketeering activity." Racketeering is defined as "any act or threat involving murder, kidnapping…bribery, extortion," or "any act which is indictable under any of the following provisions of title 18, United States Code…section" 1503 (relating to obstruction of justice), section 1511 (relating to obstruction of State or local law enforcement). Title 18 U.S.C. 875(c) addresses interstate communications and states: "Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person…shall be fined under this title or imprisoned not more than five years, or both." This includes a photograph of what appeared to be the Plaintiff with tears in her eyes and duct tape over her mouth as described in **Exhibit C**. If that was done in furtherance of money laundering; specifically, the surreptitious theft of the Plaintiff's entire cell phone, Facebook, email contacts list, and private Facebook and text messages between herself and Defendant Priest between May and September of 2011, it encompasses multiple additional felonies.

1.    **The Plaintiff would never hurt anyone.**

The Plaintiff would never hurt anyone; she is the person who was affirmatively, deliberately, and repeatedly harmed. She is the person who found a photograph of what appeared to be herself with tears in her eyes and duct tape over her mouth in October of 2011. As she stated in her email to Judge McKeague dated February 13, 2014, she is "a yoga-loving-hippie artist who couldn't hurt a fly." However, to fully explain the exact source of the Plaintiff's grief, suicidal thoughts, and her prior Facebook posts expressing her desire for Justice Scalia, Justice Ginsburg, Justice Sotomayor, Justice Kagan, and Justice Roberts to "order up" anyone that has ever lied to or about them or about the Plaintiff in a manner that jeopardized their physical safety and the Plaintiff's, and her own statements that Mr. Priest "should probably kill a few members of the military" at that point:

The Plaintiff is a sexual assault victim who was being threatened with rape.

**Every** decision that she made for her own personal privacy and physical safety as an adult, as a woman, and as a lawyer between May of 2005-September of 2011 was ignored.

Nothing **she** said in the Meade case whether in defense of her client, or in defense of **herself** mattered. Her arguments were twisted, words were put into her mouth, and she was talked over. Nothing the Supreme Court or Sixth Circuit judges said in published decisions mattered. **She** might as well have been invisible.

The only thing the Plaintiff wanted to do was be an appellate lawyer and argue a case before the Supreme Court, which was the only reason she gave up what would by now be a multi-million dollar salary as a partner at Perkins Coie and applied for federal clerkships starting in the Fall of 2008. Every appellate brief that she drafted and filed after September of 2011 was

drafted while she wasn't sleeping for, at first, 1-3 days at a time, which then widened to 2-4 days

when she was being threatened with contempt of the Government. Her briefs, briefs that she

spent hours researching and drafting were ignored or were not delivered to Sixth Circuit judges

as written.

She was then technologically closed out of the Supreme Court in the manner described in

the supplemental brief quoted above.

And, since it was in fact all pointless, the Plaintiff wanted one thing in 2015. She wanted

the same husband, a **really** expensive wedding, a house with a **really** good alarm system, a

puppy, and the same babies that certain politicians are now forcing on women and little girls.

Furthermore, the Plaintiff graduated from Oakridge High School with Joe Thue in 1998,

the same year Daniel Lewin co-founded the largest cloud-computing and content mirroring

company and then named it after the Hawaiian word for "intelligent." Like the Plaintiff, Hawaii

is both beautiful and intelligent. The Plaintiff was required to establish an email address for

purposes of federal financial aid and the FAFSA, katherinelou0311@yahoo.com, which is the

email address listed on the cover of her top secret security clearance application. The password

for that account, and for all of her online accounts including Facebook (established in August of

2006) and Google (established in 2004) was Hawaii00 through 2011. Judge Yates recruited the

Plaintiff to be his first law clerk from Hawaii because her resume and career-related goals

reminded him so much of his and Judge Beckwith's career paths. Defendant Priest had nothing to

do with the Plaintiff's academic credentials, personal and professional relationships, cell phone,

Facebook, and email contacts list, or her flight record. The same law clerk and lawyer who

earned a straight A in contracts, constitutional law I and II, the second highest grade in Judge

McKeague's federal jurisdiction class, and a straight A in anti-trust law after spending weeks studying the same Microsoft case that Justice Roberts was responsible for should also never need to speak about herself in the third-person after being personally attacked by the same Government that she used to work for over legal arguments made in appellate briefs, particularly for repeating the same principles of federal jurisdiction that Judge McKeague taught her. In fact, Congress itself is aware of the financial liability associated with this case, which was the specific reason it enacted the contempt statute two hundred years ago. The Plaintiff should also never need Craig Kobza or his son, Kelly Lovett who is a female former Marine, Lisa Manheim, Erwin Chemerinsky, Judge Yates, Judge Beckwith, or Defendant Priest to physically protect her inside a courtroom.

**2.     Empathy and compassion are the guiding principles of the Plaintiff's life**

The footnotes of the Plaintiff's law review article recounted the heartbreaking stories of women who attempted to speak with members of Congress about the reality of their own pregnancies. Doors were slammed in their faces. No one cared about the health of those women. The Plaintiff is an empath who feels things, including the pain of others, on an extremely deep level, and she has been reading people for physical safety-related reasons since she started flying from GRR as an unaccompanied minor. This is also what makes her so good at her current sales job, and her range on identifying terrible people is expanding. Her Krav Maga instructor worked in security environments and has trained both military and law enforcement. The number one rule in defensive situations preached to women is to trust your institution; however, because male law enforcement officers rarely believe or listen to women, the second rule is to create a crime scene so they can identify the body.

232

Hopefully, it will be your attacker's body, not yours.

In response to Defendant Priest's Facebook note about the killing of Bin Laden in May of 2011, the Plaintiff responded with her own. In it, she explained her general allergy to hypocrisy, but especially when interpreting various constitutional amendments because of the holes that can be exploited by those who are financially so-inclined. Specifically, by: (1) ignoring the fact that establishing justice was so important to the founding fathers that it's one of the first priorities set forth in the Preamble of the Constitution and failing to properly fund the justice system; (2) ignoring what the Founding Fathers sought to escape from and the specific reasons (set forth in the Federalist Papers) that they were so against the establishment of religion that they banned it in the first clause of the First Amendment; (3) pretending that the first clause of the Second Amendment doesn't exist; and (4) ignoring the equal protection clause and the entirety of the Fourth, Fifth, and Fourteenth Amendments as they apply to women. Their conversations led to the Plaintiff agreeing to meet Mr. Priest. In a letter to Justice Roberts dated March 11, 2020, the Plaintiff's birthday, Hawaii Judge Dannenberg resigned his Supreme Court Bar membership due to the same cynicism and selective application of originalism.[81] The Plaintiff also couldn't conceive of a world where anyone would lie to the Justices or federal judges and ignore their Fourth Amendment-related opinions since maintaining privacy physically protects everyone.

In the present case, and notwithstanding **every** decision that the Plaintiff made for her own personal privacy and physical safety as an adult, as a woman, and as a lawyer after she was sexually assaulted in May of 2005, she became an electronic stalking victim in September of

---

[81] *See* Former Judge Resigns From Supreme Court Bar, March 13, 2020 (available at: https://slate.com/news-and-politics/2020/03/judge-james-dannenberg-supreme-court-bar-roberts-letter.html) (last retrieved April 2, 2023).

2011, which resulted in the loss of her job clerking for Judge Yates in May of 2012. She was

offered the opportunity to interview and potentially clerk for Judge Beckwith in November of

2011, but she turned it down based on Defendant Priest's prior statements and reassurances that

he "never intended to disappear from her life forever," and would be back in "four years." She

wouldn't have even been in the same state as him anymore when he filed the PPO that he

perjured himself in back in September of 2016. She was also operating under the assumption

between May of 2014-October of 2015 that her identity in a case would never matter. That she

would never need to explain in a filing directed to Justice Kagan, Justice Ginsburg, or Justice

Sotomayor that: (1) she wrote a law review article that contained a section entitled: In Defense of

the Judiciary between 2003-2005 because she was so appalled that politicians and political

pundits were threatening the lives of federal judges, which resulted in a Supreme Court amicus

brief citation in 2006 that she **wasn't old enough** to understand; (2) she worked on the 9/11

Litigation on behalf of Boeing; (3) she clerked for a federal judge on Oahu and was vetted for a

top secret security clearance between May and August of 2009; (4) she clerked for Judge Yates,

whose ex wife specialized in appellate work for the Public Defender office in Washington D.C.;

and (5) she was now being harmed by the same Government that she used to work for for the

exact same academic credentials and professional qualifications, research and writing abilities,

general intellect, and legal perfectionism that **resulted** in her career offer, top secret security

clearance, and subsequent clerkships for Judge Gillmor and Judge Yates.

Ideally, the Plaintiff wanted to specialize in constitutional law-related appellate work and

eventually become a federal judge just like Judge Beckwith, who was the Plaintiff's hero. In fact,

Michigan Supreme Court Justice Kyra Harris Bolden is 34 years old; nine years younger than the

Plaintiff. However, like Judge McKeague predicted at his investiture, and for the exact reasons, deliberate politicization of the federal judiciary, death threats, and "activist judge" epithet, the Plaintiff would never accept a nomination in today's political environment and she would advise Judge Yates against it for the sake of his daughters.

  3.  **The Plaintiff's relationship with her parents is not the defining relationship**

  When they ran into each other in July of 2021, Judge McKeague asked the Plaintiff "if she was happier now," and if she had ever "fixed her relationship with her parents." Because she is an empath and doesn't like making other people feel uncomfortable, the Plaintiff lied and said "Oh yeah." What the Plaintiff should have said was: "I would be a lot happier if the federal marshals that you sent to Derek's house in April of 2015 had actually done what you told them to do and brought me to Defendant Priest and then to you." When she mentioned the fact that the conservatorship had been terminated, he looked baffled. Her exact thought at that moment was: "Holy —t. He doesn't have any idea what I went through" despite everything set forth in **Exhibit B**. While revising her law review article, the Plaintiff imagined what it would feel like to be one of his family members; to hear him being called an "activist judge" and listen to politicians suggest that murdering judges was an appropriate solution to them doing their jobs objectively. Again, it shouldn't be offensive to find out that the Plaintiff cares about human life.

  The Plaintiff's father, David MacPherson, had her set up a gmail account in 2004, which was by invitation only at the time and he sent her an invitation to do it so he could send her money anonymously while she was in law school without her stepmother finding out. Her graduation "gift" was him "forgiving" what he called a loan of about $4,000. He also thought that her law review article was "the best thing he'd ever read," and he has the same views about

women's rights as the Plaintiff. He was extremely happy when the Plaintiff told him that she was moving back to Michigan in 2010, but to him, emotions are stupid. Everyone the Plaintiff has ever dated has been a "loser." No one is ever good enough for "daddy's girl," but just as bafflingly, he doesn't understand that his exceptionally intelligent daughter might be someone important, or might be extremely important to other people, or might be someone exceptionally rare. When the Plaintiff lost her job clerking for Judge Yates in May of 2012, his response was similar to her sexual assault: "Well, what are you going to do about it? You're not going to let this ruin your career, are you? I can't help you." In 2013, he thought that she should write a book about everything that she had been through up until that point. The whole point of the Plaintiff's legal education and career was that so she would **not** end up like her high school friend Shannon Johnson; so she had the financial means, could own her own home, and be safe; so she wouldn't "need" a man to provide for her financially; so she didn't have to "settle." She finally had that in June of 2011.

The Plaintiff's mother, on the other hand, is extremely kind and compassionate, but she is selfish as her dad repeatedly reminded her. She gave the Plaintiff's father custody when the Plaintiff was three years old, and then he tried to have her visitation revoked later. Between October of 2014 and August of 2016, she was focused on the sale of her house and then her wrist, which she broke in 2015-2016. When the conservatorship happened, the Plaintiff begged her mother to take over. But, because it was easier for her to just let the Plaintiff's father handle it just like it was easier for her to give him custody when she was a small child, she refused. The Plaintiff and her stepmother talk now; however, the Plaintiff will never trust **any** of her parents. She has been on her own her entire life. After the hearing in the Johnson expungement case, the

Plaintiff called her stepmother because she was so angry about the entire situation. Her stepmother has repeatedly encountered the same backstabbing, jealousy, and cattiness exemplified by Shannon Johnson throughout her career, and confirmed that, yes in fact, she wants the Plaintiff to put her fist through the glass ceiling on behalf of both herself and the Plaintiff's twelve year old niece. But, they can't all be in the same room together, and in fact, the Plaintiff's mother and father actually refused to take a picture together with the Plaintiff at her law school graduation.

Because they couldn't see beyond themselves.

However, they do all agree on politics. The Plaintiff's father has stated that what scared him the most about President Trump is that he is "amoral and doesn't have a conscience."

As a result of the above-referenced dysfunction and inability to communicate, the Plaintiff has always had to be the adult and develops pseudo-parents. She has neighbors who are much older than her and love her, she befriended one of Judge McKeague's neighbors in July of 2021, and Judge McKeague was the person who the Plaintiff trusted with her physical safety in 2006, 2008, 2010, February of 2013, and February of 2014. During their conversation in February of 2013, he teased the Plaintiff about her "ever changing hair color," and said that she "always manages to attract losers," when she was discussing Defendant Priest, to which the Plaintiff responded by rolling her eyes and saying: "You sound just like my father." *See* **Exhibit B** at p. 1. But, when the Plaintiff emailed him in October of 2015 about the same "loser" and "criminal" and said: "No really, I agree with you now. He just tried to make me kill myself and I want him prosecuted to the fullest extent," she received no response. Defendant Priest is somehow exactly as important as the Plaintiff previously stated that her communications with

237

her own judges were cut off. The same thing happened in the Meade case when the Government made various accidental admissions in its pleadings. When the Plaintiff said: "I agree with you," which means "I win," the arguments shifted and hers were ignored.

Again, nothing **she** said in that case mattered, whether in defense of Mr. Meade, or in defense of herself. **She** might as well have not existed.

Likewise, while the Plaintiff didn't have enough contacts when she applied to be a financial advisor at Edward Jones pre-9/11, between May of 2005 and September of 2011, she went out into the world and acquired an extremely monetarily valuable cell phone, Facebook, judicial interview, and email contacts list that included her mother's entire family (2004-present), Judge McKeague (2004-2005, 2006, 2008, 2010, 2013, 2014), Judge Suhrheinricht (2005), Justice Kennedy's female law clerk Lisa Manheim (2007-2009), Judge Tallman (2009), then-Chief Judge Gillmor (2009-2010) who the Plaintiff and Ms. Lovett house-sat for, Judge Ezra (2009-2010), all of the law clerks on Hawaii including Magistrate Judge Barry Kurren's daughter Amy Kurren, Judge Yates (2010-2012), Judge Beckwith through Judge Yates (2010-2012), and Defendant Priest (May-September of 2011). She gave up a six figure salary at Perkins Coie, sold most of her belongings, emptied her 401(k) and actually paid tax penalties on it all so she could afford to take the position with Judge Gillmor and relocated away from her mother and brothers in August of 2009. Out of **all** of them, Defendant Priest was the most valuable relationship to her. He was the only person that cared more about her intellect than her physical appearance. He was the **one** person she wanted to take with her. He was the **one** thing that she wanted out of this world.

One would also expect that when the same Daughter of the American Revolution and, quite literally, the original "Patriot" explains to the same National Security Agency that coordinated the communications for the same Navy SEALs that Mr. Kobza's son was a part of that: (1) she received a text message from someone with an Arabic name four months after the capture and execution of Bin Laden while she was standing in a Washington D.C. airport waiting to board a flight back home to Grand Rapids, Michigan, and the same month that she applied to its appellate division; (2) she discovered a photograph of what appeared to be herself with tears and her eyes and duct tape over her mouth in October of 2011 upon logging into the same Facebook account that she established in August of 2006 at the insistence of Mr. Kobza's best friend's son and the Plaintiff's cousin, Justin Lawrence, which was a threat to kidnap or kill her; (3) she was electronically stalked across every electronic device and account because of a romantic relationship with a person who she believed to be a classified individual using a form of all-encompassing technological power that she could not explain; (4) a federal judge **already** deemed those acts "criminal," which they are regardless of the identity of the responsible parties; and (5) he insisted on what resulted in a Secret Service investigation that was deliberately discontinued a few weeks after Snowden came forward without providing her with any answers or information — that it would investigate immediately and act to protect and inform **her** as a matter of national security, because it shouldn't be possible for her physical safety and life to be used as leverage to get to a classified person. Also, because again, the Government has a multi-trillion dollar budget and can afford to pay damages.

**4. If Defendant Priest has some form of immunity then the Plaintiff is automatically entitled to damages**

In a text message in September of 2016, the Plaintiff did in fact say that "her last name better be f-ing changing to Priest soon." This is because her life wasn't supposed to be defined by a man. Accepting a Facebook friend request from him in March of 2010 after the Plaintiff flew from HNL to GRR to interview with Judge McKeague, who she discussed her impending wedding to Mr. Wing with, and further doing so in reliance on Mr. Thue's top secret security clearance, should not have destroyed her life. He actually asked the Plaintiff if she had ever "had to hurt someone intentionally before out loud," which is an admission against interest. Their inside joke and definition of the meaning of the word "jurisdiction" also better **not** have been relevant in the Meade case, but it nevertheless was exactly what the Plaintiff was threatened with. And, while the Plaintiff was never actually married to Defendant Priest, "someone" did a **really** good job of implicating him in everything the Plaintiff suffered through between 2011-2016, and that "someone" continues to do so.

Furthermore, he created the hazard in the form of sending the Plaintiff the above-described Facebook friend request in March of 2010, hurting her "intentionally," failing to respond to her Facebook messages between March and October of 2015, letting her suffer in silence for an entire year, which further resulted in a conservatorship that was an existential threat to the Plaintiff because her **entire** identity as a human being was wrapped up in being the same lawyer who climbed out of her bedroom window to escape from the **same** parental relationship in 1997, became a lawyer, graduated with a published law review article-Supreme Court amicus brief citation, worked on the most famous case in the world, and clerked for two judges. Because he created the hazard, he had a legal duty to rescue the Plaintiff. Most importantly, he profited from "intentionally" hurting the Plaintiff to the point where she nearly

240

committed suicide twice, the second time after he perjured himself in the PPO that he filed in September of 2016.

Finally, at the first hearing regarding Garry Johnson's expungement, the **female** judge asked the Plaintiff to speak, but realized that she knew Shannon Johnson, and unlike Judge VanTatenhove in the Meade case, she recused herself. In the course of that, the Plaintiff asked the **female** prosecutor what to do about Defendant Priest's perjury, and the fact that the acts are still on-going with respect to her cell phone. Her response was that the Plaintiff should go to the FBI.

The same FBI that sponsored her own top secret security clearance.

At the second hearing on March 24, 2023, Shannon and Gary Johnson were present. The **male** prosecutor didn't ask the Plaintiff the right questions, nor did he ask her to read the statement that the first judge had specifically asked her for, and the conviction was expunged. The point of the Plaintiff's speech was that anyone who is a threat to the Plaintiff is a threat to judges. Since the male prosecutor didn't see the "relevance" of the Plaintiff's life as it related to judges **and** their daughters, Garry Johnson is the person who can now own a gun; the man who snapped to violence, screamed obscenities at the Plaintiff, and threw her into a brick wall. His profile is that of the person who doesn't believe in facts and knows nothing about the Constitution, and during the hearing, he claimed that he had since "found God." After the hearing, the Plaintiff sent her high school friend, Derek Foster, who is in the Air Force, a private Facebook message summarizing what she'd been through between 2011-2016 and the hearing, and said: "I get it now why Judge McKeague had a temper and used to micromanage cases."

Professor Barnhizer taught the Plaintiff that *stare decisis* is a binding contract. The Plaintiff made educational and financial decisions in reliance on Justice Ginsburg's legacy as it

related to women's rights and the opinions of the Justices addressing the First, Fourth, Fifth, and

Sixth Amendment, and she incurred significant costs and paid higher taxes as a result thereof.

Despite who she is as a human being; despite the same kindness, compassion, empathy, and

intellect, the exact legal education that resulted in her law review article, and further resulted in

her bar admissions, top secret security clearance, personal and professional relationships and

friendships; the thing that was supposed to make it possible for her to own her own home and be

safe with Mr. Priest in 2011; despite **every** decision that she made for her own personal privacy

and physical safety: None of it mattered. The Plaintiff was being electronically stalked inside

Judge Yates' chambers, **because of** her relationship with Mr. Priest in March-May of 2012, the

same month that she printed off her application to become a member of the Supreme Court Bar.

The article identified above discussing Hawaii Judge Dannenberg's resignation from the

Supreme Court Bar notes that its members are "part of the legal elite."

That certificate is sitting in a frame in the Plaintiff's basement collecting dust and is now

worthless.

The Plaintiff has the same physical appearance and personality-related traits that resulted

in the above-described combination of professional and personal relationships. But, yes, when a

sexual assault victim is threatened with rape to prevent her from speaking; when it turns out that

everything that she suffered through was for nothing; when her communications with her own

judges — judges who she worked incredibly hard to meet and clerk for — are cut off so she can't

seek their help and she is further harmed for even knowing them; when the person who she

loved(s) more than her own life tries to make her kill herself and then minimizes their

relationship and her entire life into nothing in a PPO that he perjured himself in, she does in fact

become suicidal. This should surprise no one. The Plaintiff is also a gifted artist. She should have just met Mr. Priest, the same pothead "loser" in high school, married him then, had babies, and gone to art school for all the good that getting a legal education did her. She would have more rights left than she does now.

## REQUESTED RELIEF

Accordingly, and for the foregoing reasons, the Plaintiff respectfully requests a full accounting, including but not limited to: (a) a refund of everything that she paid in student loan debt between May of 2005 and 2020 since the above-described surveillance practices began in 2004 and she can now be tracked to her own doctor's office; (b) a refund plus compounded interest on her tax liabilities beginning in 2001-2002; (c) the amount that she saved the Government in the Boeing C-17 trial plus compounded interest, the briefing for which was part of her OSCAR clerkship application packet; (d) lost wages and attorney fees based on her salary at Perkins Coie, the fact that she received glowing reviews from everyone that she worked with, she would have made partner there as of 2013 while she was working on the Meade case, she would now be receiving a multi-million dollar salary, and she listened to the advice of Professor Barnhizer, Ms. Manheim, and Judge McKeague when deciding to apply for federal clerkships; (e) lost wages and opportunity costs for turning down the opportunity to clerk for Judge Beckwith in Washington D.C. in November of 2011 based on Defendant Priest's four year reassurances, how mad he got at her when she told him that she wanted to run away to D.C. and had applied to the NSA's appellate division, and the perjury set forth in the PPO that he filed in September of 2016; (f) unpaid costs and attorney fees for the Meade, Jones, and Grooms cases; (g) compensation for extreme emotional distress to the point of near-suicide twice; (h)

appreciation on 940 Pennoyer Avenue, which she purchased for $74,500 and was forced to sell in November of 2012; (i) compensation for the extreme emotional distress associated with being sexually assaulted after graduating from law school, being electronically stalked and losing her job with Judge Yates for that reason, being physically, professionally, and sexually threatened in a federal courthouse in Kentucky, and then threatened with rape for speaking about threats to her own physical safety and that of judges; (j) extreme emotional distress for being funneled back to the same childhood parental relationship that she climbed out of her bedroom window to escape from in 1997, and living under a conservatorship controlled by her father from September of 2016 through October of 2019; (k) all damages to which she is entitled under 42 U.S.C. 1983 and 50 U.S.C. 1801-1809, including $100 per day from at least September of 2011 through the date of such an award; and (j) an equally staggering amount in punitive damages since the Government is aware of the fact that sleep deprivation is a prohibited form of torture, the Plaintiff can no longer fall or stay asleep without a prescription medication, and she has to essentially poison herself to be able to write.

The Plaintiff further and respectfully requests that: (1) her gun rights be restored; (2) the Court enter an order to protect the Plaintiff, and order the Government to collect and turn over **all** information in its possession about her and Defendant Priest, regardless of classification level, since the Plaintiff was already vetted for a top secret security clearance for purposes of a "national security position" as is stated in her application, it is information about herself, and she has a right to it; (3) that the Court order a full criminal investigation; (4) that it consolidate this case with the letter of appeal that she sent to the Social Security Administration in February of 2023 since she had to put a hard block on her credit report and banking information, her social

security number, birthday, and prior home address in Grand Haven is available on the dark web,

she can't file her own taxes, and she can't wait for an adjudication there if she is in danger; and

(5) all available injunctive, declaratory, and equitable relief based on Counts I-3 and the claims

set forth herein.

Respectfully submitted,

4.19.2023

s/Katherine L. MacPherson [Lawrence] P-69159
943 Pennoyer Ave.
Grand Haven, MI 49417
Ph: 616.550.0822